**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| ROYALTY CLEARINGHOUSE, LTD, | § | |
| Plaintiff, | § | |
| V. | § | |
| | § | |
| CTS PROPERTIES, LTD., CTS | § | A-16-CV-1342-LY-ML |
| MANAGEMENT, LLC, SCOTT Y. | § | |
| WOOD, AND TANA R. WOOD, | § | |
| Defendants. | § | |

**REPORT AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

Before the court are Defendant Tana R. Wood's Motion to Dismiss [Dkt. #12] filed January 31, 2017; Plaintiff's Opposition to Tana R. Wood's Motion to Dismiss [Dkt. #17] filed February 13, 2017; Defendant Tana R. Wood's Reply in Support of Motion to Dismiss [Dkt. #22] filed February 21, 2017; Defendants' Motion to Dismiss [Dkt. #13] filed February 1, 2017; Plaintiff's Opposition to the CTS Defendants' Motion to Dismiss [Dkt. #18] filed February 14, 2017; and Defendants' Reply in Support of Motion to Dismiss [Dkt. #21] filed February 21, 2017. The motions and related briefings were referred to the undersigned for a Report and Recommendation as to the merits by United States District Judge Lee Yeakel pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72, and Rule 1(d) of the Local Rules of the United States District Court for the Western District of Texas.  Upon careful consideration of the motions, the briefing, and the relevant case law, the undersigned issues the following report and recommendation to the District Judge.

1

## I.   BACKGROUND

This case is about alleged financial fraud. In short, Plaintiff Royalty Clearinghouse, Ltd. ("RCH") alleges that Defendant Scott Y. Wood ("Mr. Wood") orchestrated a complex scheme to defraud RCH into purchasing certain mineral assets. RCH, a Texas limited partnership and a successor-in-interest to RCPTX, Ltd., purchases oil and gas interests. Mr. Wood owns several entities, including Defendant CTS Properties, Ltd. ("CTS"), a limited partnership, and ERG Resources LLC ("ERG"). Defendant CTS Management, LLC ("CTS Management") is the general partner of CTS. At times relevant to this lawsuit, Mr. Wood co-owned these companies with his now former wife, Defendant Tana R. Wood ("Ms. Wood"). RCH brings claims against Defendants Mr. Wood, CTS, and CTS Management (together, the "CTS Defendants") for federal securities fraud, breach of contract, and common law fraud. RCH also brings an equitable claim for money had and received against the CTS Defendants and Ms. Wood.[1] The CTS Defendants and Ms. Wood have each filed motions to dismiss RCH's claims against them. The following facts and allegations are taken from RCH's Complaint [Dkt. #1] and assumed to be true unless otherwise noted.[2]

In the summer of 2013, Mr. Wood learned that a Chinese company, Goldleaf Jewelry Co. ("Goldleaf") was interested in purchasing ERG, a company he co-owned with his then-wife, Ms. Wood for around $300 million. (Dkt. #1 at ¶¶ 6, 37, 119–136). While Mr. and Ms. Wood were equal shareholders in ERG, Mr. Wood operated it. (*Id.* ¶ 37). At this time, Mr. Wood was in the

---

[1] In this Report and Recommendation, "Defendants" refers to the CTS Defendants and Ms. Wood collectively.

[2] The Court treats the facts and allegations contained in BIP's Complaint as true for the purpose of assessing the merits of BRT's Motion to Dismiss under well-established principles of law that govern motions under Rule 12(b)(6). *See Clemens v. McNamee*, 615 F.3d 374, 378 (5th Cir. 2010). Accordingly, the facts are stated in the light most favorable to RCH. When "faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Although, in the interest of brevity, every allegation in the Complaint is not recounted here, the Magistrate Court is mindful of its duty to consider "the complaint in its entirety," and has done so. *Id.*

midst of divorce proceedings with Ms. Wood. (*Id.* ¶¶ 6, 29). If the divorce did not settle prior to Goldleaf's purchase of ERG, then Ms. Wood would be entitled to approximately $150 million as a co-equal shareholder in ERG. (*Id.* ¶ 128). RCH contends that Mr. Wood's alleged fraudulent scheme was devised to avoid this outcome. RCH's factual allegations explain how it arrives at this conclusion as follows:

A few years earlier, in July 2010, ERG had purchased oil and gas interests in the Cat Canyon Field in California (the "Royalty Interests"). (*Id.* ¶ 36). On or about July 26, 2010, shortly after ERG bought the Royalty Interests, Mr. Wood had ERG transfer them to CTS. (*Id.* ¶ 38). CTS is a limited partnership that originally had three partners—two limited partners (Mr. Wood and Ms. Wood) and one general partner (CTS Management). (*Id.* ¶ 40). As limited partners, Mr. Wood and Ms. Wood each owned 49.5% of CTS. (*Id.* ¶ 41). As the general partner, CTS Management owned the remaining 1%, but Mr. Wood and Ms. Wood each owned 50% of CTS Management. (*Id.* ¶ 42). In other words, Mr. Wood and Ms. Wood were equal owners of CTS and as a result, the Royalty Interests. (*Id.* ¶ 43).

From 2010 through 2012, ERG produced oil and gas from the Cat Canyon Field. (*Id.* ¶ 43). The Cat Canyon Field was profitable for ERG and thus the Royalty Interests were valuable to CTS. (*Id.* ¶ 45).

Around December 20, 2012, Mr. Wood filed for divorce from Ms. Wood (the "Wood Divorce"), in the 264th District Court of Harris County, Texas (the "Divorce Court"). (*Id.* ¶ 46). About a month later, on or about January 24, 2013, ERG signed a loan agreement and deed of trust (together, the "Original Credit Agreement") with a consortium of lenders led by CLMG Corporation (collectively, the "Bank"). (*Id.* ¶ 47). Because the Original Credit Agreement extended up to $350 million in loans, the Bank required ERG to pledge collateral as security for

the debt. (*Id.*). ERG pledged both its current property and any future property it might acquire as collateral under the Original Credit Agreement. (*Id.*). Specifically, ERG agreed that:

> Mortgagor [ERG] hereby grants to Agent [the Bank] . . . a security interest in the entire interest of the Mortgagor (whether now owned or hereafter acquired by Mortgagor in any and all . . . documents, money, instruments, . . . investment property, . . . contract rights, and all rights and privileges with respect thereto.

(Dkt. #13-1 at 8–9).

This clause, referred to herein as the "After-Acquired Title Clause" is not uncommon in commercial loans. (Dkt. #1 at ¶ 50).

Because Mr. Wood controlled the family companies, including CTS and ERG, Ms. Wood filed a Motion for Temporary Order that sought the Divorce Court's help to ensure that Mr. Wood did not conceal or transfer marital assets. (*Id.* ¶ 51). Around May 30, 2013, the Divorce Court held a hearing on this motion at which RCH states on "information and belief," Mr. Wood represented—either affirmatively or through omission—that he had not unlawfully transferred assets or wrongfully encumbered them. (*Id.* ¶ 53). Around June 6, 2015, the Divorce Court granted Ms. Wood's request and entered an injunction (the "Divorce Injunction"), effective immediately, prohibiting Mr. Wood from:

> [d]estroying removing, concealing, encumbering, transferring, or otherwise harming or reducing the value of the property of one or both of the parties[;] [f]alsifying any writing or record relating to the property of either party[; or] [s]elling, transferring, assigning, mortgaging, encumbering, or in any other manner alienating any of the property of [Mr. Wood] or [Ms. Wood], whether personalty or realty, and whether separate or community, except as specifically authorized by this order.

(*Id.* ¶ 54).

RCH states that the Divorce Court filings make clear that Mr. Wood's defense in the divorce was that ERG had little value because its assets were worth barely more than its debts. (*Id.* ¶ 55). If this were true, then, Ms. Wood would only be entitled to half of ERG's limited

value. (*Id.* ¶ 56). CTS' Royalty Interests, however, presented a problem for Mr. Wood because they remained valuable and free and clear of ERG's debts. (*Id.* ¶ 57). As RCH explains it, because Ms. Wood was an equal shareholder in CTS, if she knew her 50% stake in the Royalty Interests remained valuable, she would not believe Mr. Wood's claim that their marital estate had little value, which would in turn prolong the divorce settlement and jeopardize Mr. Wood's ability to claim 100% of the proceeds from the Goldleaf sale. (*Id.* ¶ 57). RCH pleads that "[k]nowing that the Original Credit Agreement contained an after-acquired title clause, and intending to prevent Ms. Wood from obtaining one-half of the Royalty Interests, Mr. Wood intentionally encumbered CTS'[] Royalty Interests with ERG's debt." (*Id.* ¶ 58.) Through two property transfers in August 2013, Mr. Wood caused CTS to transfer the Royalty Interests to ERG (the "CTS-to-ERG Transfers"). (*Id.* ¶ 59).

With this assignment, CTS' Royalty Interests became encumbered by ERG's bank debt of approximately $300 million via the After-Acquired Title Clause in the Original Credit Agreement. (*Id.* ¶ 58). This assignment also allowed Mr. Wood to represent to the Divorce Court that the Woods' family-owned oil and gas interests were largely encumbered by debt. (*Id.* ¶¶ 58–66). This assignment, however, ostensibly occurred two months after the Divorce Injunction—which prohibited the Woods from transferring marital assets or encumbering them with debt—went into effect. (*Id.* ¶¶ 51–65). While the CTS-to-ERG Transfers were executed in August 2013, their effective date was given as June 1, 2013—i.e., five days before the Divorce Injunction was entered. (*Id.* ¶ 62).

On December 27, 2013, Mr. Wood and Ms. Wood agreed to settle the Wood Divorce, entering an Agreement Incident to Divorce (the "Divorce Settlement"). (*Id.* ¶ 67). Under the

Divorce Settlement, Ms. Wood agreed to transfer her ownership interest in CTS and ERG to Mr. Wood and Mr. Wood agreed to pay Ms. Wood a large cash payment. (*Id.* ¶ 68).

To pay Ms. Wood the amount they settled for, Mr. Wood needed to raise cash, so he engaged an oil and gas broker on behalf of CTS to market the Royalty Interests for sale. (*Id.* ¶¶ 69, 71). On January 16, 2014, after receiving and reviewing the broker's offer package, RCH offered $17.5 million for 100% of the Royalty Interests. (*Id.* ¶¶ 73–75). That same day, Doug Lacey ("Lacey")—a landman for both ERG and CTS—represented in writing to RCH that CTS has clean title to the Royalty Interests, stating: "We have a title book for each tract containing a run sheet from patent to current plus recorded copies to the conveyances to CTS out of ERG at the time we purchased the property." (*Id.* ¶ 76). The next day, Lacey repeated these oral representations and provided RCH with documents to support this representation that CTS had clean title. (*Id.* ¶¶ 77–79). RCH also notes that in its initial offer letter it twice referenced Mr. Wood as the owner of the Royalty Interests. (*Id.* ¶ 91).

On January 17, 2014, RCH representatives met in person with Mr. Wood, Lacey and others to essentially seal the deal. (*Id.* ¶ 81). At this meeting, Mr. Wood attested to the value of the Royalty Interests and represented that he had to sell the Royalty Interests because of the cash payment needed for his divorce. (*Id.* ¶¶ 84–85). He also insisted that the deal be completed and funded by January 31, 2014, creating an abbreviated window for RCH to conduct due diligence. (*Id.* ¶ 84) RCH notes that it left the meeting feeling comfortable that this was a "bona fide offer of valuable oil and gas interests" and feeling like its questions regarding legal title to the Royalty Interests had been answered by both Mr. Wood's representations at the meeting and those of his agents prior to the meeting. (*Id.* ¶ 89). For example, in the January 17, 2014 meeting, Mr. Wood

explained "in great detail" that he had worked with Chevron for years to purchase its interest in the Cat Canyon field. (*Id.* ¶ 93).

After the January 17, 2014 meeting, the parties insisted on two changes to the draft purchase agreement. (*Id.* ¶ 94). First, CTS' marketing agent for the Royalty Interests notified RCH that the "wiring instructions" for the $500,000 option payment should be "[c]hange[d] . . . to ERG" even though CTS owned the bank account where the payment would be wired. (*Id.* ¶ 95). Second, RCH insisted that the draft purchase agreement contain a representation by Mr. Wood that he did not need the Divorce Court or Ms. Wood's approval to sell the Royalty Interests to RCH. (*Id.* ¶ 96). Mr. Wood agreed to make this representation. (*Id.* ¶ 97). On January 20, 2014, CTS and RCH signed an offer to purchase the Royalty Interests (the "Purchase Agreement") which contained that following representation:

> SELLER [CTS] warrants and represents unto BUYER [RCH] that there are no Temporary or Permanent Orders entered in the divorce proceedings between Tana Wood and Scott Wood which require (i) an Order from the Court having jurisdiction of the divorce proceedings approving the sale of the Interests to BUYER or (ii) approval of Tana Wood, to such sale.

(*Id.* ¶ 99).

The Purchase Agreement further provided that "a breach of [this] representation and warranty shall constitute a failure of title." (*Id.*). The Purchase Agreement was structured such that an immediate option fee of $500,000 was to be paid followed by the $17 million balance by January 29, 2014. (*Id.* ¶¶ 99–100). After paying the option fee on January 21, 2014, RCH continued to conduct its diligence. (*Id.* ¶ 104). As part of its due diligence, RCH learned that CTS had previously assigned the Royalty Interests to ERG via the CTS-to ERG Transfers and thus CTS did not own title to them free and clear. (*Id.* ¶ 105).

Upon learning this, RCH representatives initiated a call with Lacey to inform him that ERG, not CTS, owned the Royalty Interests. (*Id.* ¶ 107). Lacey first responded that he was

"shocked." (*Id.*). He then acknowledged, however, that he knew of the CTS-to-ERG Transfers but said it was an "administrative error" that "should have already been taken care of." (*Id.*). Lacey then promised RCH: "We'll get it fixed." (*Id.*).

On January 25, 2014, RCH formally notified CTS of a "complete failure of title" because of the CTS-to-ERG Transfers" and suggested that the title problem could be cured by a "properly executed Assignment [of the Royalty Interests] from ERG to CTS" prior to closing. (*Id.* ¶ 109). On January 27 and 28, 2014, Lacey provided RCH with draft assignments designed to undo the CTS-to-ERG Transfers and transfer the Royalty Interests back to CTS (the "ERG-to-CTS Transfers"). (*Id.* ¶ 111). At no time did anyone from CTS inform RCH of ERG's Original Credit Agreement containing the After-Acquired Title Provision. (*Id.* ¶ 112).

Believing that the ERG-to-CTS Transfers would cure the complete failure of title it had identified in its due diligence, RCH agreed to close on the transaction once the ERG-to-CTS Transfers were completed and filed. (*Id.* ¶ 113). On January 29, 2014, RCH transferred the $17 million balance to CTS and completed its purchase of the Royalty Interests pursuant to the Purchase Agreement. (*Id.* ¶ 117). On February 7, 2014, a filing company recorded CTS' transfer of the Royalty Interests to RCH with an effective date of February 1, 2014 (the "CTS-to-RCH Transfers"). (*Id.* ¶ 122). In the CTS-to-RCH Transfers, CTS again represented that it had good title to the Royalty Interests: "Assignor [CTS] does hereby warrant and agree to defend the title to the Assigned Interests [the Royalty Interests" against and all persons whomever lawfully claim the same or any part thereof by, through or under Assignor, but not otherwise." (*Id.* ¶ 123).

The Woods subsequently finalized their divorce on February 6, 2014. (*Id.* ¶ 120). On February 17, 2014, the Wall Street Journal and other media outlets reported that Goldleaf had agreed to purchase ERG for around $665 million (the "Goldleaf Transaction"). (*Id.* ¶ 124). RCH

8

states that sworn testimony by Kelly Plato, ERG's Chief Financial Officer, shows that ERG was introduced to Goldleaf in the late summer of 2013. (*Id.* ¶ 126). In other words, around the time of the Divorce Injunction and the CTS-to-ERG Transfers, Mr. Wood knew that Goldleaf was interested in purchasing ERG for tens of millions of dollars more than ERG's debt to the Bank. (*Id.* ¶ 126). Despite this knowledge, Mr. Wood did not disclose this offer or the negotiations to the Divorce Court. (*Id.* ¶ 127).

Believing the Goldleaf Transaction to be proof of fraud on the Divorce Court, Ms. Wood filed a motion for New Trial in the Wood Divorce on March 5, 2014. (*Id.* ¶¶ 129–30).   In her affidavit supporting this motion, Ms. Wood stated that Mr. Wood defrauded her and the Divorce Court by undervaluing ERG and failing to disclose the Goldleaf Transaction. (*Id.* ¶ 130). On April 29, 2014, Ms. Wood filed a Motion for Dismissal with Prejudice that abandoned her right to seek a new trial in the Wood Divorce, which the Divorce Court granted on April 29, 2014. (*Id.* ¶¶ 131–32). RCH states that "[u]pon information and belief, Ms. Wood dismissed her [m]otion . . . for additional payments of cash . . . from Mr. Wood." (*Id.* ¶133).

Still unaware of the After-Acquired Title Provision, RCH did not think the Goldleaf Transaction did or would have any effect of its purchase of the Royalty Interests. Indeed, it continued to be paid royalties from the Royalty Interests through 2014. (*Id.* ¶ 136). According to RCH, if Mr. Wood's scheme had gone according to plan, then the Goldleaf Transaction never would have affected RCH's claim to the Royalty Interests. To wit, RCH maintains that Mr. Wood knew the Royalty Interests were encumbered by ERG's debt to the Bank at the time he commenced negotiations to sell them, but that he believed that CTS' title to the Royalty Interests would only be questioned in the event that the bank sought to enforce its rights under the Original Credit Agreement. (*Id.* ¶135). If the Goldleaf Transaction went forward as planned, Mr.

Wood could use the proceeds from the Goldleaf Transaction to repay the Bank in full, thereby extinguishing its liens against the Royalty Interests and clearing RCH's title claim to them. (*Id.*).

Mr. Wood's plan came crashing down early in 2015 when the Goldleaf Transaction was vetoed by the U.S. Government due to national security concerns. (*Id.* ¶¶ 137–38). Without the money from the Goldleaf Transaction, ERG did not have enough cash to pay the Bank. (*Id.* ¶ 139). On April 15, 2015, then, the Bank sued ERG in the Superior Court of Santa Barbara County, California (the "Foreclosure Lawsuit") seeking (1) the recovery of ERG's assets through a judicial foreclosure, and (2) the appointment of a receiver to sell ERG's assets and repay its debts. (*Id.* ¶ 140). The Bank named RCH as a defendant in the Foreclosure Lawsuit, alleging that the Royalty Interests were encumbered and that CTS had no right to sell them. (*Id.* ¶¶ 141–44). Between April and October 2015, CTS, through its agents, communicated to RCH that the Bank's inclusion of RCH in the Foreclosure Lawsuit was essentially a misunderstanding. (*Id.* ¶ 146). Throughout this time, RCH's representatives mostly spoke with Lacey, but they believed he was communicating to and on behalf of Mr. Wood. (*Id.* ¶ 145). In an April 28, 2015 phone call to RCH, Lacey stated that "Scott [Wood] is aware that bad title would effectively require him to pay back" millions to RCH so he is "motivated" to get the Bank to release the Royalty Interests to RCH. (*Id.* ¶ 152). On April 29, 2015, RCH representatives requested that Lacey provide written confirmation between CTS, ERG, and the Bank that the Royalty interests were not pledged as collateral to secure ERG's debt to the Bank. (*Id.* ¶¶ 153–54).

Shortly after the Foreclosure Lawsuit was initiated, the Bank began negotiating with Mr. Wood over whether to put ERG into bankruptcy. (*Id.* ¶ 156). Mr. Wood initially refused because he had executed a personal guaranty of ERG's debt. (*Id.* ¶ 156). On April 30, 2015, however,

after receiving a partial release of his personal guaranty to the Bank, ERG filed for bankruptcy in the Northern District of Texas (the "ERG Bankruptcy Case"). (*Id.* ¶ 159).

After the ERG Bankruptcy Case was filed, RCH continued to work with Lacey to investigate whether the Bank had a valid claim to the Royalty Interests. (*Id.* ¶ 160). In a May 12, 2015 email from Lacey to RCH, Lacey stated that in all of CTS' negotiations with the Bank, "it has always been understood that the CTS [Royalty Interests] were not mortgaged." (*Id.* ¶ 161). In the same email, he also acknowledged, however, that the Bank "might argue" that the CTS-to-ERG Transfers "triggered the after acquired title provision in the [Deed of Trust]." (*Id.* ¶ 162). In response, on May 14, 2015, RCH again requested that Lacey provide written confirmation of his representation that "it was always understood" that CTS' Royalty Interests were not mortgaged. (*Id.* ¶ 163). Lacey demurred, stating that ERG's bankruptcy counsel would need to approve sending any documents. (*Id.* ¶ 164). On July 1, 2015, ERG's bankruptcy counsel finally provided RCH all the documents that Lacey could find to support Mr. Wood and CTS' claim that the Bank consented to the ERG-to-CTS Transfers. (*Id.* ¶ 168). In all, the bankruptcy counsel provided fourteen documents—all of which were publicly available, and all of which RCH already had in its possession. (*Id.* ¶ 169). None of these documents showed that the Bank consented to the CTS-to-ERG Transfers. (*Id.* ¶ 173).

By August and September 2015, the Bank informed RCH that it owned the Royalty Interests, relaying its position as follow: it believed that prior to the CTS-to-ERG Transfers, the Royalty Interests were not collateral for ERG's debts; these Transfers, however, made the Royalty Interests the Bank's collateral because it made the after-acquired collateral pursuant to the Original Credit Agreement. (*Id.* ¶ 175). The Bank also stated that because Mr. Wood had told the Bank that its officers knew of, and consented to, the CTS-to-ERG Transfers, the Bank's

lawyers were investigating Mr. Wood's explanation. (*Id.* ¶ 175). In its investigation, the Bank did not find any documents—email, voicemail or otherwise—to support Mr. Wood's claim. (*Id.* ¶ 178). The Bank had asked Mr. Wood for "anything at all" that would support his claim, but nothing was produced. An interview with the Bank loan officers who oversaw ERG's loans confirmed that they had never agreed to the CTS-to-ERG Transfers. (*Id.* ¶ 180).

On a September 25, 2015 phone call between RCH and Mr. Wood's respective bankruptcy counsel, Mr. Wood's counsel stated that Mr. Wood had asked the Bank to release its lien on the Royalty Interests because "it is at best after-acquired property and it's just not fair." (*Id.* ¶ 176). On October 23, 2015, RCH representatives participated in a phone call with Lacey, Mr. Wood and their lawyers in which Mr. Wood's lawyer acknowledged that the Royalty Interests were "probably after acquired" collateral for ERG's debt to the Bank; Mr. Wood stated that he had no documents supporting his claim that the Bank consented to the transfer but that the Bank's lawyer had confirmed to Mr. Wood's personal lawyer that the Bank "knew" that Royalty Interests were not pledged as collateral. (*Id.* ¶¶ 182– 91). Mr. Wood also stated that the CTS-to-ERG Transfers had been a "bookkeeping entry between affiliates" so he had instructed "his guys" to not put the Royalty Interests on any reserve reports to the Bank. (*Id.* ¶ 191). The CTS-to-ERG Transfers, however, were not merely a bookkeeping entry: they were filed with, and recorded by, Santa Barbara County. (*Id.* ¶ 193). Mr. Wood's statement was also in opposition to a prior representation made by Lacey—according to RCH, under instructions from Mr. Wood—that the CTS-to-ERG Transfer was to improve ERG's reserve report with the Bank. (*Id.* ¶ 194).

Based on the information supplied in the October 23, 2015 phone call, RCH realized that the Bank had superior title to the Royalty Interests based on the after acquired title provision. 195. RCH then negotiated a settlement with the Bank for $700,000. (*Id.* ¶ 196).

RCH now brings this lawsuit against Defendants alleging that it was defrauded by Mr. Wood and CTS' representations and omissions regarding CTS' title to the Royalty Interests. It seeks money damages equal to the greater of $17.5 million or the benefit-of-the-bargain lost because of Defendants' conduct; recovery of all money that in equity and good conscience belongs to it; exemplary damages; attorney's fees; and pre-and post-judgment interest.

## II.   LEGAL STANDARD

Rule 12(b)(6) provides for dismissal of an action for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is said to be plausible if the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Plausibility will not be found where the claim alleged in the complaint is based solely on legal conclusions, or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Nor will plausibility be found where the complaint "pleads facts that are merely consistent with a defendant's liability" or where the complaint is made up of "'naked assertions devoid of further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557)). Plausibility, not sheer possibility or even conceivability, is required to survive a Rule 12(b)(6) motion to dismiss. *Twombly*, 550 U.S. at 556–557; *Iqbal*, 556 U.S. at 678–79.

In considering a Rule 12(b)(6) motion to dismiss, all well pleaded facts are to be taken as true, and viewed in the light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). But, as it is only facts that must be taken as true, the court may "begin by identifying the pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. It is only then that the court can view the well pleaded facts, "assume their veracity and [ ] determine whether they plausibly give rise to an entitlement to relief." *Id.*

## III.   ANALYSIS

RCH brings a private federal securities fraud action cause of action, breach of contract, and common law fraud against the CTS Defendants. In addition, RCH brings a claim for money had and received against both the CTS Defendants and Ms. Wood. The undersigned takes up each claim in turn.

### A.   Violation of the Federal Securities Laws

RCH brings a federal securities law action pursuant to 15 U.S.C. § 78j and 17 C.F.R. § 240.10b-5 against the CTS Defendants. In their Motion to Dismiss, the CTS Defendants contend that RCH's 39-page complaint falls short of meeting the Private Securities Litigation Reform Act ("PSLRA")'s heightened pleading standard and in the alternative, is timed-barred. The undersigned disagrees on both accounts.

Section 10(b) of the Securities Exchange Act of 1934 empowers the SEC to promulgate rules to prevent manipulative or deceptive practices in the sale or purchase of securities. 15 U.S.C. § 78j(b). Under this grant of authority, the SEC issued Rule 10b-5, which makes it unlawful:

(a) To employ any device, scheme, or artifice to defraud,

    (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstance under which they were made, not mislead.

    (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

The Fifth Circuit has held the elements of a claim under § 10(b) are: (1) a misrepresentation or omission; (2) of a material fact; (3) in connection with the purchase or sale of a security; (4) scienter by the defendant; (5) justifiable reliance by the plaintiff; (6) damages; and (7) proximate cause. *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 865 (5th Cir. 2003). To establish scienter, a plaintiff must show the defendant intended to deceive, defraud, or manipulate, or that the defendant acted with severe recklessness. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 251 (5th Cir. 2009). Severe recklessness is limited to "highly unreasonable omissions or misrepresentations" involving an "extreme departure from the standards of ordinary care." *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 408 (5th Cir. 2001).

Both Federal Rule of Civil Procedure 9(b) and the PSLRA impose a heightened pleading requirement on § 10(b) claims. FED. R. CIV. P. 9(b); 15 U.S.C. § 78u-4(b). Rule 9(b) requires plaintiffs alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). In order to avoid dismissal under Rule 9(b) for lack of particularity, the Fifth Circuit has held a plaintiff must:

    (1) specify each statement alleged to have been misleading, i.e., contended to be fraudulent;
    (2) identify the speaker;
    (3) state where and when the statement was made;
    (4) plead with particularity the contents of the false representations;
    (5) plead with particularity what the person making the misrepresentation obtained thereby; and
    (6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.

*Rosenzweig*, 332 F.3d at 866.

The PSLRA dictates a more rigorous pleading standard for private securities fraud actions in two ways. First, in any such action alleging the defendant made an untrue statement of material fact or a misleading omission:

> [T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b). Second, for claims under which the plaintiff must prove a particular state of mind to recover:

> [T]he complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

*Id.* (emphasis added). Based on the elements of a § 10(b) claim described above, it is clear that § 10(b) claims are subject to both of these requirements of the PSLRA.

In addition, the United States Supreme Court has outlined a framework for courts to use in analyzing motions to dismiss § 10(b) complaints for failing to establish a "strong inference" of scienter. *See Tellabs*, 551 U.S. at 322-23. First, as in any other motion to dismiss, the court accepts all factual allegations in the complaint as true. Second, the court considers the entire complaint, other sources typically examined in a 12(b)(6) motion, sources incorporated by reference into the complaint, and matters of which a court may take judicial notice. Third, in determining whether the pleaded facts give rise to a "strong" inference of scienter, as required by the PSLRA, a court should consider all of the facts alleged, taken collectively, and should also take into account plausible opposing inferences. *Id.* "A district court may best make sense of scienter allegations by first looking to the contribution of each individual allegation to a strong inference of scienter, especially in a complicated case. . . ." *Owens v. Jastrow*, 789 F.3d 529, 537

(5th Cir. 2015). "As a matter of efficiency, if any single allegation, standing alone, create[s] a strong inference of scienter, the court [does] not need to consider additional allegations of scienter." *Id.* If analyzing each allegation alone does not support a strong inference of scienter, "the court must follow this initial step with a holistic look at all the scienter allegations," or may assess the allegations holistically, without first engaging in an allegation-by-allegation analysis. *Id.*

The scienter inference need not be irrefutable, nor even the most compelling of all competing inferences, but must be strong in light of other inferences. *Tellabs*, 551 U.S. at 324. Ultimately, a complaint will only survive if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

The CTS Defendants raise two general challenges to RCH's federal securities law claim: (1) it is barred by the applicable two year statute of limitations and (2) the allegations fail to meet the heightened pleading requirements.[3] The undersigned takes up each argument in turn.

1. *PSLRA and Rule 9(b) Heightened Pleading Requirements*

i.   Material Misrepresentations

To survive a motion to dismiss, RCH must plead with particularity the misleading or false statements made by the CTS Defendants. *Rosenzweig*, 332 F.2d at 866. The CTS Defendants argue that the Complaint does not plead any actionable misstatements by the CTS Defendants.

---

[3] In a footnote in their Motion to Dismiss, the CTS Defendants suggest that the Royalty Interests do not qualify as "securities" for purposes of a PSLRA claim. (Dkt. #13 at 17 n.6). However, both the statutory provision defining "security," which specifically lists a "fractional undivided interest in oil, gas, or other mineral rights," and the Fifth Circuit provide otherwise. 15 U.S.C. § 77b(a); *see also Adena Expl., Inc. v. Sylvan*, 860 F.2d 1242, 1244–45 (5th Cir. 1988) ("That an assignment of a fractional undivided interest in oil and gas rights is a security within the definition of Section 2(1) of the Act is clearly and uncontrovertibly established by decisions of the Supreme Court of the united States.") (internal citations and quotations omitted).

In response, RCH states it has pleaded at least four actionable misstatements and omissions.[4] First, RCH states that the CTS Defendants made representations, at various points, which indicated either explicitly or implicitly that CTS owned the Royalty Interests free and clear. (Dkt. #18 at 12). Specifically, RCH points to Lacey's January 16, 2014 written statement sent to RCH in advance of its January 17, 2014 in-person meeting with Lacey and Mr. Wood which represented in part that: "[CTS] ha[s] a title book for each tract containing a run sheet from patent to current plus recorded copies to the conveyances to CTS out of ERG at the time we purchased the property from Chevron." (Dkt. #1 at ¶ 76). RCH next pleads that Lacey provided RCH with documents to support this written representation that CTS had clean title on the following day. (*Id.* at ¶ 77). RCH also points to a representation made by Lacey at 11:48 AM on January 17, 2014 stating: "Runsheet on the top with copies of the listed documents behind it – patent to current. ERG acquired the mineral fee from Chevron and carved out the interests you are purchasing to CTS at that time." (*Id.* ¶ 78).

In addition, RCH cites to the fact that it sent an initial offer letter to the CTS Defendants that twice described Mr. Wood as the owner of the Royalty Interests and did not receive any objections or corrections from the CTS Defendants. (*Id.* ¶ 91). RCH further points out that in its January 17, 2014 meeting, Mr. Wood explained that he had worked with Chevron for years to purchase part of the interests that made up the Royalty Interests and that when he finally completed the acquisition, the Royalty Interests were "carved out" to "Scott." (*Id.* at ¶ 93).

---

[4] The CTS Defendants assert that RCH is alleging an additional fifth set of misstatements, namely Mr. Wood's statement that he "wouldn't be selling" the Royalty Interests if he "didn't have to" and that the Royalty Interests were a "gift," "the greatest gift," or the "gift of a lifetime." (Dkt. #13 at 19). Defendants assert these statements are "immaterial puffery" that are not actionable under federal securities law. (*Id.* (citing *Southland Secs. Corp. v. INSpire Ins. Solns. Inc.*, 365 F.3d 353, 372 (5th Cir. 2004))). RCH agrees that these statements are nonactionable and states that it pleads them only to show proof of intent.

According to RCH, this representation further cemented its view that CTS had unencumbered title to the Royalty Interests as the co-owner of CTS. (*Id.*).

In conducting its due diligence over the next few days, however, RCH learned that Lacey's statements regarding CTS' title to the Royalty Interests did not tell the whole story. Indeed, RCH discovered public records reflecting that the Royalty Interests had been transferred to ERG. (*Id.* at ¶ 105). Upon learning this, RCH contacted Lacey to inquire about this title issue on January 24, 2014. (*Id.* at ¶ 106). RCH argues that, at this point, CTS had a duty under Rule 10b-5 to correct its representations that CTS had clear title to the Royalty Interests. (Dkt. #18 at 12 (citing *Rubinstein v. Collins*, 20 F.3d 160, 170 (5th Cir. 1994))). Specifically, RCH states that when it confronted CTS with this title issue, it had a duty to disclose ERG's debt, the deed of trust, and the after-acquired title problem created by the CTS-to-ERG Transfers. (Dkt. #18 at 12). According to RCH, omitting these facts made Lacey and Mr. Wood's prior representations about the Royalty Interests misleading under Rule 10b-5. (*Id.*).

Second, RCH alleges that Lacey's January 24, 2014 statement, made during a telephone call with RCH executives, that the CTS-to-ERG Transfers were an "administrative error" was a material misrepresentation. (Dkt. #1 at ¶ 107). Indeed, subsequent statements by Lacey reveal that this was not the case—that the Royalty Interests were transferred to ERG as collateral for ERG's debt and were not the result of administrative error. (*Id.* ¶ 150).[5]

On January 27 and 28, 2014, Lacey provided RCH with draft assignments to undo the CTS-to-ERG Transfers and transfer the Royalty Interests back to CTS, an action that RCH believed would cure the title problem it had discovered during its due diligence. (*Id.* ¶ 111). RCH pleads that at no point did any one from CTS inform RCH of ERG's $350 million Original

---

[5] These subsequent statements are not actionable in and of themselves, but they serve to raise a plausible inference that the actionable statement—that the transfer was an administrative error—was false, and knowingly false, at the time made. *See In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1245 (3d Cir. 1989).

Credit Agreement or the Deed of Trust that went with it which would continue to encumber CTS' title to the Royalty Interests, even post-transfer from ERG. (*Id.* ¶ 112).

Third, RCH alleges that CTS and Mr. Wood made a false statement by backdating the CTS-to-ERG Transfers. The Complaint alleges that CTS and Mr. Wood made these transfers in August 2013, but backdated them to be effective as of June 1, 2013. (Dkt. #1 at ¶¶ 52–67, 76). RCH contends that Mr. Wood backdated these transfers to conceal the fact that they violated the Divorce Injunction's prohibition against transfer of marital assets. (*Id.* ¶¶ 46–54).

Fourth, RCH alleges that CTS and Mr. Wood made two misrepresentations in connection with CTS's contracts with RCH. Specifically, RCH pleads that Mr. Wood represented in the Purchase Agreement, signed on January 20, 2014, that he did not need the Divorce Court or Ms. Wood's approval to sell the Royalty Interests. (*Id.* ¶¶ 96–99 ("SELLER [CTS] warrants and represents unto BUYER [RCH] that there are no Temporary or Permanent Orders entered in the divorce proceeding . . . which require (i) an Order from the [Divorce Court] approving the sale of the Interests to BUYER or (ii) approval of Tana Wood."). However, the Divorce Injunction, entered into on June 6, 2013, prohibited Mr. Wood from concealing or transferring any marital property without approval from the Divorce Court or Ms. Wood and remained in effect until several weeks after RCH agreed to purchase the Royalty Interests. (*Id.* ¶¶ 54, 97). Thus, according to RCH, CTS and Mr. Wood represented in the Purchase Agreement that approval from the Divorce Court or Ms. Wood was not necessary despite the existence and effect of the Divorce Injunction. (*Id.* ¶¶ 97, 99).

In addition, the CTS Defendants represented in the Purchase Agreement that they were transferring title in the Royalty Interests to RCH, even though CTS and Mr. Wood knew that CTS' title was impaired by ERG's debt. (*Id.* ¶ 123 ("In the CTS-to-RCH Transfers, CTS again

promised in a written contract that it had good title to the Royalty Interests: 'Assignor [CTS] does hereby warrant and agree to defend the title to the Assigned Interest [the Royalty Interests] against any and all persons whomever lawfully claim the same or any part thereof by, through or under Assignor, but not otherwise.'")).

The above-listed statements and omissions identified by RCH represent actionable, material misstatements. "A statement or omitted fact is 'material' if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *R&W Tech. Servs. Ltd. v. Commodity Futures Trading Comm'n*, 205 F.3d 165, 169 (5th Cir. 2000). The Fifth Circuit has also explained that "materiality is determined by evaluating whether the substantial likelihood that the false or misleading statement would have been would have been viewed by the reasonable investor as having altered the total mix of information made available." *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 359 (5th Cir. 2002) (internal quotation marks citations and alterations omitted). While disclosure of material information is not always required, it is required when necessary "to make . . . statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1321 (2011) (quoting 17 C.F.R. § 240.10b-5(b)).

RCH has pleaded that CTS' representation in the Purchase Agreement that Mr. Wood did not need the Divorce Court or Ms. Wood's approval to sell the Royalty Interests was false because the Divorce Injunction specifically required such approval. (Dkt. #1 at ¶¶ 96–97, 99). Such a misrepresentation is material—whether the approval of a third party is required before selling an asset is information a reasonable investor would deem important. *See ABC Arbitrage*, 291 F.3d at 359.

RCH has also pleaded that in its negotiations with the CTS Defendants to purchase the Royalty Interests from CTS, both CTS representatives and Mr. Wood made representations and omissions indicating that CTS had clear title to the Royalty Interests. (*See* Dkt. #1 at ¶¶ 76–80, 90–93). The CTS Defendants argue that the statements cited by RCH were true in a literal sense, specifically Lacey's written statement regarding the history of the Royalty Interests' purchase, his statement that ERG acquired the mineral fee from Chevron and carved out the interests to CTS, and Mr. Wood's statement that the Royalty Interests were "carved out" to him. (Dkt. #13 at 18 (citing Dkt. #1 at ¶¶ 76, 78–79, 92)). As to Mr. Wood's statement that the Royalty Interests were carved out to him, the CTS Defendants notes that this statement is literally true because "both ERG and CTS were owned, in part, by Mr. Scott Wood." (Dkt. #13 at 19).

Yet, it is not the CTS Defendants' words alone that matter, but also the context in which they uttered them. *See Isquith v. Middle S. Util., Inc.*, 847 F.2d 186, 200 n.9 (5th Cir. 1988) ("[I]nformation is imparted not just through the use of individual words—information is also gained from the context in which those words are placed.") Indeed, "[w]hen determining what has been disclosed, therefore, it is wrong to treat each individual piece of information separate, as it if had no relation to the other pieces which surround it." *Id.* Furthermore, "[e]ven literally true statements and information can be framed in ways that make them misleading." *Dawes v. Imperial Sugar Co.*, 975 F. Supp. 2d 666, 697 (S.D. Tex. 2013). Mr. Wood's statement that the Royalty Interests were carved out to him may be literally true because he also owned ERG but RCH has adequately shown in its pleadings that he made this statement in a context that was intended to lead RCH to believe that Mr. Wood's other company, CTS, had clear title to the Royalty Interests. Likewise, the factual content of the Lacey statements that RCH points to may be true, but when viewed in context and in the circumstances as pleaded, it is clear that these

statements created the impression that CTS had clear title to the Royalty Interests. In other words, this literally true information was framed in such a way as to make it misleading. *Id.*

The misleading nature of these literally true statements becomes even more clear when the undersigned considers what transpired next. RCH performed some due diligence that gave it reason to question CTS' claim to ownership of the Royalty Interests. These concerns were assuaged by statements by Lacey that any title issues were a mere "administrative error" and could be fixed by transferring the assets from ERG to CTS. By then completing this transfer via the CTS-to-RCH Transfers, CTS again represented, this time in a formal contract, that it could transfer clean title to the Royalty Interests. The "accurate" title history of the Royalty Interests contained in Lacey and Mr. Wood's alleged misstatements is meaningless without the inclusion of the facts that the prior CTS-to-ERG Transfers had encumbered the Royalty Interests with ERG's debt via the after-acquired title provision in the Original Credit Agreement. It seems almost too obvious to point out that information regarding the after-acquired title problem that the CTS-to-ERG Transfers created, as well as the problem created by Mr. Wood's backdating the CTS-to-ERG Transfers to avoid violating the Divorce Court injunction might be information that RCH would have viewed as important in making its decision regarding whether or not to purchase the Royalty Interests. In other words, the statements made by Lacey, Mr. Wood and CTS' contracts, combined with the omissions regarding ERG's debt and how it encumbered CTS' ownership of the Royalty Interests even once it was re-assigned to CTS are undeniably material.

It is clear from the Complaint that these statements, combined with the CTS Defendants' omission or failure to disclose facts such as ERG's debt, the deed of trust, and the after-acquired title issue created by the CTS-to-ERG Transfers, left the impression that there were no title

issues or encumbrances surrounding CTS' ownership of the Royalty Interests. It is likewise clear from the Complaint that this was not the actual state of affairs. A reasonable investor would consider the omission of this information important in making a decision to invest. *R&W Tech. Servs. Ltd.*, 205 F.3d at 169.

Not only are the misstatements and omissions RCH has alleged material, but they are adequately pleaded. RCH has identified who made or contributed to the statements—Lacey or Mr. Wood, or CTS through its contracts; what the content of the statements were or what the relevant omissions were, and when and where those statements were made. Taken together, the statements and omissions alleged by RCH, which they attribute to particular individuals on particular dates, are sufficient for the Magistrate Court court to find that they have pleaded material misstatements or omissions with particularity.

ii.     Scienter

As previously stated, § 10(b) and Rule 10b–5 require proof the defendant acted with "scienter"—i.e., "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc.*, 551 U.S. at 319. To establish scienter, a plaintiff must show the defendant intended to deceive, defraud, or manipulate, or that the defendant acted with severe recklessness. *Lormand*, 565 F.3d at 251. Severe recklessness is limited to "highly unreasonable omissions or misrepresentations" involving an "extreme departure from the standards of ordinary care." *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 408 (5th Cir. 2001). Under the PSLRA, a complaint must state with particularity facts giving rise to a "strong inference" that the defendant acted with the required state of mind in order to avoid dismissal. 15 U.S.C. § 78u–4(b)(2); *Tellabs*, 551 U.S. at 313. The scienter inference need not be irrefutable, nor even the most compelling of all competing inferences, but must be strong in light of other inferences. *Tellabs*, 551 U.S. at 324.

Ultimately, a complaint will only survive if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

Taking RCH's allegations as a whole, the undersigned finds that they raise a strong inference of scienter on the part of the CTS Defendants. *See id.* (adopting a holistic approach to pleading scienter which requires courts to consider whether all of the facts taken collectively give rise to a strong inference of scienter). RCH has alleged that CTS and Mr. Wood intentionally made false statements and omissions regarding CTS' ownership of the Royalty Interests, ERG's debts to the Bank its encumbrance of the Royalty Interests, and the effect of the Divorce Injunction. (Dkt. #1 at ¶¶ 201–203).

These allegations are sufficient to state a claim that Mr. Wood and CTS were at least severely reckless in making the representations regarding CTS' title to the Royalty Interests and omitting the existence of ERG's debt, the deed of trust that came with it and the after-acquired title problem created by the CTS-to-ERG Transfers. RCH has pleaded that Mr. Wood, as the co-owner and sole operator of both CTS and ERG, signed a loan agreement with the Bank for $350 million; and that he knew that in order to execute this loan agreement, he was required to pledge collateral as security for the debt.[6]   RCH has further pleaded that Mr. Wood knew the loan agreement contained an after-acquired title clause, and that he transferred the Royalty Interests from CTS to ERG in order to encumber them with ERG's debt to prevent Ms. Wood from obtaining one-half of the Royalty Interests in the Divorce Settlement. Despite this alleged

---

[6] A sufficient finding of scienter on the part of Mr. Wood indicates scienter on the part of CTS. *C.f. KB Partners I, L.P. v. Pain Therapeutics, Inc.*, Case No. A-11-CA-1034-SS, 2012 WL 12850252, at *8 ("Where plaintiffs do not allege any individual corporate employee other than the named defendants acted with scienter, it is only necessary to consider the scienter of the named defendants to determine whether the corporation itself acted with scienter.") (citing *Southland*, 365 F.3d 353, 367 (5th Cir. 2004)). Furthermore, "if any single allegation, standing alone, create[s] a strong inference of scienter, the court [does] not need to consider additional allegations of scienter." *Tellabs*, 551 U.S. at 322.

knowledge on the part of Mr. Wood, RCH states he did not disclose the Original Credit Agreement and the after acquired title issue—an issue that clouded the nature of CTS' title to the Royalty Interests—to RCH at any point in their dealings. Indeed, RCH points out that in the CTS-to-RCH transfers, CTS effectively represented it could transfer clear title to the Royalty Interests even though they were encumbered by ERG's debt. These allegations are sufficient to raise a strong inference of scienter on the part of the CTS Defendants.

Moreover, RCH has pleaded that Mr. Wood backdated the CTS-to-ERG Transfers to evade the orders of the Divorce Court. RCH has also pleaded that the Purchase Agreement contained a representation by Mr. Wood that he did not need the Divorce Court or Ms. Wood's approval to sell the Royalty Interests even though this was not true. Taking RCH's allegations as true, this representation was false when made and Mr. Wood knew that. (Dkt. #1 at 96–97). Making such a false representation and misleading RCH in their contract is a highly unreasonable misrepresentation and an extreme departure from the ordinary standard of care. *See Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 430 (5th Cir. 2002). Whether or not RCH's version of events is the full truth is not the question for the Magistrate Court at this stage. At the motion to dismiss stage, the undersigned takes as true RCH's well-pleaded allegations and finds that the direct and circumstantial evidence pleaded therein justifies a strong inference of scienter against Mr. Wood and thereby CTS. *Cf. In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 843 (N.D. Tex. 2005); *see also KB Partners I, L.P.*, 2012 WL 12850252, at *8 (observing that a finding of scienter of named defendants sufficient to determine whether corporation itself acted with scienter). In other words, RCH's Complaint as a whole raises an inference that the CTS Defendants acted with intent to deceive RCH that is at least as compelling as any opposing inference one could draw from the facts alleged. *See Tellabs*, 551 U.S. at 322–23.

iii.     Reliance and Loss Causation

The CTS Defendants next argue that RCH's PSLRA claim must fail because (1) it cannot prove that it justifiably relied on the CTS Defendants' alleged misrepresentations and omissions and (2) it cannot show loss causation. The undersigned disagrees on both accounts.

As to reliance, the CTS Defendants argue that because RCH is a sophisticated party with experience in the oil and gas industry, it was not justified in relying on the CTS Defendants' statements regarding CTS' good title to the Royalty Interests. (Dkt. #13 at 21–22).  Essentially the CTS Defendants contend that when RCH discovered that ERG and not CTS had title to the Royalty Interests, either it should have known better than to complete the sale, or at least, known better than to rely on CTS' subsequent representation that the title issue was simply an "administrative error" that could be easily fixed prior to closing.

The CTS Defendants specifically note that the Deed of Trust showing that the Royalty Interests were encumbered was recorded in the public records of Santa Barbara County. According to the CTS Defendants then, "had [RCH] exercised reasonable diligence in January 2014 when it discovered that ERG held title, [RCH] would have known that title to the Royalty Interests could be adversely affected by the Deed of Trust." (Dkt. #13 at 22 n.9). Thus, the CTS Defendants maintain, RCH's failure to exercise "reasonable diligence" in ferreting out the title issue by checking out the public records in Santa Barbara County means it cannot demonstrate justifiable reliance on the alleged misrepresentations.

It appears justifiable reliance in the Fifth Circuit is equivalent to actual reliance plus due diligence by a plaintiff. *See Dupuy v. Dupuy*, 551 F.2d 1005, 1014 (5th Cir. 1977) ("[W]ith regard to private recovery for the violation of Rule 10b-5, a properly stated cause of action must establish . . . the extent of actual reliance by the plaintiff on the defendant's statements, and the

justifiability of the reliance, frequently translated into a requirement of due diligence by the plaintiff"); *see also Aubrey v. Barlin*, No. A-10-CA-076-SS, 2011 WL 13127642, at *3 (W.D. Tex. Sept. 26, 2011). "[T]he relevant inquiry in determining due diligence is whether the plaintiff has intentionally refused to investigate in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." *Stephenson v. Paine Webber Jackson & Curtis, Inc.*, 839 F.2d 1095, 1098 (5th Cir. 1988) (internal citations and quotations omitted). The Fifth Circuit has characterized this as a "recklessness" standard. *Id.*

It is clear from the Complaint that RCH did investigate CTS' title claim to the Royalty Interests. (Dkt. #1 at ¶ 105). Indeed, the Complaint demonstrates that as a result of its investigation, RCH uncovered that CTS did not own the Royalty Interests because they had been transferred to ERG. (*Id.*). When RCH presented this "red flag" to the CTS Defendants, however, it was assured that it was only an administrative error and one that was easily fixed. (Dkt. #1 at ¶¶ 109, 111). In the face of such assurances—first that there were no title issues, and next, that any title issue that was discovered was a simple administrative fix—the Magistrate Court cannot say that as a matter of law it was unreasonable for RCH to rely on the CTS' Defendants misrepresentations and omissions regarding CTS' clear title to the Royalty Interests. Perhaps RCH could have conducted more intensive due diligence that would have turned up the Deed of Trust, which upon examination could have revealed the encumbrance issue. To that point, RCH has pleaded that the CTS Defendants limited the time for diligence. Still, the Magistrate Court does not believe that the fact that this document existed in the public records in Santa Barbara County means that RCH's reliance on the repeated representations, assurances, and notable omissions by the CTS Defendants regarding the title issue was reckless.

The undersigned also agrees with the CTS Defendants' point that RCH may be considered a "sophisticated party" whose experience and expertise is relevant to the due diligence inquiry. But while this sophisticated status may be relevant to the inquiry, it is not dispositive of it. *See Stier v. Smith*, 473 F.2d 1205, 1207 (5th Cir. 1973) ("[S]ophisticated investors, like all others, are entitled to the truth."). And, in the story relayed in the Complaint, the CTS Defendants repeatedly obfuscated the full truth of the investment picture.  The Complaint pleads that Mr. Wood was a party to the securing of the loan agreement for ERG which contained the after-acquired title provision; that Mr. Wood likewise caused CTS to transfer the Royalty Interests to ERG thereby encumbering the Royalty Interests via the after-acquired title provision. It further pleads that despite this involvement, Mr. Wood participated in negotiations with RCH in which he and other representatives from his company contributed to creating the impression that CTS held clear title to the Royalty Interests. (Dkt. #1 at ¶ 112).

The CTS Defendants are correct that RCH discovered the title issue prior to closing. But without disclosure from Mr. Wood or CTS regarding the Original Credit Agreement, the CTS-to-ERG Transfers, and the after acquired title provision, RCH was unable to connect the dots to understand the full ownership picture of the Royalty Interests to be able to realize that the "administrative fix" of transferring the title from ERG back to CTS would not cure the problem. In light of these facts, the undersigned finds that RCH has sufficiently pleaded justifiable reliance.

The cases the CTS Defendants cite to support their argument that there was no justifiable reliance here are inapposite. For example, in *Porter v. Shearson Lehman Brothers, Inc.*, the court found no reasonable reliance where the buyer-plaintiff relied on oral statements by the seller-defendant which were "directly contradicted by clear language" in the offering prospectus. 802

F. Supp. 41, 57–58 (S.D. Tex. 1992). Furthermore, in *Porter*, the plaintiff "admitted receiving documents detailing the risks of the investments" and was informed that "no individual was authorized to make representations involving the [investments] and that he was to rely solely upon the written prospectus." *Id.* at 58. In this case, however, there is no allegation that there were written contracts or prospectuses specifically disclaiming RCH's right to rely on any parol statements by the CTS Defendants.

The CTS Defendants also cite *Mayes v. OneBeacon Americas Ins.*, No. A-14-cv-355-LY, 2014 WL 3548621, at *4 (W.D. Tex. July 17, 2014), for the proposition that reliance on a representation is not justifiable if "there are 'red flags' indicating such reliance is unwarranted." As an initial matter, the undersigned notes that the court in *Mayes* was not dealing with the concept of justifiable reliance in the context of a PSLRA claim. Regardless, *Mayes* further states that "[r]eliance is justified 'if its falsity is not ascertainable upon a cursory examination or investigation.'" *Id.* In this case, the Complaint makes clear that RCH conducted *at least* a cursory examination or investigation. Thus, the CTS Defendants' arguments are unavailing

The CTS Defendants' argument regarding loss causation is even less availing. Loss causation is a "causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). It requires "a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* at 347. RCH has expressly pleaded loss causation in its Complaint. (Dkt. #1 at ¶¶ 204–08). Here, RCH has alleged that it would not have paid $17.5 million for the Royalty Interests had the CTS Defendants not represented that CTS owned the Royalty Interests free of encumbrances. The Complaint further states that RCH was forced to

bow to the Bank's claim of superior title and settle its interests in the Royalty Interests for $700,000—a multimillion dollar loss. (*Id.* ¶ 196).

The CTS Defendants attempt to argue it is not clear whether this devaluation is the result of "all-time low" commodity prices or rather RCH's forced sale based on its inferior title claim. (Dkt. #13 at 16). As RCH points out, the CTS Defendants may move for summary judgment and provide evidence that a tanking commodities market was the reason for the drastic devaluation in the Royalty Interests' sale price. For now, RCH has adequately pleaded that the CTS Defendants were the cause of its loss. *See Pub. Employees' Retirement Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 325 (5th Cir. 2014) ("Whether the connection between [defendant's] misleading statements and the alleged [misrepresentations] may ultimately be found too attenuated at a later stage in litigation is a highly fact intensive inquiry that need not be reached at this point."). In short, RCH has adequately pleaded reliance and loss causation.

### 2.    *PSLRA and the Statute of Limitations*

The CTS Defendants also argue that RCH's PSLRA claim must be dismissed because it is barred by the applicable statute of limitations. Section 10(b) and Rule 10b–5 claims must be filed within two years after the discovery of the violation. 28 U.S.C. § 1658(b). The Supreme Court has held this "cause of action accrues (1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation'—whichever comes first . . . [and] the 'facts constituting the violation include the fact of scienter." *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 637 (2010). The CTS Defendants state that the alleged actionable misrepresentations and omissions regarding CTS' title to the Royalty Interests occurred in early January 2014 and that RCH has pleaded it discovered these

representations were false in late January 2014. (Dkt. #13 at 14 (citing Dkt. #1 at ¶¶ 91–118)). Because this lawsuit was filed in December 2016, then, it is untimely.

The CTS Defendants concede that RCH has pleaded it did not know that the Royalty Interests were encumbered by the Deed of Trust until the foreclosure lawsuit was filed in April 2015—a discovery date that would mean RCH's lawsuit was in fact timely. Yet, the CTS Defendants argue that this alleged April 2015 discovery date does not toll the statute of limitations because RCH can be charged with *constructive* notice of the possible encumbrance as far back as January 2014. (Dkt. #13 at 13–14). The CTS Defendants state this is so because the Deed of Trust was filed in the public records in January of 2013, thus, had RCH "exercised reasonable diligence in January 2014 when it discovered that ERG held title to the Royalty Interests, it would have known that title to the Royalty Interests could be adversely affected by the Deed of Trust. (*Id.* at 14).

As an initial matter, the undersigned has already discussed *supra* that RCH has pleaded facts indicating it did exercise reasonable diligence in January 2014, but that the CTS Defendants lulled RCH into believing that the title issue was superficial and fixable and that the ERG-to-CTS Transfers did indeed fix the problem. RCH's January 2014 discovery that ERG had title to the Royalty Interests may have put it on notice of a potential issue, but the CTS Defendants' subsequent representations and omissions put them off notice.

Furthermore, in RCH's narrative, the key fact underlying the violation was the existence of the after-acquired title provision in the Original Credit Agreement. The CTS Defendants argue that a reasonably diligent plaintiff would have discovered this encumbrance because the Deed of Trust was a publicly available document since January of 2013. Again, RCH has pleaded that it did conduct an investigation into CTS' title but did not discover the Deed of Trust. The

undersigned cannot say that as a matter of law, a reasonably diligent plaintiff would have discovered the Deed of Trust in its investigation into the Royalty Interests.

Furthermore, the undersigned notes that the Supreme Court in *Merck & Co. v. Reynolds* rejected an "inquiry notice" interpretation of 28 U.S.C. § 1658(b)(1), explaining that "the point where the facts would lead a reasonably diligent plaintiff to investigate further . . . is not necessarily the point at which the plaintiff would already have discovered facts showing scienter or other 'facts constituting the violation.'" 130 S. Ct. at 1797. Thus, even assuming RCH's discovery of ERG's title to the Royalty Interests in January 2014 put RCH on inquiry notice, the undersigned cannot determine, based on the pleadings and the related attachments, when exactly RCH should have discovered the facts constituting the violation.

To summarize, the Complaint pleads that RCH did not know of the CTS Defendants' alleged fraud in 2014 and that the April 2015 foreclosure lawsuit by the Bank was the first sign of trouble. (Dkt. #1 at ¶¶ 112, 140–42). Indeed, the Complaint supplies facts to explain why RCH did not actually discover the CTS Defendants' alleged fraud until as late as October 2015 despite its mounting suspicions. Specifically, RCH states that after learning of the Bank's Foreclosure Lawsuit in April 2015, it "immediately began investigating facts alleged by the Bank, but that CTS continued to represent that it had an agreement with the Bank that the Royalty Interests "were not pledged as collateral." (*Id.* ¶¶ 142, 147, 151). Moreover, RCH has pleaded that it repeatedly asked CTS to produce documents supporting the Bank's agreement to this effect, and that the CTS Defendants repeatedly told RCH that they would provide these documents. (*Id.* ¶¶ 153–54, 160–180). It was not until October of 2015, however, that Mr. Wood acknowledged he did not have documents exempting the Royalty Interests from the Bank's lien. (*Id.* ¶¶ 182–194). Simply put, the undersigned cannot say that as a matter of law that RCH did

discover—or that a reasonably diligent plaintiff would have discovered—the facts constituting the alleged securities fraud, especially the facts constituting scienter, more than two years prior to the filing of this complaint. *See N. Port Firefighters' Pension--Local Option Plan v. Temple-Inland, Inc.*, 936 F. Supp. 2d 722, 765 (N.D. Tex. 2013). Accordingly, the CTS Defendants' Motion to Dismiss, to the extent it seeks dismissal of this case based on PSLRA limitations, should be denied.

### B.      Breach of Contract

Next, RCH brings a claim for breach of contract against CTS and CTS Management, alleging that CTS breached two written contracts—the Purchase Agreement and the CTS-to-RCH Assignments—by warranting that it had good and valid title to the Royalty Interests when in fact it did not.[7]

Under Texas law, to establish a breach of contract claim, the plaintiff must plead: (1) a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *Marquis Acquisitions, Inc. v. Steadfast Ins.*, 409 S.W.3d 808, 814 (Tex. App.—Dallas 2013, no pet.).

The CTS Defendants argue that RCH's breach of contract claim must fail because it has not identified a "single provision" of either the Purchase Agreement or the CTS-to-RCH Assignments that was breached. (Dkt. #13 at 23). The CTS Defendants purport to cite to case law from the Fifth Circuit and district courts within the Fifth Circuit for the proposition that in bringing a breach of contract claim, the plaintiff must always identify a particular provision of the contract that was breached. (*See id.* at 23–24). Yet the cases the CTS Defendants rely on all pertain to mortgage foreclosures, and it is not clear that the Fifth Circuit extends this holding to

---

[7] RCH seeks to hold CTS Management liable for CTS' alleged breach because it is the general partner of CTS, a Texas limited partnership. *See generally* TEX. BUS. ORG. CODE § 153.152(b).

all claims for breach of contract. Indeed, the Fifth Circuit case cited by the CTS Defendants states: "It has been held that a claim for **breach of a note and deed of trust** must identify the specific provision in the contract that was breached." *Williams v. Wells Fargo Bank, N.A.*, 560 F. App'x 233, 241 (5th Cir. 2014) (citing *Watson v. Citimortgage, Inc.*, 814 F. Supp. 2d 726, 732 (E.D. Tex. 2011)) (emphasis added).

Regardless, at least as to the Purchase Agreement, the undersigned finds that RCH has alleged the breach of a specific provision: the representation that Mr. Wood did not need the Divorce Court or Ms. Wood's approval to sell the Royalty Interests. (*See* Dkt. #1 at ¶¶ 97, 99). Indeed, RCH cites this specific provision in its Complaint and it includes the following language: "BUYER [RCH] and SELLER [CTS] expressly understand, acknowledge and agree that a breach of the foregoing representation and warranty shall constitute a failure of title." (*Id.* ¶ 99). The CTS Defendants concede that RCH has identified this provision in its Complaint, but they argue (1) RCH does not provide any explanation for how this provision was breached, and (2) the provision does not contain any language regarding clear title to the Royalty Interests. The undersigned disagrees—RCH's allegations clearly state that the Divorce Injunction rendered CTS' representation in the Purchase Agreement false when made, and the contractual provision specifically states that if this representation turned out to be false, it would constitute a failure of title. (Dkt. #1 at ¶¶ 54–63, 99). In short, the undersigned finds that RCH has sufficiently identified a specific contractual provision and pleaded its claim for breach of contract as to the Purchase Agreement.

Next, the CTS Defendants argue that the CTS-to-RCH Assignments only contain a special warranty and not a general warranty clause, and the Complaint does not adequately plead breach of a special warranty. (Dkt. #13 at 24). The warranty language in the CTS-to-RCH

Assignments reads in relevant part as follows: "[CTS] does hereby warrant and agree to defend the title to the assigned interest against any and all persons whomsoever lawfully claim the same or any part thereof by, through or under assignor, but not otherwise."  (Dkt. #13-1 at 63).The CTS Defendants argue this language constitutes a special warranty that only protects RCH from defects or encumbrances created by, through, or under CTS. Here, the CTS Defendants argue, the encumbrance complained of was created by ERG, not CTS and thus the alleged encumbrance does not constitute a breach of the CTS-to-RCH Assignments.

Citing to a Texas appellate decision from 1960 and one from 1948, as well as two California appellate decisions, from 1987 and 1919, respectively, the CTS Defendants contend that "the inclusion of a warranty provision in a conveyance does not automatically mean that the grantor warrants good and clean title throughout the entire chain of title."  (Dkt. #13. at 24–25). Rather, under certain circumstances, they maintain, the conveyance contains only a covenant that the *grantor* has not conveyed or encumbered the property at issue prior to the conveyance containing the warranty. (*Id.* at 25).

RCH rejoins that even acknowledging that this language constitutes a "special warranty" which limits the scope of protection it supplies, the encumbrance RCH complains of is covered by this warranty. To wit, RCH argues that the Bank challenged RCH's title by and through CTS, claiming that CTS transferred good fee simple title to ERG before it purported to transfer the same to RCH. (Dkt. #18 at 19). As already described in depth above, the undersigned has found RCH has plausibly alleged that the CTS Defendants knew or should have known that the Royalty Interests they were transferring to RCH in the CTS-to-RCH Assignments were encumbered by the Original Credit Agreement. In other words, RCH has adequately pleaded facts suggesting that CTS did not have clear title to the Royalty Interests at the time it contracted to transfer them

to RCH and included a representation that it did. The undersigned cannot say as a matter of law that the Bank's claim to the Royalty Interests, which was based on the prior CTS-to-ERG Transfers, does not constitute a challenge to RCH's title "by and through" CTS. In short, RCH has pleaded enough to state a claim that CTS breached the warranty contained in the CTS-to-RCH Transfers. Accordingly, the CTS Defendants' Motion to Dismiss RCH's breach of contract claim should be denied.

## C.      Fraud

RCH also brings a claim for common law fraud against the CTS Defendants. Under Texas law, the elements of common law fraud are:

> (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011); *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (per curiam). A plaintiff claiming fraudulent inducement must also allege that, as a result, it has been fraudulently induced into a binding agreement. *In re Guardianship of Patlan*, 350 S.W.3d 189, 198 (Tex. App.—San Antonio 2011, no pet.). "State law fraud claims are subject to the heightened pleading requirements of Rule 9(b)." *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 550–51 (5th Cir. 2001).

RCH's common law fraud allegations are premised on the same allegations of false and misleading statements and omissions referenced to support RCH's federal securities fraud claim against the CTS Defendants. Specifically, RCH has alleged the following actionable misrepresentations: Lacey's representation that the CTS-to-ERG Transfers were an

administrative error; Mr. Wood's backdating of the CTS-to-ERG Transfers; CTS' representation in the Purchase Agreement that Mr. Wood did not need the Divorce Court or Ms. Wood's approval to sell the Royalty Interests; and CTS' representation in the CTS-to-RCH Transfers that it was transferring title to the Royalty Interests. Furthermore, RCH has pleaded that these representations were false; that the CTS Defendants and Mr. Wood knew these representations were false or they were at least reckless in making these representations; that they made these representations so that RCH would purchase the Royalty Interests; that relying on these representations RCH did purchase the Royalty Interests; and that it suffered damages.

The undersigned has already found these allegations sufficient to satisfy the requisite pleading standards under Rule 12(b)(6) and Rule 9(b). Indeed, because the strong inference of scienter does not apply to common law fraud claims, they are arguably subject to a lower pleading standard than cases analyzing securities fraud. *See Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 213 (5th Cir. 2009) ("It is true that common law fraud claims are not subject to the heightened strong inference of scienter standard imposed by the PSLRA."). Thus, the CTS Defendants' argument that RCH's common law fraud allegations do not meet the Rule 9(b) standards has been addressed and denied. *See supra* section III(A)(1); *see also Lohr v. Gilman*, 3:15-cv-1931-L, 2017 WL 1178259, at \*12 (N.D. Tex. Mar. 30, 2017) (finding plaintiff's fraud allegations that were sufficient to survive Rule 12(b)(6) and Rule 9(b) for PSLRA claim were likewise sufficient to state a claim for common law fraud under these rules).

The CTS Defendants also argue that RCH's common law fraud claim is barred by the "economic loss" doctrine. In Texas, the economic loss rule "generally precludes recovery in tort for economic losses resulting from the failure of a party to perform under a contract." *Lamar*

*Homes, Inc. v. Mid–Continent Cas. Co.*, 242 S.W.3d 1, 12 (Tex. 2007). That is, "a duty in tort does not lie when the only injury claimed is one for economic damages recoverable under a breach of contract claim." *Sterling Chems., Inc. v. Texaco Inc.*, 259 S.W.3d 793, 796 (Tex. App.—Houston [1st Dist.] 2007, pet. denied); *accord Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986). Thus, the rule restricts contracting parties to contractual remedies for economic losses associated with their relationship, "even when the breach might be reasonably viewed as a consequence of a contracting party's negligence." *Lamar Homes, Inc.*, 242 S.W.3d at 13 (citing *Jim Walter Homes, Inc.*, 711 S.W.2d at 618). "The focus of the rule 'is on determining whether the injury is to the subject of the contract itself.'" *Acad. of Skills & Knowledge, Inc. v. Charter Schs., USA, Inc.*, 260 S.W.3d 529, 541 (Tex. App.—Tyler 2008, pet. denied) (quoting *Lamar Homes, Inc.*, 242 S.W.3d at 12). The burden is on the plaintiff to establish evidence of an independent injury. *Esty v. Beal*, 298 S.W.3d 298, 302 (Tex. App.—Dallas 2009, no pet.); *Sterling Chems., Inc.*, 259 S.W.3d at 797.

To "determin[e] whether a claim can be brought as a tort, consideration must be given to (1) 'the source of the defendant's duty to act (whether it arose solely out of the contract or from some common-law duty) and (2) the nature of the remedy sought by the plaintiff.'" *Regus Mgmt. Grp., LLC v. Int'l Bus. Machines Corp.*, No: 07–1799, 2008 WL 1836360 at *6 (N.D. Tex. Apr. 24, 2008) (quoting *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 13 (Tex. 1996)). However, "[t]he burden is on the plaintiff to establish evidence of an independent injury." *McDaniel v. JPMorgan Chase Bank, N.A.*, Civil Action No. 1:12-cv-392, 2012 WL 6114944, at *7 (E.D. Tex. Dec. 10, 2012).

The Texas Supreme Court has applied the economic loss rule in cases involving defective products or failure to perform a contract. *Sharyland Water Supply Corp. v. City of Alton*, 354

S.W.3d 407, 418 (Tex. 2011). However, the court has not extended the economic loss rule to fraudulent inducement claims, noting that "it is well established that the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself." *Formosa Plastics Corp. v. Presidio Eng'r & Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1996). The court further noted that "Texas law has long imposed a duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations. As a rule, a party is not bound by a contract procured by fraud." *Id.* (citing *Prudential Ins. Co. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 162 (Tex. 1995); *Weitzel v. Barnes*, 691 S.W.2d 598, 601 (Tex. 1985); *Town North Nat'l Bank v. Broaddus*, 569 S.W.2d 489, 491 (Tex. 1978); *Dallas Farm Mach. Co. v. Reaves*, 307 S.W.2d 233, 239 (1957)). "Accordingly, tort damages are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract." *Formosa*, 960 S.W.2d at 47.

At this stage, RCH has sufficiently pleaded a fraudulent inducement claim with respect to the actionable misrepresentations alleged by the CTS Defendants as detailed above. As a result, then, RCH's fraud claim—to the extent it is based on the misrepresentations made by these defendants prior to the commencement of the parties' contractual relationship—may proceed. *See, e.g.*, *LVI Facility Servs., Inc. v. Watson Road Holding Corp.*, No. A-12-cv-672-LY, 2013 WL 5519588, at *14 (W.D. Tex. Oct. 1, 2013).

### D.     Money Had and Received

Finally, RCH brings a state law claim against all Defendants for money had and received arguing that it is entitled to a "money judgment, equal to the amounts, plus interest, that CTS, Mr. Wood and Ms. Wood were each paid from the $17.5 million paid by [RCH] to CTS in

January 2014." (Dkt. #1 at ¶ 236). "An action for money had and received arises when the defendant obtains money which in equity and good conscience belongs to the plaintiff." *Amoco Prod. Co. v. Smith*, 946 S.W.2d 162, 164 (Tex. App.—El Paso 1997, no pet.) (citing *Austin v. Duval*, 735 S.W.2d 647, 649 (Tex. App.—Austin 1987, writ denied)). A claim for money had and received is equitable in nature. *Stonebridge Life Ins. Co. v. Pitts*, 236 S.W.3d 201, 203 n.1 (Tex. 2007); *Best Buy Co. v. Barrera*, 248 S.W.3d 160, 162 (Tex. 2007).

Unlike RCH's fraudulent inducement claim, the undersigned finds that its claim for money had and received asserted against the CTS Defendants and Ms. Wood is barred by the existence of the express contracts concerning the Royalty Interests. While the Texas Supreme Court has recognized that a plaintiff may pursue a fraudulent inducement claim, even when the claimant suffered only economic losses to the subject of a contract, it has made no such exception for the equitable claim of money had and received.

Generally speaking, when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory, *see generally TransAmerican Natural Gas Corp. v. Finkelstein*, 933 S.W.2d 591, 600 (Tex. App.—San Antonio 1996, writ denied), with certain exceptions not relevant here, *see, e.g., Sw. Electric Power Co. v. Burlington N. R.R. Co.*, 966 S.W.2d 467, 469–70 (Tex. 1998) (observing that overpayments under a contract can be recovered under a theory of restitution or unjust enrichment). That is because parties should be bound by their express agreements. When a valid agreement already addresses the matter, recovery under an equitable theory is generally inconsistent with the express agreement. *See TransAm. Natural Gas Corp.*, 933 S.W.2d at 600. Similarly, "[t]he existence of an express contract forecloses equitable relief under a 'money had

and received' theory." *Tex Star Motors, Inc. v. Regal Fin. Co.*, 401 S.W.3d 190, 202 (Tex. App. 2012, no pet.) (citing *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000)).

Here, the Purchase Agreement and the CTS-to-RCH Transfers are valid contracts addressing the subject matter in dispute—the Royalty Interests.[8] The Fifth Circuit has recently reaffirmed that "the existence of an express contract precludes equitable relief under the theory of money had and received." *Payne v. Wells Fargo Bank Nat. Ass'n*, 637 F. App'x 833, 838 (5th Cir. 2016). As such, RCH's equitable claim for money had and received is foreclosed by the existence of the express agreements in this matter. *Id.*

Because RCH's money had and received claim should be dismissed based on the existence of the express agreements covering the subject of the dispute, the undersigned need not address Defendants additional arguments for dismissal of this claim.

## IV.   CONCLUSION

To summarize, the undersigned finds that RCH has pleaded sufficient factual allegations to state a claim under the PSLRA and for common law fraud and breach of contract against the CTS Defendants. The undersigned further finds that RCH's money had and received claim brought against all Defendants should be dismissed because it is foreclosed by the existence of express contracts concerning the matters in dispute.

Defendants seek dismissal of their claims with prejudice but RCH has requested leave to amend to replead any claims that the court finds defective. When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend under

---

[8] RCH attempts to argue that its claim for money had and received is not preempted by the governing contracts because the CTS Defendants dispute the existence of the contracts here. (Dkt. #18 at 10). The undersigned finds this is an inaccurate description of the CTS Defendants' arguments—they do not dispute the *existence* of the agreements at issue, they dispute whether they *breached* these agreements. (*See* Dkt. #13 at 16–19). Indeed, the CTS Defendants concede that the Purchase Agreement and CTS-to-RCH Assignments are valid contracts. (Dkt. #21 at 4). As such, RCH's arguments in this regard are unavailing. *See TIB—The Indep. BankersBank v. Canyon Cmty. Bank*, 13 F. Supp. 3d 661, 672 (N.D. Tex. 2014) (noting that alternative pleading of equitable claims is unavailable unless one party disputes the existence of a contract governing the dispute) (citations omitted).

Rule 15(a) before dismissing the action with prejudice. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case."); *United States ex rel. Adrian v. Regents of the Univ. of Cal.*, 363 F.3d 398, 403 (5th Cir. 2004) ("Leave to amend should be freely given, and outright refusal to grant leave to amend without a justification . . . is considered an abuse of discretion." (internal citation omitted)). Thus, the undersigned finds that RCH's money had and received claim should be dismissed without prejudice and with leave to amend.

## V.   RECOMMENDATIONS

The undersigned **RECOMMENDS** that the District Court **GRANT** Tana R. Wood's Motion to Dismiss [Dkt. #12] and **DISMISS** RCH's claim against Ms. Wood for money had and received **WITHOUT PREJUDICE**.

The undersigned **FURTHER RECOMMENDS** that the District Court **GRANT IN PART** and **DENY IN PART** the CTS Defendants' Motion to Dismiss [Dkt. #13]. Specifically, the undersigned **RECOMMENDS** that the District Court **GRANT** the CTS Defendants' Motion to Dismiss with respect to RCH's money had and received claim and **DISMISS** that claim **WITHOUT PREJUDICE**. In addition, the undersigned **RECOMMENDS** that the District Court **DENY** the motion with respect to RCH's PSLRA, breach of contract, and fraud claims.

Finally, as to the claim dismissed without prejudice, the undersigned **RECOMMENDS** that RCH be granted leave to amend.

## VI.   OBJECTIONS

The parties may file objections to this Report and Recommendation.   A party filing objections must specifically identify those findings or recommendations to which objections are

being made.  The District Court need not consider frivolous, conclusive, or general objections. *See Battles v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  See 28 U.S.C. § 636(b)(1)(C);  *Thomas v. Arn*, 474 U.S. 140, 150-53, 106 S. Ct. 466, 472–74 (1985); *Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (en banc).

SIGNED July 12, 2017.

_____

MARK LANE
UNITED STATES MAGISTRATE JUDGE

44