IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| ROYALTY CLEARINGHOUSE, LTD., § <br> § <br> Plaintiff, § <br> § <br> v. § <br> § <br> CTS PROPERTIES, LTD., CTS § <br> MANAGEMENT, LLC, AND SCOTT Y. § <br> WOOD, § <br> § <br> Defendants. § | JURY TRIAL DEMANDED <br><br> CIVIL ACTION NO. <br> 1:16-cv-1342-LY |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON ITS BREACH OF CONTRACT CLAIM**

Respectfully submitted,

| | |
|---|---|
| */s/ Andrew B. Ryan* <br> Andrew B. Ryan <br> State Bar Card No. 24054464 <br> **RYAN LAW PARTNERS LLP** <br> 3811 Turtle Creek Blvd., Suite 780 <br> Dallas, Texas 75219 <br> T: (214) 347-7360 <br> F: (888) 594-6240 <br> andy@ryanlawpartners.com <br><br> *Counsel for Plaintiff* <br><br> Dated: August 11, 2017 | R. Dean Gresham <br> State Bar Card No. 24027215 <br> L. Kirstine Rogers <br> State Bar Card No. 24033009 <br> **STECKLER GRESHAM COCHRAN PLLC** <br> 12720 Hillcrest Road, Suite 1045 <br> Dallas, Texas 75230 <br> T: (972) 387-4040 <br> F: (972) 387-4041 <br> dean@stecklerlaw.com <br> krogers@stecklerlaw.com <br><br> Mazin A. Sbaiti <br> State Bar Card No. 24058096 <br> **SBAITI & COMPANY PLLC** <br> 1201 Elm Street, Suite 4010 <br> Dallas, Texas 75201 <br> T: (214) 432-2899 <br> F: (214) 853-4367 <br> MAS@SbaitiLaw.com |

Royalty Clearinghouse, Ltd. ("RCH" or "Plaintiff") respectfully submits this Motion for Partial Summary Judgment on its Breach of Contract Claim (the "Motion") against CTS Properties, Ltd. ("CTS") and CTS Management, LLC ("CTS Management"; collectively, the "CTS Defendants").

## I.   INTRODUCTION

> "As through this life you travel, you'll meet some funny men.
> Some will rob you with a six-gun, and some with a fountain pen."
> —The Byrds, *Pretty Boy Floyd*, *on*
> Sweetheart of the Rodeo (Columbia Records 1968).

This case is about financial fraud. Defendant Scott Y. Wood ("Mr. Wood") defrauded RCH. The mechanism for Mr. Wood's fraud was three contracts between RCH and CTS—a Purchase Agreement and the CTS-to-RCH Assignments[1]—under which CTS promised to transfer good title to the Royalty Interests[2] in exchange for $17.5 million. RCH paid the agreed price of $17.5 million. CTS broke its promises. CTS promised that Divorce Court approval was not needed for the CTS-to-RCH Transfers. But Divorce Court approval was, in fact, needed: seven months before the CTS-to-RCH Transfers, the Divorce Court entered an injunction prohibiting Mr. Wood from transferring the Royalty Interests without court approval. CTS also warranted its title to the Royalty Interests. But CTS's warranty was false when made. CTS had transferred the Royalty Interests to another company that Mr. Wood controlled, ERG Resources, LLC ("ERG"), in the summer of 2013. Because ERG's loan documents contained an after-acquired title

---

[1]   Terms not otherwise defined in this Motion shall have the meaning given to them in Plaintiff's Original Complaint (ECF No. 1).

[2]   The Royalty Interests include an undivided 3% of 8/8ths nonparticipating royalty in all oil, gas, casinghead gas, or other hydrocarbons, produced, saved, and sold from certain lands in Cat Canyon Field, as well as an undivided .333325 percent of 8/8ths of all oil, casinghead gas, or other hydrocarbons produced, saved, and sold under the terms of certain oil and gas leases in Cat Canyon Field.

provision, the CTS-to-ERG Transfers encumbered the Royalty Interests with ERG's bank debt and impaired RCH's title to the Royalty Interests.

CTS's broken promises have caused RCH millions of dollars in damages, but the exact amount of that damage is reserved for another day. In this Motion, RCH asks the Court to rule that CTS breached its contracts with RCH, which is clear from the undisputed facts currently known to all parties.[3]

## II.     UNDISPUTED MATERIAL FACTS

On or about December 20, 2012, Mr. Wood filed for divorce from Ms. Wood in the 264th District Court of Harris County, Texas (the "Divorce Court") in Case Number 2012-74497 (the "Wood Divorce"). *See* Exhibit A (Ryan Decl.) at ¶ 3 & Ex. A-1 (App. at 5-8).

On or about January 24, 2013, ERG signed a loan agreement and deed of trust (collectively, the "Original Credit Agreement") with a consortium of lenders led by CLMG Corp. (collectively, the "Bank"). *See* Exhibit A (Ryan Decl.) at ¶ 4 & Ex. A-2 (App. at 9-33). The Original Credit Agreement required ERG to pledge collateral as security for the debt, including through an after-acquired title clause. *See id.* (App. at 12). ERG pledged both its current property and any future

---

[3]     RCH understands its Motion will be filed during the first week of discovery. But "Rule 56 does not require that any discovery take place before summary judgment can be granted; if a party cannot adequately defend such a motion," Rule 56(d) "is his remedy." *Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1285 (5th Cir. 1990) (collecting cases); *Carder v. Cont'l Airlines, Inc.*, 595 Fed. App'x 293, 299 (5th Cir. 2014) ("Discovery is not a prerequisite to the disposition of a motion for summary judgment.") (quoting *Skiba v. Jacobs Entm't Inc.*, 587 Fed. App'x 136, 138 (5th Cir. 2014) (per curiam)); *Ferrant v. Lowe's Home Centers, Inc.*, 494 Fed. App'x 458, 463 (5th Cir. 2012) (same). Indeed, per Rule 56(g), the Court should resolve dispositive legal issues on summary judgment. *See, e.g.*, FED. R. CIV. P. 56(g); *Doughten v. State Farm Mut. Auto Ins. Co.*, 31 Fed. App'x 839, 2002 WL 261522, at *2, n.4 (5th Cir. Feb. 6, 2002) (unpublished) ("Courts should resolve disputed legal issues at summary judgment, even though they lack the power to resolve factual disputes.") (citing *Hang On, Inc. v. City of Arlington*, 65 F.3d 1248, 1257 (5th Cir. 1995); *Neff v. Am. Dairy Queen Corp.*, 58 F.3d 1063, 1065 (5th Cir. 1995)). As the CTS Defendants recently admitted, RCH's "Complaint establishes that…there is a complex ***legal*** dispute over whether the Royalty Interests constituted after acquired property." ECF No. 28 at 5-6 (emphasis supplied). RCH agrees the after-acquired title question is a legal one. But, as set forth below, it is far from complex.

property it might acquire as collateral under the Original Credit Agreement. Specifically, ERG agreed that:

> Mortgagor [ERG] hereby grants to Agent [the Bank] …a security interest in the entire interest of the Mortgagor (whether now owned or hereafter acquired by operation of law or otherwise) in and to…all rights, titles and interests now owned or hereafter acquired by Mortgagor in any and all…documents, money, instruments,…investment property,…contract rights,…and all rights and privileges with respect thereto[.]

*See id*. (App. at 12).

On or about the date of the Original Credit Agreement and the Deed of Trust, CTS and CTS Management were equally owed by Mr. Wood and his wife, Tana Wood. *See* **Exhibit B** (Plato Decl.) at ¶ 10 (App. at 181). Mr. and Mrs. Wood each owned 49.5% of CTS. *Id*. (App. at 181). CTS Management owned the other 1% of CTS, but Mr. and Mrs. Wood each owned 50% of CTS Management. *Id*.

On or about March 28, 2013, Ms. Wood filed a Motion for Temporary Orders in the Wood Divorce. *See* Exhibit A (Ryan Decl.) at ¶ 5 & Ex. A-3 (App. at 34-39). On or about May 30, 2013, the Divorce Court held a hearing on Ms. Wood's Motion for Temporary Orders. *See* Exhibit A (Ryan Decl.) at ¶ 6 & Ex. A-4 (App. at 40). On or about June 6, 2013, the Divorce Court granted Ms. Wood's request and entered Temporary Orders that prohibited Mr. Wood from taking the following actions:

> The temporary injunction granted below shall be ***effective immediately*** and shall be ***binding on Petitioner [Scott Wood] and****/*or Respondent [Tana Wood]; ***on their agents, servants, employees, and attorneys***; and on those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise…
>
> ***IT IS ORDERED that Petitioner [Scott Wood] and Respondent [Tana Wood] are enjoined from***:

> 6. Destroying, removing, ***concealing, encumbering, transferring***, or otherwise harming or reducing the value of the property of one or both of the parties.
>
> 7. ***Falsifying any writing*** or record relating to the property of either party.
>
> ….
>
> 11. Selling, ***transferring, assigning***, mortgaging, ***encumbering, or in any other manner alienating any of the property of Petitioner [Scott Wood] or Respondent [Tana Wood]***, whether personalty or realty, and whether separate or community, except as specifically authorized by this order.

*See id*. (App. at 41-42) (emphasis supplied). In a section titled "*Duration*", the Temporary Orders state that the injunction "shall continue in force until the signing of the Final Decree of Divorce or until further order of this Court." *See id*. (App. at 43).

Through three property transfers on August 20, 2013, and one more one week later, Mr. Wood caused CTS to transfer the Royalty Interests to ERG (the "CTS-to-ERG Transfers"). *See* Exhibit A (Ryan Decl.) at ¶ 7 & Exs. A-5, A-6, A-7, A-8 (App. at 46-76).

On January 20, 2014, CTS and RCH signed a contract for RCH to purchase the Royalty Interests (the "Purchase Agreement"). *See* Exhibit A (Ryan Decl.) at ¶ 8 & Ex. A-9 (App. at 77-87). Under the Purchase Agreement, RCH agreed to pay CTS an immediate option fee of $500,000 (the "Option Fee"), which would be nonrefundable unless CTS breached the following representation (the "Seller's Representation"):

> **SELLER** [CTS] warrants and represents unto **BUYER** [RCPTX] that there are no Temporary or Permanent Orders entered in the divorce proceedings between Tana Wood and Scott Wood which require (i) an Order from the Court having jurisdiction of the divorce proceedings approving the sale of the Interests to **BUYER** or (ii) approval of Tana Wood, to such sale. **BUYER** and **SELLER** expressly understand, acknowledge and agree that a breach of the foregoing representation and warranty shall constitute a failure of title…and **BUYER** shall be entitled to refund of the Option Fee.

*Id*. (App. at 79) (emphasis in original).

RCH also agreed to pay an additional $17 million, representing the balance of the Purchase Price, if the parties completed the sale on or before January 29, 2014. *Id*. (App. at 183). On January 21, 2014, RCH paid the $500,000 Option Fee to CTS via wire transfer. *See* **Exhibit C** (Zimmerman Decl.) at ¶ 3 & Ex. C-1 (App. at 185).

On January 29, 2014, in full compliance with its obligations under the Purchase Agreement, RCH wired the $17 million balance of the purchase price to CTS and completed its purchase of the Royalty Interests. *See* Exhibit C (Zimmerman Decl.) at ¶ 4 (App. at 183). That afternoon, at 2:46PM, Doug Lacey wrote: "Houston, we have touchdown. It [RCH's $17 million wire] has arrived. Thanks and congratulations." *See* Exhibit C (Zimmerman Decl.) at ¶ 5 & Ex. C-2 (App. at 186-187).

On January 29, 2014, Mr. Wood, on behalf of CTS, signed CTS's transfer of the Royalty Interests to Royalty Clearinghouse (the "CTS-to-RCH Transfers"), which had an effective date of February 1, 2014. *See* Exhibit A (Ryan Decl.) at ¶ 9 & Exs. A-10, A-11 (App. at 88-103). In the CTS-to-RCH Transfers, CTS warranted that it had good title to the Royalty Interests: "Assignor [CTS] does hereby warrant and agree to defend the title to the Assigned Interest [the Royalty Interests] against any and all persons whomever lawfully claim the same or any part thereof by, through or under Assignor, but not otherwise." *See id*. (App. at 100).

On February 6, 2014, at 8:53AM, the Divorce Court entered the Woods' Agreed Final Decree of Divorce (the "Divorce Judgment"). *See* Exhibit A (Ryan Decl.) at ¶ 10 & Ex. A-12 (App. at 104-125). The Divorce Judgment "approve[d]" Mr. Wood's and Ms. Wood's Divorce Settlement and "incorporate[d] it by reference as part of this decree as if it were recited herein verbatim and orders the parties to do all things necessary to effectuate the agreement." *See id*.

(App. at 105).⁴  The Divorce Judgment also dissolved the Temporary Orders, stating that: "IT IS ORDERED AND DECREEED that Petitioner [Mr. Wood] and Respondent [Mrs. Wood] are discharged from all further liabilities and obligations imposed by…the temporary order of this Court rendered June 6, 2013."  *See id*. (App. at 122).

### III.   ARGUMENT AND AUTHORITIES

On this Motion, the Court need only decide two elements of Plaintiff's breach of contract claim: (1) performance or tendered performance by RCH; and (2) breach of contract by the defendant.  *See* ECF No. 27 at 34 (citing *Marquis Acquisitions, Inc. v. Steadfast Ins.*, 409, S.W. 808, 814 (Tex. App.—Dallas 2013, no pet.)).⁵

**A.   CTS Breached its Seller's Representation in the Purchase Agreement.**

The Seller's Representation "warrants and represents unto **BUYER** that there are no Temporary or Permanent Orders entered in the divorce proceedings between Tana Wood and Scott Wood which require (i) an Order from the Court having jurisdiction of the divorce proceedings approving the sale of the Interests…" (App. at 79).  Because CTS made the Seller's Representation on January 20, 2014, it was false when made.

The Divorce Court had entered Temporary Orders seven months prior, on June 6, 2013. (App. at 104).  Those Temporary Orders remained in effect until February 6, 2014, approximately

---

⁴   Pursuant to the Divorce Settlement, Mrs. Wood transferred her one-half ownership of CTS and CTS Management to Mr. Wood in exchange for consideration.  *See* Exhibit A (Ryan Decl.) at ¶ 11 & Ex. A-13 (App. at 126-130).

⁵   The other two elements—a valid contract and damages—are not at issue in this Motion.  RCH is not seeking summary judgment on any of its several damages components.  *See* ECF No. 27 at 13 (correctly noting that RCH "seeks money damages equal to the greater of $17.5 million or the benefit-of-the-bargain lost because of Defendants' conduct; recovery of all money that in equity and good conscience belongs to it; exemplary damages; attorney's fees; and pre-and post-judgment interest.").   And the CTS Defendants have conceded that the Purchase Agreement and CTS-to-RCH Assignments are valid contracts.  *See id*. at 42, n.8 (citing ECF No. 21 at 4 ("CTS Defendants do not dispute that the Purchase Agreement or CTS-to-RCH Assignments are valid contracts that bind the parties in this case…")); *accord* ECF No. 28 at 11 (the CTS Defendants stating, again, that "the parties' dispute is covered by a valid, express contract….").

2 ½ weeks after the Seller's Representation. (App. at 122). The Temporary Orders prohibited Mr. Wood from "*encumbering, transferring*, or otherwise harming or reducing the value of the property of one or both of the parties" and from "[s]elling, *transferring, assigning*, mortgaging, *encumbering, or in any other manner alienating any of the property of Petitioner [Scott Wood] or Respondent [Tana Wood]*, whether personalty or realty, and whether separate or community." (App. at 41-42) (emphasis supplied).

The CTS-to-RCH assignments transferred and assigned property of Mr. and Mrs. Wood—Royalty Interests belonging to CTS, a company jointly owned by them. The CTS-to-RCH Assignments were signed by Mr. Wood on January 29, 2014, with an effective date of February 1, 2014. (App. at 88-103). Thus, CTS breached the Seller's Representation because a Temporary Order entered in the Wood Divorce required Court approval to sell the Royalty Interests to RCH. And CTS agreed that "breach of the foregoing representation and warranty shall constitute a failure of title…and **BUYER** shall be entitled to refund of the Option Fee." (App. at 79).

RCH fully performed its obligations under the Purchase Agreement. RCH paid the $500,000 Option Fee on January 17, 2014. (App. at 185). And it paid the balance of the purchase price, $17,000,000, on January 29, 2014. (App. at 183 & 186-187). Because RCH paid what it promised while CTS breached its Seller's Representation, RCH is entitled to partial summary judgment on its claim that CTS breached the Purchase Agreement.

    **B.**    **Because ERG's Debt Attached to the Royalty Interests, CTS Breached its Warranty of Title to RCH.**

           1.    <u>The CTS-to-ERG Transfers Caused ERG's Bank Debt to Attach to the Royalty Interests</u>.

In January 2013, ERG executed the Original Credit Agreement and Deed of Trust with the Bank. (App. at 9-33). The Deed of Trust contained an after-acquired title provision. (App. at 12). Seven months later, ERG acquired title to the Royalty Interests through the CTS-to-ERG

Transfers.  (App. at 46-76).  Thus, the CTS-to-ERG Transfers caused ERG's Bank debt to attach to the Royalty Interests.  (App. at 12).

As noted above, ERG agreed in the Deed of Trust that:

> Mortgagor [ERG] hereby grants to Agent [the Bank] …a security interest in the entire interest of the Mortgagor (whether now owned or hereafter acquired by operation of law or otherwise) in and to…all rights, titles and interests now owned or hereafter acquired by Mortgagor in any and all…documents, money, instruments,…investment property,…contract rights,…and all rights and privileges with respect thereto[.]

*See id*. (App. at 12).  Under California law,[6] the Deed of Trust is a grant deed that transfer title ERG acquired to the Royalty Interests through the CTS-to-ERG Transfers.  The essential element of a grant deed that undeniably transfers after-acquired title is the word "grant".  *Schwenn* at 953 (citing *Klamath Land & Cattle Co., v. Roemer*, 12 Cal. App. 3d 613, 619 (Ct. App. 1970)).  A grant deed "unquestionably transfers an after-acquired title." *Klamath* at 618.  Applicability of the doctrine does not depend on the grantor's motive in reacquiring the property.  *Schwenn v. Kaye*, 155 Cal. App. 3d 949, 952 (Ct. App. 1984) (in an action brought against purchasers to quiet title to oil royalties, holding that it is "patently clear…that any reason…for re-acquiring the…rights is simply irrelevant").  Courts have construed the "now or hereafter acquired" clause in a security agreement applies to all after-acquired collateral, "even though they were not expressly stated in the security agreement." *See, e.g.*, *In re Vecco Constr. Indus., Inc.*, 9 B.R. 866, 877 (Bankr. E.D. Va. 1981) (citing *In re Newkirk Mining Co.,* 1 U.C.C. Rep. Serv. 468 (E.D. Pa. 1962)).  The attachment occurs even if the lender does not file a UCC lien specifically listing the after-acquired

---

[6] The Deed of Trust contains a California choice of law provision.  In California, the doctrine of after-acquired title is partially codified in Cal Civ. Code § 1106 and continues in the common law.  *Noronha v. Stewart*, 199 Cal. App. 3d 485, 490 (Cal. Ct. App. 1988) (citing 2 Miller & Starr, Current Law of California Real Estate (1977) Deeds, § 14:56, p. 588)).

property.  *See, e.g.*, *Crow-Southland Joint Venture No. 1 v. N. Fort Worth Bank*, 838 S.W.2d 720, 724-25 (Tex. App.—Dallas 1992, writ denied) ("We conclude that the…Bank obtained a security interest in 'all equipment now owned or hereafter acquired' by Diversified.  This security interest was perfected when Bank filed a financing statement with the Secretary of State.").

Here, ERG's Deed of Trust uses the term "grant" to unquestionably transfer to the Bank title to property that ERG acquires after execution of the Original Credit Agreement and Deed of Trust.  (App. at 12).  And the Deed of Trust uses the phrase "now or hereafter acquired," which makes clear the lien attaches immediately upon ERG obtaining title to the Royalty Interests.  (App. at 12).  ERG executed the Original Credit Agreement and Deed of Trust in January 2013.  (App. at 9).  The CTS-to-ERG Transfers were in August and September 2013 and backdated to June 2013—but either date is after ERG executed the Original Credit Agreement and Deed of Trust.  *See* Exs. A-14, A-15, A-16, & A-17 (App. at 131-163).  Thus, the CTS-to-ERG Transfers caused ERG's Bank debt to attach automatically to the Royalty Interests the minute Mr. Wood executed the back-dated transfers in violation of the Temporary Orders.  This means that CTS did not have clean title to transfer to RCH.

        2.      <u>Because the Bank Claimed Title to the Royalty Interests Through CTS, CTS Breached its Warranty of Title to RCH.</u>

The CTS-to-RCH Assignments contain a warranty of title.  A "[w]arranty of title" is "[a] warranty that the seller or assignor of property has title to that property, that the transfer is rightful, and that there are no liens or other encumbrances beyond those that the buyer or assignee is aware of at the time of contracting."  BLACK'S LAW DICTIONARY 1823 (10th ed. 2014).  The CTS-to-RCH Assignments both state:

> Assignor [CTS] does hereby warrant and agree to defend title to the Assigned Interest [the Royalty Interests] against any and all persons whomever lawfully claim the same or any part thereof by, through, or under Assignor, but not otherwise.

The CTS Defendants counter that the CTS-to-RCH Assignments' "by, through, or under" language constitutes a special warranty deed. (ECF No. 28 at 10.) RCH agrees. The CTS Defendants argue that the special warranty could not be breached "unless CTS created the defect or encumbrance at issue." (*Id.*) RCH disagrees. *See, e.g.*, Rhonda S. Kaye, *Defects in Title Encompassed by Warranty of a Special Warranty Deed*, 98 A.L.R. 5th 665 (2017) (assignment's "by, through, and under" language extends the warranty of title to any encumbrances created by the grantor or through the grantor's "knowledge and acquiescence"). Indeed, RCH's disagreement is supported by the CTS Defendants' own cases.

The CTS Defendants cite *Paul v. Houston Oil Co. of Tex.*, 211 S.W.2d 345 (Tex. App.—Waco 1948, writ ref'd n.r.e.), which is primarily a procedural case. But *Paul* rejects the CTS Defendants' argument that a special warranty deed constitutes notice to RCH that CTS's title might be defective: "It is true that this deed contains a special warranty but under the great weight of authority, such special warranty does not carry *any* notice of defects of title to the grantee." 211 S.W.2d at 356 (emphasis supplied).

The CTS Defendants also cite *Owen v. Yocum*, 341 S.W.2d 709 (Tex. App.—Fort Worth 1960, no writ), But *Owen* supports RCH. In *Owen*, the chain of title was as follows: Owen to Baggs; Baggs to Yocum; Yocum to Owen; Owen to Yocum. *Id.* at 710. When Baggs owned the property, he failed to pay a plumber who had worked on the property, so Baggs' plumber (Bates) filed a mechanic's lien. *Id.* at 710. But in the last deed from Owen to Yocum, Owen warrantied title "against every person whomsoever lawfully claiming **under me only**." *Id.* (emphasis supplied). The court held that Owen was not liable because "**he** did not create the Bates lien [the plumber's lien], nor did **anyone claiming under him create said lien**." *Id.* (emphasis supplied). Thus, the CTS-to-RCH Assignments are not limited to CTS only; each extends to anyone claiming

by, through, or under CTS.  Here, a party claiming through CTS—ERG—created the lien that impaired RCH's title.  And the same executive—Mr. Wood—signed all documents related to the encumbrance: ERG's Original Credit Agreement and Deed of Trust (App. at 26), the CTS-to-ERG Transfers (App. at 48, 59, 68, & 74), the ERG-to-CTS Transfers (App. at 133, 143, 154, & 159), and the CTS-to-RCH Transfers (App. at 90, 102).

Therefore, there is no question of material fact whether CTS breached its warranty of title as soon as it made the CTS-to-RCH Transfers: CTS could not warrant title to the Royalty Interests because ERG's Bank had superior title under the after-acquired title doctrine.

### C. Because it is CTS's General Partner, CTS Management is Liable for CTS's Breach of Contract.

CTS is a limited partnership.  CTS Management is CTS's general partner.  *See* Exhibit B (Plato Decl.) at ¶ 10 (App. at 181).  As its general partner, CTS Management is liable for CTS's debts, including CTS's breaches of its contracts with RCH.  *See* TEX. BUS. ORG. CODE § 153.152 ("Except as provided by this chapter or the other limited partnership provisions, a general partner of a limited partnership has the liabilities of a partner in a partnership without limited partners to a person other than the partnership and the other partners."); *accord Shawell v. Pend Oreille Oil & Gas Co.*, 823 S.W.2d 336, 337 (Tex. App.—Texarkana 1991, writ denied).

### IV.   Conclusion

Because there are no issues of material fact, RCH seeks a summary judgment that: (1) RCH tendered the performance required of it by the Purchase Agreement and CTS-to-RCH Assignments; (2) CTS breached the Seller's Representation in the Purchase Agreement; (3) CTS breached the warranty of title in the CTS-to-RCH Assignments; and (4) CTS Management is liable for the debts of CTS, including any liabilities related to CTS's breaches of contract.

## CERTIFICATE OF SERVICE

    I hereby certify that on August 11, 2017, a true and correct copy of the foregoing document was served on counsel for all parties via the Court's ECF system.

                                                      */s/ Andrew B. Ryan*
                                                      Andrew B. Ryan