**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| ROYALTY CLEARINGHOUSE, LTD., | § | JURY TRIAL DEMANDED |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 1:16-cv-1342 |
| | § | |
| CTS PROPERTIES, LTD., | § | |
| CTS MANAGEMENT, LLC, | § | |
| SCOTT Y. WOOD, TANA R. WOOD, | § | |
| AND PLS, INC., | § | |
| | § | |
| Defendants. | | |

---

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

---

By and through its undersigned counsel, Royalty Clearinghouse, LTD. ("Royalty Clearinghouse" or "Plaintiff") respectfully submits its First Amended Complaint and states as follows:

## I.   INTRODUCTION

1.      Royalty Clearinghouse brings this Complaint to recover damages resulting from the defendants' fraudulent conduct in connection with the sale of $17.5 million in fractional undivided interests in oil, gas, or other minerals—an overriding royalty interest and a non-participating royalty interest in the historically profitable Cat Canyon Field in California (the "Royalty Interests")—that resulted in Plaintiff losing virtually its entire investment. Royalty Clearinghouse's fraud claims are based on four simple and indisputable premises.

2.      First, Defendant Scott Wood backdated transfers of the Royalty Interests between two entities he owned with his ex-wife Defendant Tana R. Wood—e.g., from Defendant CTS

Properties Ltd. ("CTS") to another company the Wood family controlled, ERG Resources, LLC ("ERG")—in order to defraud the state court presiding over the Woods' divorce.

3.     Second, by transferring the Royalty Interests from CTS to ERG, the bank that provided ERG a $350 million loan obtained superior title to the Royalty Interests through the "after acquired property" or "after acquired title" clause in ERG's loan documents.  If ERG defaulted on its loan, these transfers would give the bank title to the Royalty Interests that would prevail over any later purchaser.

4.     Third, Defendant Scott Wood then caused CTS to sell the Royalty Interests—oil and gas interests that CTS had previously transferred to ERG and encumbered with ERG's debt— to Royalty Clearinghouse in exchange for $17.5 million in cash.  Mr. Wood and CTS only accomplished this sale, however, by falsely warranting that CTS had free and clear title to the Royalty Interests and representing that the CTS-to-ERG Transfers (defined below) were merely an "administrative error" or a "bookkeeping entry."

5.     Fourth, Royalty Clearinghouse did not know that ERG's debt had encumbered the Royalty Interests.  Instead, Royalty Clearinghouse relied upon Mr. Wood and CTS's false representations in agreeing to pay $17.5 million for the Royalty Interests—oil and gas interests that it lost entirely when ERG defaulted on its debt and the bank asserted its superior title to the Royalty Interests.

6.     Mr. Wood's motive for this fraud was money—and lots of it. While he was litigating his divorce and before he sold the Royalty Interests to Royalty Clearinghouse, Mr. Wood learned that a Chinese company would pay $665 million for ERG.  So, Mr. Wood began his plate-spinning scheme:  Settle his divorce with Ms. Wood before the sale to the Chinese company became public, sell the Royalty Interests to pay off Ms. Wood before the bank made its claim to

the Royalty Interests, and close the Chinese transaction to pay off the bank before Royalty Clearinghouse figured out it had been defrauded.  Accomplish all of this, and Mr. Wood would keep approximately $300 million dollars from the China deal for himself.  But the Unites States government vetoed ERG's sale to a Chinese company due to national security concerns.  This drove ERG into bankruptcy and brought Mr. Wood's fraud to light, forcing Royalty Clearinghouse to file suit to recover the millions it lost because of his deceit.

## II.   THE PARTIES

7.     Plaintiff Royalty Clearinghouse is a Texas limited partnership with its principal place of business in Travis County, Texas.  It is related to, and a successor-in-interest to, RCPTX, Ltd.  At all times relevant to the acts or omissions giving rise to the claims in this lawsuit, Royalty Clearinghouse and RCPTX, Ltd. shared the same partners.  Royalty Clearinghouse also declared and suffered the multimillion dollar loss that is the subject of this Complaint.

8.     Defendant CTS Properties, Ltd. ("CTS") is a Texas limited partnership with its principal place of business in Harris County, Texas.  It may be served with process by its registered agent, through the Texas Secretary of State, or by any other means permitted by Texas law.

9.     Defendant CTS Management, LLC ("CTS Management") is a Texas limited liability company with its principal place of business in Harris County, Texas.  CTS Management, LLC is the general partner of Defendant CTS.  It may be served with process by its registered agent, through the Texas Secretary of State, or by any other means permitted by Texas law.

10.     Defendant Scott Y. Wood (sometimes referred to herein as "Mr. Wood" or "Scott Wood") is an individual whose principal place of residence is in Harris County, Texas.  He may be served with process at The Houstonian Estates, 121 N. Post Oak Lane #1204A, Houston, TX 77024, or by any other means permitted by Texas law.

11.     Defendant Tana R. Wood (sometimes referred to herein as "Ms. Wood" or "Tana Wood") is an individual whose principal place of residence is in Harris County, Texas. She may be served with process at 5532 Sturbridge Drive, Houston, TX 77056, or by any other means permitted by Texas law.

12.     Defendant PLS, Inc. ("PLS") is a Texas corporation with its principal place of business in Harris County, Texas. It may be served with process by its registered agent, through the Texas Secretary of State, or by any other means permitted by Texas law.

13.     CTS, CTS Management, Mr. Wood, Ms. Wood, and PLS are collectively referred to herein as the "Defendants."

### III.     JURISDICTION AND VENUE

14.     This Court has federal question jurisdiction over this lawsuit under 28 U.S.C. § 1331 pursuant to Section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and 17 CFR § 240.10b-5 because the matters in controversy arise under the laws of the United States. Further, this Court has supplemental jurisdiction over the state law causes of action asserted herein pursuant to 28 U.S.C. § 1367(a) because the state law claims are so related to the federal claim within this Court's original jurisdiction as to form part of the same case or controversy.

15.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because all or a substantial part of the events or omissions giving rise to this claim occurred in Travis County, Texas. Plaintiff Royalty Clearinghouse's business is in Travis County. CTS's title representations regarding the Royalty Interests were sent via e-mail to Royalty Clearinghouse employees in Travis County. CTS's response to Royalty Clearinghouse's discovery of the CTS-to-ERG Transfers (as defined below) were directed to Travis County via e-mail and telephone calls. The decision to enter into the Purchase Agreement (as defined below) was made in Travis County, as were the

decisions to wire the $17.5 million in total payments required by the Purchase Agreement. After the ERG Bankruptcy Case (as defined below), CTS and Wood directed defenses of their title representations regarding the Royalty Interests to Royalty Clearinghouse employees in Travis County via e-mails and telephone calls.

16.     Defendants are subject to the personal jurisdiction of the Texas courts because each availed themselves of the privileges and benefits of doing business in the State of Texas by registering as Texas companies, residing in Texas, and/or soliciting business from (and engaging in business with) Royalty Clearinghouse in Texas.

## IV.    STATEMENT OF FACTS

**A.    An Overview of the Facts.**

17.     This is case about a fraud orchestrated by Mr. Wood so that he could enrich himself personally and use someone else's money to finalize his divorce from his then-wife, co-Defendant Tana R. Wood.

18.     The Woods' family money came from oil and gas interests that were owned through various family entities. One of those entities, Defendant CTS Properties, Ltd. ("CTS") owned the Royalty Interests.

19.     In early January 2014, Royalty Clearinghouse was approached by an oil and gas broker about purchasing the Royalty Interests. Mr. Wood offered the Royalty Interests for sale at an attractive price, but on the condition that the transaction close within just a few weeks.

20.     In the two weeks leading up to the payment, Mr. Wood, CTS, and their respective agents and principals made written and oral representations to Royalty Clearinghouse that CTS had free and clear title to the Royalty Interests.

21.     Royalty Clearinghouse relied upon these preliminary representations in deciding to move forward with the transaction on such an accelerated pace.

22.     And when Royalty Clearinghouse later discovered that the prior representations were not true because CTS had transferred its interests to another Wood family company in the middle of 2013—ERG—CTS's representative told the plaintiff that these transfers were nothing more than an "administrative error" that CTS and Mr. Wood would "fix."

23.     Relying on these representations, Royalty Clearinghouse agreed to complete its purchase of the Royalty Interests and wired $17.5 million to CTS in January 2014.  CTS accepted Royalty Clearinghouse's wire with a "thanks" and a "congratulations."

24.     Any celebration would be short-lived.  Just over one year later, in the Spring of 2015, ERG was no longer able to pay its debts, and its bank sued for a judicial foreclosure on its collateral—including the Royalty Interests.

25.     This foreclosure lawsuit, and the weight of the bank debt that prompted it, forced ERG to file for bankruptcy on April 30, 2015.

26.     But all throughout the bankruptcy, CTS and its principals—including Mr. Wood— continued to represent to Royalty Clearinghouse that the Royalty Interests were not the bank's collateral.

27.     CTS and Mr. Wood promised that there were "documents" that would prove that the bank knew about, and had consented to, CTS's transfers of the Royalty Interests to ERG and their subsequent sale to Royalty Clearinghouse.

28.     Naturally, Royalty Clearinghouse asked for copies of such documents.  None were ever produced.

29.     Six months after it first asked for supporting documents, Mr. Wood was forced to admit to Royalty Clearinghouse during an October 2015 telephone call, that indeed, no such documents ever existed.

30.     Realizing that Mr. Wood and CTS had lied repeatedly and committed fraud, Royalty Clearinghouse settled with ERG's bank and began investigating Mr. Wood.  It was only then that the Plaintiff discovered Mr. Wood's fraud could be traced directly to his divorce.

31.     When Mr. Wood filed for divorce from Ms. Wood in late 2012, the two spouses owned CTS in equal shares.  By February 2013, CTS owned the Royalty Interests free and clear of any debts or encumbrances.  That meant Ms. Wood could receive approximately half of the Royalty Interests' values—which would be millions of dollars.

32.     Mr. Wood did not want to pay Ms. Wood millions of dollars for her share of CTS's Royalty Interests.  So, Mr. Wood violated a court order and transferred CTS's Royalty Interests to ERG.  Mr. Wood made these transfers because ERG was drowning in debt.  Mr. Wood knew that ERG's loan agreement with its bank contained a provision known as an "after-acquired title" or "after-acquired property" clause.  This clause meant that the bank would have a lien on the Royalty Interests as soon as CTS transferred its Royalty Interests to ERG.  The bank's lien on the Royalty Interests would allow Mr. Wood to convince Ms. Wood that CTS (including its Royalty Interests) had little or no value—either because CTS had no assets (all were owned by ERG) or CTS's assets were encumbered by hundreds of millions of dollars of ERG's debt.

33.     Mr. Wood's strategy worked, and he settled his divorce with Ms. Wood for a fixed payment.

34.     To raise the cash to pay Ms. Wood, Mr. Wood decided to sell the Royalty Interests—interests that he had hidden from Ms. Wood (so he was using her money to pay his

divorce settlement), interests that he knew CTS did not own, and interests that he knew were encumbered by ERG's massive bank debt.

35.     To convince a potential purchaser that the Royalty Interests were worth the $17.5 million asking price, Mr. Wood had to represent to Royalty Clearinghouse that CTS owned the Royalty Interests free and clear of all liens and encumbrances, or else no rational company would buy them—certainly not Royalty Clearinghouse.

36.     Royalty Clearinghouse believed Mr. Wood and CTS and relied on their representations.  Thus, in January 2014, Royalty Clearinghouse paid $17.5 million for the Royalty Interests, but then lost them almost two years later once Mr. Wood's fraud came to light.

37.     Thus, Royalty Clearinghouse brings this lawsuit to recover from Mr. Wood and the beneficiaries of his fraud the millions of dollars that the Plaintiff has lost.

**B. As Part of a Scheme to Defraud the Divorce Court, Mr. Wood Intentionally Burdens CTS's Royalty Interests with ERG's Debt.**

38.     In July 2010, ERG purchased oil and gas interests in the Cat Canyon Field from Chevron Corporation.

39.     Mr. Wood and Ms. Wood jointly owned ERG, but Mr. Wood operated it.

40.     On or about July 26, 2010, shortly after ERG bought its interests in the Cat Canyon Field from Chevron, Mr. Wood had ERG transfer the Royalty Interests that are the subject of this lawsuit to Defendant CTS.

41.     The Royalty Interests include an undivided 3% of 8/8ths nonparticipating royalty in all oil, gas, casinghead gas, or other hydrocarbons, produced, saved, and sold from certain lands in Cat Canyon Field (the "NPRI"), as well as an undivided .333325 percent of 8/8ths of all oil, casinghead gas, or other hydrocarbons produced, saved, and sold under the terms of certain oil and gas leases in Cat Canyon Field (the "ORRI").

42.   At the time of both the Wood Divorce and the Original Credit Agreement (both terms defined below), CTS had three partners—two limited partners (Mr. Wood and Ms. Wood) and one general partner (Defendant CTS Management).

43.   As limited partners, Mr. Wood and Ms. Wood each owned 49.5% of CTS.

44.   As the general partner, CTS Management owned the remaining 1%, but Mr. Wood and Ms. Wood each owned 50% of CTS Management.

45.   Stated simply, Mr. Wood and Ms. Wood were equal owners of CTS and, by extension, the Royalty Interests.

46.   From 2010 through 2012, ERG produced oil and gas from the Cat Canyon Field.

47.   The Cat Canyon Field was profitable for ERG, and the Royalty Interests were extremely valuable to CTS.

48.   On or about December 20, 2012, Mr. Wood filed for divorce from Ms. Wood in the 264th District Court of Harris County, Texas (the "Divorce Court") in Case Number 2012-74497 (the "Wood Divorce").

49.   Just over one month later, on or about January 24, 2013, ERG signed a loan agreement and deed of trust (collectively, the "Original Credit Agreement") with a consortium of lenders led by CLMG Corp. (collectively, the "Bank").

50.   Because the Original Credit Agreement extended up to $350 million in loans, the Bank required ERG to pledge collateral as security for the debt.

51.   ERG pledged both its current property and any future property it might acquire as collateral under the Original Credit Agreement.

52.   Specifically, ERG agreed that:

> Mortgagor [ERG] hereby grants to Agent [the Bank]…a security
> interest in the entire interest of the Mortgagor (whether now owned

or hereafter acquired by operation of law or otherwise) in and to:…all rights, titles and interests now owned or hereafter acquired by Mortgagor in any and all…documents, money, instruments,…investment property,…contract rights,…and all rights and privileges with respect thereto[.] (Deed of Trust § 1.3(h)).

53.     This clause, known as an after-acquired collateral, after-acquired property, or after-acquired title clause, is not unusual in commercial loans. i

54.     Because Mr. Wood controlled the family companies (including CTS and ERG) that held valuable marital assets, Ms. Wood filed a Motion for Temporary Orders that sought the Divorce Court's help to ensure that Mr. Wood did not conceal or transfer away marital assets.

55.     On or about May 30, 2013, the Divorce Court held a hearing on Ms. Wood's Motion for Temporary Orders.

56.     At this hearing, on information and belief, Mr. Wood represented (either affirmatively or through omission) that he had not unlawfully transferred assets or wrongfully encumbered them.

57.     On or about June 6, 2013, the Divorce Court granted Ms. Wood's request and entered an injunction (the "Divorce Injunction")—a court order, the violation of which is punishable by contempt of court—that prohibited Mr. Wood from taking the following actions:

> The temporary injunction granted below shall be **effective immediately** and shall be **binding on Petitioner [Scott Wood] and**/or Respondent [Tana Wood]; **on their agents, servants, employees, and attorneys**; and on those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise…
>
> **IT IS ORDERED that Petitioner [Scott Wood] and Respondent [Tana Wood] are enjoined from**:
>
> 6.     Destroying, removing, **concealing, encumbering, transferring**, or otherwise harming or reducing the value of the property of one or both of the parties.

7.    ***Falsifying any writing*** or record relating to the property of either party.

….

11.    Selling, ***transferring, assigning***, mortgaging, ***encumbering, or in any other manner alienating any of the property of Petitioner [Scott Wood] or Respondent [Tana Wood]***, whether personalty or realty, and whether separate or community, except as specifically authorized by this order. (emphasis supplied)

58.    The Divorce Court filings make clear that Mr. Wood's defense in the divorce was that ERG was essentially worthless because ERG's assets were worth barely more than its debts.

59.    Ms. Wood, therefore, would only be entitled to approximately half of ERG's limited value.

60.    CTS's Royalty Interests therefore presented a problem for Mr. Wood's strategy. As discussed in the overview, the Royalty Interests were worth at least $17.5 million in 2014. Assuming the Royalty Interests were at least that valuable in 2013, Ms. Wood's 50% share of CTS's Royalty Interests would have been worth approximately $8.875 million (*i.e.*, one-half of their value).

61.    Knowing that the Original Credit Agreement contained an after-acquired title clause, and intending to prevent Ms. Wood from obtaining one-half of the Royalty Interests, Mr. Wood intentionally encumbered CTS's Royalty Interests with ERG's debt.

62.    Through two property transfers on August 20, 2013, and two more one week later, Mr. Wood caused CTS to transfer the Royalty Interests to ERG (the "CTS-to-ERG Transfers").

63.    For at least three reasons, the timing of the CTS-to-ERG Transfers compels the conclusion that Mr. Wood knew that he was perpetrating a fraud on the Divorce Court.

64.    First, Mr. Wood made the CTS-to-ERG Transfers after the Divorce Court entered the Divorce Injunction. The Divorce Court entered the Divorce Injunction on or about June 6,

2013.  The Divorce Injunction prohibited Mr. Wood from transferring marital assets.  The CTS-to-ERG Transfers were made on August 20, 2013 and August 27, 2013, and transferred marital assets—property owned by CTS, a company co-owned by Ms. Wood—in violation of the Divorce Injunction.

65.    Second, even though the assignments were executed in August 2013 and not recorded until months later, Mr. Wood backdated each of the CTS-to-ERG Transfers to be effective as of June 1, 2013.  Because Mr. Wood knew he could not transfer marital assets after the Divorce Injunction had been entered, he falsely stated that the CTS-to-ERG Transfers were effective as of June 1, 2013—one day after the Divorce Court heard argument on the Divorce Injunction, but five days before the injunction was entered.

66.    Third, Mr. Wood caused the CTS-to-ERG Transfers to be executed in the last two weeks of August 2013, just in time for him to give testimony under oath that the value of the marital assets did not include CTS's Royalty Interests.

67.    Mr. Wood was deposed in the Wood Divorce on September 11, 2013 (approximately 2 ½ weeks after the CTS-to-ERG Transfers), and produced a sworn inventory of assets and a valuation report by a third-party expert in support of his sworn statements on November 1, 2013 (slightly more than two months after the CTS-to-ERG Transfers).

68.    If Mr. Wood had not executed the CTS-to-ERG Transfers before his sworn testimony, he would have had to disclose the Royalty Interests' multimillion dollar value or risk committing perjury.

69.    Mr. Wood's gamesmanship worked.  By the end of 2013, ERG had borrowed almost the entire amount allowed by the Original Credit Agreement—approximately $350 million.

Having convinced Ms. Wood that ERG's debts subsumed almost all its value, Ms. Wood agreed with Mr. Wood to settle the Wood Divorce.

70.     On December 27, 2013, Mr. Wood and Ms. Wood entered into an Agreement Incident to Divorce (the "Divorce Settlement").

71.     Under the Divorce Settlement, Ms. Wood agreed to transfer her ownership interest in CTS and ERG to Mr. Wood and Mr. Wood agreed to pay Ms. Wood a large cash payment.

72.     Needing money to make the payments required by the Divorce Settlement, Mr. Wood began marketing the Royalty Interests for sale.

73.     But the Royalty Interests were still owned by ERG and burdened by ERG's debt to the Bank.   To complete the sale, Mr. Wood and CTS committed fraud, telling Royalty Clearinghouse that CTS owned the Royalty Interests free and clear.

**C. Because CTS Represented It Had "Good Title" and its Ownership Was Free and Clear, Royalty Clearinghouse Buys the Royalty Interests for $17.5 Million.**

74.     Mr. Wood engaged an oil and gas broker—Defendant PLS, which stands for Petroleum Listing Services—to market the Royalty Interests for sale.

75.     In exchange for its marketing efforts, PLS would be paid a flat fee and/or commission if it found a buyer for the Royalty Interests.

76.     PLS had contacts at Royalty Clearinghouse, so it sent a package on the Royalty Interests to Royalty Clearinghouse on or about January 7, 2014.

77.     On January 15, 2014, and after reviewing the materials PLS had provided, Royalty Clearinghouse sent a written offer letter to Mr. Wood (through PLS) that offered $9 million for one-half of the Royalty Interests.

78.     On January 16, 2014, Royalty Clearinghouse increased its offer to $17.5 million for 100% of the Royalty Interests.   Royalty Clearinghouse transmitted an updated offer letter to

Mr. Wood (through PLS) and set up a meeting with Mr. Wood in Houston, Texas, for January 17, 2014.

79.     In advance of the in-person meeting, Doug Lacey—a landman for both ERG and CTS—represented in writing to Royalty Clearinghouse on January 16, 2014, that CTS had clean title to the Royalty Interests:

> Land Records:  The ORRI covers 8 producing tracts, each of which has been owned by a small handful of oil companies for the last century.  We have a title book for each tract containing a run sheet from patent to current plus recorded copies to the conveyances to CTS out of ERG at the time we purchased the property from Chevron.

80.     The next day, Mr. Lacey provided Royalty Clearinghouse with documents to support his written representation that CTS had clean title.

81.     At 11:48AM on January 17, 2014, Mr. Lacey represented: "Runsheet on the top with copies of the listed documents behind it – patent to current.  ERG acquired the mineral fee from Chevron and carved out the interests you are purchasing to CTS at that time."

82.     Four minutes later, Mr. Lacey again represented to Royalty Clearinghouse: "ERG acquired the mineral fee from Chevron and carved out the interests you are purchasing to CTS at that time."

83.     The same day that Mr. Lacey represented in writing that CTS had clean title to the Royalty Interests, Royalty Clearinghouse representatives—its founder Shain McCaig and its Chief Operating Officer Marc Zimmermann—traveled from Austin, Texas to Houston, Texas to meet with Mr. Wood.

84.     On January 17, 2014, Mr. McCaig and Mr. Zimmermann arrived at the ERG offices in Houston and met with Mr. Wood and Doug Lacey (of CTS), as well as two representatives from PLS (Jaason Reimbold and Brian Green).

85.     Mr. McCaig and Mr. Zimmermann understood the purpose of this meeting was so that Mr. Wood could "size up" Royalty Clearinghouse and ensure it could pay the $17.5 million offered for the Royalty Interests.

86.     During this meeting, Mr. Wood made direct representations to Royalty Clearinghouse.  Mr. Wood represented that he "wouldn't be selling" the Royalty Interests if he "didn't have to."

87.     Mr. Wood further explained that he *had* to sell the Royalty Interests because he was going through a divorce and needed the cash generated by a sale of the Royalty Interests to fund his Divorce Settlement.

88.     Mr. Wood characterized CTS's sale of the Royalty Interests to Royalty Clearinghouse as a "gift"—that he was giving Royalty Clearinghouse a "gift," "the greatest gift," or the "gift a lifetime"—because even though the Royalty Interests were worth more than $17.5 million, he needed to sell them for less than fair market value in order to finalize his divorce.

89.     Mr. Wood emphasized repeatedly that CTS's sale to Royalty Clearinghouse had to be completed and funded by January 31, 2014.

90.     If Royalty Clearinghouse could not complete the transaction in the next two weeks, Mr. Wood warned, he had another plan to raise the money needed for his divorce and CTS would never sell the Royalty Interests.

91.     Royalty Clearinghouse's executives left the meeting feeling more comfortable about completing the transaction.   There were at least two reasons for this.

92.     First, walking into the meeting, Royalty Clearinghouse's executives did not know Mr. Wood, CTS, or any of his companies.  Royalty Clearinghouse needed to confirm, in person, that Mr. Wood was a reputable businessman who could be trusted.  Mr. Wood, and the people

surrounding him that day, played the part and convinced Royalty Clearinghouse that this was a bona fide offer of valuable oil and gas interests.

93.     <u>Second</u>, Mr. Wood and his agents also had answered Royalty Clearinghouse's questions about who held legal title to the Royalty Interests.

94.     In early January 2014, and in response to materials provided by PLS, Royalty Clearinghouse had sent an initial offer letter that twice referenced Mr. Wood as the owner of the Royalty Interests.

95.     In the January 17, 2014, meeting, Mr. Wood explained in great detail that he had worked with Chevron Corporation for years to purchase its interest in the Cat Canyon Field.  When Mr. Wood completed its acquisition, Royalty Clearinghouse was told, the Royalty Interests were "carved out" to "Scott."

96.     It was not uncommon, either in Royalty Clearinghouse's experience or in the oil and gas industry, for a company to "carve out" royalty interests for its owners, key personnel, and family members after a large acquisition.  Instead, the description that the Royalty Interests were "carved out" to "Scott" further cemented Royalty Clearinghouse's view that Mr. Wood and CTS were one in the same, so title would be unencumbered.

97.     After the January 17, 2014 meeting, each of the parties insisted on two telling changes to the draft purchase agreement.

98.     <u>First</u>, on the night of January 17, 2014, at 6:24PM, CTS's marketing agent for the Royalty Interests—PLS—notified RCPTX that the "wiring instructions" for the $500,000 option payment should be "[c]hange[d]…to ERG" even though CTS owned the bank account where the payment would be wired.   At the time, this change seemed inconsequential to Royalty Clearinghouse, which had completed other deals where the owner had requested payment be made

to a non-party.   In hindsight, however, it is further proof of Mr. Wood's fraud: by falsely designating Royalty Clearinghouse's money for ERG, Ms. Wood might never know of the tremendous price Royalty Clearinghouse had paid CTS.

99.     Second, Royalty Clearinghouse insisted that the draft purchase agreement contain a representation by Mr. Wood that he did not need the Divorce Court or Ms. Wood's approval to sell the Royalty Interests to Royalty Clearinghouse.

100.    Mr. Wood agreed to make this representation, but it was false when made and knowingly so—Mr. Wood knew the Divorce Injunction remained in effect, and the Divorce Court did not dissolve the Divorce Injunction until several weeks after Royalty Clearinghouse agreed to purchase the Royalty Interests.

101.    On January 20, 2014, CTS and Royalty Clearinghouse both signed an offer to purchase the Royalty Interests (the "Purchase Agreement").

102.    Under the Purchase Agreement, Royalty Clearinghouse agreed to pay CTS an immediate option fee of $500,000 (the "Option Fee"), which would be nonrefundable unless CTS breached the following representation:

> **SELLER** [CTS] warrants and represents unto **BUYER** [RCPTX] that there are no Temporary or Permanent Orders entered in the divorce proceedings between Tana Wood and Scott Wood which require (i) an Order from the Court having jurisdiction of the divorce proceedings approving the sale of the Interests to **BUYER** or (ii) approval of Tana Wood, to such sale.   **BUYER** and **SELLER** expressly understand, acknowledge and agree that a breach of the foregoing representation and warranty shall constitute a failure of title…and **BUYER** shall be entitled to refund of the Option Fee.

103.    Royalty Clearinghouse also agreed to pay an additional $17 million, representing the balance of the Purchase Price, if the parties completed the sale on or before January 29, 2014.

104.    On January 21, 2014, Royalty Clearinghouse paid the $500,000 Option Fee to CTS via wire transfer.

105.    Although Royalty Clearinghouse made the wire transfer to an account at Prosperity Bank owned by CTS, it complied with the January 17th request that the wire be designated to "ERG."

106.    When acknowledging receipt of the Option Fee, CTS's landman Mr. Lacey expressed surprise that Prosperity Bank accepted a payment to ERG into a CTS account:  "Wire received.  Payment issued to ERG instead of CTS so I'm a little surprised the bank accepted it but it's in the correct account so all is well. Thanks."

107.    After paying the Option Fee to CTS, Royalty Clearinghouse continued its due diligence on the schedule set forth in the Purchase Agreement.

108.    As part of its due diligence, Royalty Clearinghouse learned that CTS did not own the Royalty Interests.  Instead, Royalty Clearinghouse learned that the Royalty Interests had been transferred to ERG through the CTS-to-ERG Transfers described above.

109.    Early in the evening on Friday, January 24, 2014, Royalty Clearinghouse's Marc Zimmermann and Amy Bryan had a telephone call with CTS's Doug Lacey.

110.    During that call, Mr. Zimmermann and Ms. Bryan relayed that CTS did ***not*** own the Royalty Interests; ERG did. Mr. Lacey said he was "shocked." Then Mr. Lacey acknowledged that he knew of the CTS-to-ERG Transfers, but said it was "an administrative error" that "should have already been taken care of." Mr. Lacey promised Royalty Clearinghouse: "We'll get it fixed."

111.    On January 25, 2014, at 3:36PM, Royalty Clearinghouse formally notified CTS of a "complete failure of title" as to the Royalty Interests because of the CTS-to-ERG Transfers.

112.    Royalty Clearinghouse suggested to CTS that:  "This title problem can be cured by delivery of a properly executed Assignment [of the Royalty Interests] from ERG to CTS of all interest covered by [the CTS-to-ERG Transfers] prior to or at closing."

113.     Shortly after this Royalty Clearinghouse email confirming a complete failure of title, Mr. Zimmermann responded to Mr. Lacey that:  "These are the items that what [sic] we discussed yesterday on the phone.  Numbers two and three [the CTS-to-ERG Transfers] are a mute [moot] point since you already have the paperwork done to assign them to CTS from ERG before the transaction."

114.     On January 27, 2014 and January 28, 2014, Mr. Lacey provided Royalty Clearinghouse with draft assignments that would undo the CTS-to-ERG Transfers and transfer the Royalty Interests back to CTS (the "ERG-to-CTS Transfers").

115.     At no time did anyone from CTS alert Royalty Clearinghouse to ERG's $350 million Original Credit Agreement, or the deed of trust that went along with it.

116.     Relying on the representation that the ERG-to-CTS Transfers would be made and would cure the complete failure of title it had identified, Royalty Clearinghouse agreed to close on the transaction to purchase the Royalty Interests if CTS agreed to complete and file the ERG-to-CTS Transfers.

117.     Then, just as it had with the Option Fee, Mr. Wood demanded last-minute changes to the wire instructions for the $17 million balance of the Purchase Price.

118.     On January 28, 2014, at 3:23PM, Doug Lacey told Royalty Clearinghouse that: "Scott [Wood] wants the money to be funded tomorrow into the PLS escrow account where it was originally proposed instead of where the initial deposit went."

119.     Approximately four hours later, at 7:05PM, Doug Lacey told Royalty Clearinghouse:  "OK, false alarm on the account change.  Funding will be to the same place that the deposit went, including the 'payable to ERG' even though it's going into a CTS account.  Don't ask."

120.     On January 29, 2014, in full compliance with its obligations under the Purchase Agreement, Royalty Clearinghouse transferred the $17 million balance of the Purchase Price to CTS's Prosperity Bank Account and completed its purchase of the Royalty Interests.

121.     That afternoon, at 2:46PM, Doug Lacey wrote: "Houston, we have touchdown. It [Royalty Clearinghouse's $17 million wire] has arrived.  Thanks and congratulations."

**D. The Purpose of Mr. Wood's Fraud Becomes Clear: A Potential Buyer Was Willing to Pay $665 Million for ERG.**

122.     Now able to fund the Divorce Settlement from the proceeds of the sale, Mr. Wood sought to finalize his divorce from Tana Wood.

123.     On February 6, 2014, at 8:53AM, the Divorce Court entered the Woods' Agreed Final Decree of Divorce (the "Divorce Judgment").

124.     The Divorce Judgment "approve[d]" Mr. Wood's and Ms. Wood's Divorce Settlement and "incorporate[d] it by reference as part of this decree as if it were recited herein verbatim and orders the parties to do all things necessary to effectuate the agreement."

125.     On February 7, 2014, a filing company called Capitol Services, Inc. recorded CTS's transfer of the Royalty Interests to Royalty Clearinghouse (the "CTS-to-RCH Transfers").  The CTS-to-RCH Transfers were signed on January 29, 2014, with an effective date of February 1, 2014.

126.     In the CTS-to-RCH Transfers, CTS again promised in a written contract that it had good title to the Royalty Interests: "Assignor [CTS] does hereby warrant and agree to defend the title to the Assigned Interest [the Royalty Interests] against any and all persons whomever lawfully claim the same or any part thereof by, through or under Assignor, but not otherwise."

127.    Ten days later, the U.S. financial media reported a previously unknown fact that, in hindsight, makes clear the purpose of Mr. Wood's fraud on the Divorce Court and on Royalty Clearinghouse.

128.    On February 17, 2014, the Wall Street Journal and other financial media outlets reported that a Chinese company called Goldleaf Jewelry Co. Ltd. ("Goldleaf") had agreed to purchase ERG for at least $665 million (the "Goldleaf Transaction").

129.    Of course, a transaction of this size is not agreed to overnight.  Instead, per sworn testimony by Kelly Plato, ERG's Chief Financial Officer, ERG was introduced to Goldleaf in the late summer of 2013.  Thus, around the time of the Divorce Injunction and the CTS-to-ERG Transfers, Mr. Wood knew that a buyer (Goldleaf) was willing to purchase ERG for tens of millions of dollars more—if not hundreds of millions of dollars more—than ERG's debt to the Bank.

130.    Conveniently, Mr. Wood did not disclose this offer for ERG to the Divorce Court.

131.    If Mr. Wood could convince Ms. Wood, as part of the Divorce Settlement, to sell her interest in ERG to Mr. Wood in exchange for *some* cash – and *fast* – Mr. Wood would own 100% of ERG when it was sold to Goldleaf, and keep *100% of any profit* from the Goldleaf Transaction.

132.    To Ms. Wood, the disclosure of the Goldleaf Transaction was proof of a fraud on the Divorce Court.

133.    On March 5, 2014, Ms. Wood filed a Motion for New Trial in the Wood Divorce. Ms. Wood's motion, supported by her affidavit, alleged that Mr. Wood defrauded her—and the Divorce Court—by undervaluing ERG and failing to disclose the Goldleaf Transaction.

134.    On April 28, 2014, Ms. Wood filed a Motion for Dismissal with Prejudice that abandoned—forever—her right to seek a new trial in Wood Divorce, regardless of Mr. Wood's fraud.

135.    On April 29, 2014, the Divorce Court entered an Agreed Order granting Ms. Wood's Motion for Dismissal with Prejudice.

136.    Upon information and belief, Ms. Wood dismissed her Motion for New Trial in exchange for additional payments of cash or cash equivalents from Mr. Wood.

137.    In hindsight, it is also clear that the Mr. Wood intended and hoped that the Goldleaf Transaction would save him from his fraud on Royalty Clearinghouse.

138.    Mr. Wood knew that the Royalty Interests were encumbered by ERG's debt to the Bank.  But Mr. Wood also knew that CTS's title to the Royalty Interests would only be questioned if the Bank sought to enforce its rights against the Royalty Interests.  The Bank, of course, could not enforce its rights against ERG's collateral if Mr. Wood used the proceeds from the Goldleaf Transaction to repay the Bank in full, which would extinguish the Bank's liens.

139.    To Royalty Clearinghouse, however, the disclosure of the Goldleaf Transaction was not proof that CTS and Mr. Wood had defrauded them into the buying the Royalty Interests.  Rather, Royalty Clearinghouse was left in the dark—the Goldleaf Transaction had not been disclosed to Royalty Clearinghouse before it was announced publicly.  Nevertheless, Royalty Clearinghouse continued to be paid royalties from the Royalty Interests throughout 2014 and maintained a good relationship with CTS and its landman, Mr. Lacey.

**E.  When the Goldleaf Transaction Falls Through, the Bank Forces ERG into Bankruptcy by Pursuing its Collateral, and Royalty Clearinghouse Learns Mr. Wood Is a Fraudster.**

140.    By the end of 2014 or early 2015, it was becoming apparent that the Goldleaf Transaction would not be completed.

141.    The Goldleaf Transaction required U.S. government's approval.  Because the Cat Canyon Field is close to U.S. military installations in California, the U.S. government had national security concerns about allowing a Chinese company to be close to U.S. military interests. Eventually, the U.S. government vetoed the Goldleaf Transaction.

142.    With its credit maxed out and the Goldleaf Transaction dead, ERG did not have enough cash to pay the Bank.

143.    Unsurprisingly, the Bank sued ERG.  On April 15, 2015, the Bank filed a complaint in the Superior Court of Santa Barbara County, California (the "Foreclosure Lawsuit") that sought: (a) the recovery of ERG's assets through a judicial foreclosure; and (b) the appointment of a receiver to sell ERG's assets and repay its debts.

144.    The Bank's Foreclosure Lawsuit named Royalty Clearinghouse as a defendant.  It also named Royalty Clearinghouse's bank, Texas Capital Bank, as a defendant because Texas Capital Bank had recorded a lien on the Royalty Interests.

145.    The Bank's Foreclosure Lawsuit was filed on a Wednesday.   Royalty Clearinghouse was served the next day, Thursday, April 16, 2015.  Royalty Clearinghouse immediately began investigating the facts alleged by the Bank.

146.    On Monday, April 28, 2015, at approximately 3:45PM, Royalty Clearinghouse's Mr. Zimmermann and Al Koehler had a phone call with Doug Lacey, the CTS and ERG landman, regarding the Foreclosure Lawsuit.

147.    Royalty Clearinghouse told Mr. Lacey that it had received the lawsuit on Thursday, April 16, 2015, and that it appeared to Royalty Clearinghouse that the Bank was alleging that Royalty Interests were encumbered and that CTS had no right to sell them.

148.    Mr. Lacey responded that he was "surprised" and would "walk down the hall immediately to find out what is going on" and then call Royalty Clearinghouse.  Upon information and belief, Royalty Clearinghouse alleges that Mr. Lacey was intending to (and did) speak with Mr. Wood.

149.    Approximately four hours later, at around 8PM on Monday, April 28, 2015, Mr. Lacey had a follow-up telephone call with Mr. Zimmermann.  Mr. Lacey said that it "looked like" the Bank had added Royalty Clearinghouse to the lawsuit to "throw the kitchen sink at everyone."

150.    Mr. Lacey, on behalf of CTS, represented that the Bank knew that CTS's Royalty Interest were not pledged as collateral, and that it was "well known" that the Royalty Interests were a "separate asset."

151.    However, Mr. Lacey further disclosed that, "at one point," CTS had transferred the Royalty Interests to ERG "to see if including them in the ERG lending facility would improve its reserve report."  Mr. Lacey contended that when the Royalty Interests did not improve ERG's reserve report, the Royalty Interests were transferred back to CTS.

152.    This, quite simply, was false.  The public title record for the Royalty Interests revealed only one transfer of the Royalty Interests from CTS to ERG—the August 2013 CTS-to-ERG Transfers.  Those transfers were not reversed until January 2014—and not because of an issue with ERG's "reserve report" to the Bank, but because Royalty Clearinghouse had confronted CTS with a complete failure of title.

153.    Moreover, Mr. Lacey's April 28, 2015 explanation of why CTS had made the CTS-to-ERG Transfers puts CTS and Mr. Wood in a Catch-22.  Mr. Lacey claimed that the CTS-to-ERG Transfers were made to improve ERG's reserve report with the Bank:  In other words, ERG **intended** to use the Royalty Interests to convince the Bank it had provided enough collateral for

its loans.  Mr. Lacey's statement reveals the true motivation of the CTS-to-ERG Transfers, which is proof of Mr. Wood's fraud: he *intended* to pledge CTS's Royalty Interests as collateral for ERG's debt.

154.   Mr. Lacey ended his April 28, 2015, telephone call with Mr. Zimmermann by stating that "if and when a deal with the Bank is reached," Royalty Clearinghouse "would be dropped" from the Foreclosure Lawsuit.

155.   Although Mr. Lacey was unsure "where those discussions [between ERG and the Bank] were headed," he told Mr. Zimmermann that "Scott [Wood] is aware that bad title would effectively require him to pay back" millions to Royalty Clearinghouse, so he is "motivated" to get the Bank to release the Royalty Interests to Royalty Clearinghouse.

156.   The next day, April 29, 2015, at approximately 3:30PM, Mr. Zimmermann had another telephone call with Mr. Lacey.  Mr. Lacey again told Mr. Zimmermann that "Scott [Wood] has every reason to exclude" Royalty Clearinghouse from the Bank's Foreclosure Lawsuit.  As part of this call, Mr. Zimmermann requested that Mr. Lacey provide written confirmation between CTS, ERG, and the Bank that the Royalty Interests were not collateral that secured ERG's debt to the Bank.

157.   Mr. Zimmermann specifically asked that Mr. Lacey provide any emails, side agreements, letter agreements, or loan agreements that prove the Royalty Interests were not listed as the Bank's collateral.  Mr. Lacey did not respond immediately to this request, but again ended his conference call with Royalty Clearinghouse by reiterating that Mr. Wood shared everyone's economic incentive—*i.e.*, it was in both Mr. Wood and Royalty Clearinghouse's best interest for the Bank to leave the Royalty Interest alone.

158.    Like so many of the statements made by Mr. Wood, the representation that his financial interests were aligned with Royalty Clearinghouse is also false.

159.    Shortly after the Foreclosure Lawsuit was filed, the Bank began negotiating with Mr. Wood over whether to put ERG into bankruptcy.  Mr. Wood refused, however, because he had executed a personal guaranty of ERG's debt, and the Bank could enforce that guaranty—*i.e.*, collect Mr. Wood's personal assets to satisfy ERG's debts—if ERG filed for bankruptcy.

160.    At or near the time Mr. Lacey conveyed the message that Mr. Wood's financial interests were aligned with Royalty Clearinghouse's, Mr. Wood was negotiating with the Bank to be released from his personal guaranty entirely—*i.e.*, if ERG filed for bankruptcy, the Bank could not collect from Mr. Wood's personal assets to satisfy ERG's debts.  Every dollar of Mr. Wood's assets that were removed from the Bank's reach would require the Bank to collect from another dollar of ERG's collateral.

161.    Stated simply, Mr. Wood's negotiations with the Bank to save his own skin were putting Royalty Clearinghouse's Royalty Interests in greater jeopardy.

162.    On April 30, 2015, after Mr. Wood obtained a partial release of his guaranty to the Bank, ERG filed for bankruptcy in the Northern District of Texas (the "ERG Bankruptcy Case").

163.    After the ERG Bankruptcy Case was filed, Royalty Clearinghouse continued to work with Mr. Lacey to investigate whether the Bank had a valid claim to the Royalty Interests.

164.    On May 12, 2015, Mr. Lacey again emailed Royalty Clearinghouse and reiterated CTS's defense of the CTS-to-ERG Transfers: "There have been many discussions and negotiations [with the Bank] since that time [January 24, 2013] and it has always been understood that the CTS [Royalty Interests] were not mortgaged."

165.    In this email, Mr. Lacey disclosed the fundamental flaw in CTS's purported defense.  Mr. Lacey wrote that the Bank "might argue" that the CTS-to-ERG Transfers "triggered the after acquired title provision in the D/T [Deed of Trust]."  Unsurprisingly, Mr. Lacey had no explanation for why the CTS-to-ERG Transfers were not after acquired title that had become the Bank's collateral long before CTS sold the Royalty Interests to Royalty Clearinghouse.

166.    On May 14, 2015, Mr. Zimmermann again asked Mr. Lacey for documentation concerning CTS's defense of the CTS-to-ERG Transfers:

> [Y]ou indicated that after the deed of trust with CLMG Corp. was signed in January, 2013, there were many discussions and negotiations and it was always understood that the CTS [Royalty Interests] were not mortgaged.  Can you please send me *any* letters, correspondence, notes or emails that you have or that came from CLMG during the course of these discussions and negotiations that would document the fact that the CTS [Royalty Interests] were not to be part of the deed of trust? (emphasis supplied)

167.    Mr. Lacey did not provide any documents during May 2015, alleging that ERG's bankruptcy counsel would need to approve the transmission of these supporting documents.

168.    On June 16, 2015, ERG's bankruptcy counsel—Partner A at Law Firm 1[1]—wrote to Royalty Clearinghouse's bankruptcy counsel: "Once we get all the relevant documentation in order and agree that it is the full suite of relevant documents, we can then collectively decide what the next step is."

169.    Neither Mr. Lacey nor ERG's bankruptcy counsel provided any documents in June 2015 that supported CTS's defense of the CTS-to-ERG Transfers.

170.    July 1, 2015 was just over two months after Royalty Clearinghouse first asked for any documents supporting CTS's claim that the Royalty Interests were not the Bank's collateral,

---

[1]    As a matter of professional courtesy, Plaintiff does not name the lawyers and law firms who are persons with knowledge of the events and occurrences described herein but are not parties to this lawsuit. Plaintiff will provide the Defendants and the Court with a cipher for these anonymous lawyer and firm names if necessary or requested.

and July 1, 2015 was 17 months after Royalty Clearinghouse had wired $17.5 million to purchase the Royalty Interests.

171.    That same day, ERG's bankruptcy counsel provided to Royalty Clearinghouse all the documents that Mr. Lacey could find to defend Mr. Wood and CTS's claim that the Bank consented to the ERG-to-CTS Transfers.

172.    All Mr. Lacey could muster was 14 documents—all of them publicly-available, all related to recorded transfers of the Royalty Interests, and all documents Royalty Clearinghouse already had.

173.    ERG's bankruptcy counsel first provided the ERG-to-CTS Transfers from 2010, which Royalty Clearinghouse first saw in January 2014.

174.    ERG's bankruptcy counsel then provided the CTS-to-ERG Transfers (which are how Mr. Wood perpetrated his fraud) and the ERG-to-CTS Transfers (which Mr. Wood executed in furtherance of the representations that CTS owned the Royalty Interests free and clear).

175.    ERG's bankruptcy counsel even helpfully provided a copy of the Purchase Agreement between CTS and Royalty Clearinghouse (which disclosed nothing about the Bank's lien) and copies of the CTS-to-RCH Transfers (which the Bank was now contending was invalid).

176.    In short, Mr. Lacey could not come up with one piece of paper—an email, a letter, a side agreement, a release, or even a Post-It Note or a dirty napkin—to support Mr. Wood's claim that the Bank consented to the CTS-to-ERG Transfers.

177.    By August and September 2015, the Bank began telling Royalty Clearinghouse that it owned the Royalty Interests.

178.    On or about September 21, 2015, Royalty Clearinghouse's bankruptcy counsel had a telephone call with Partner B at Law Firm 2, who represented the Bank.  During this call, Partner

B summarized the Bank's position regarding the Royalty Interests: (a) the Bank believed that, prior to the CTS-to-ERG Transfers, the Royalty Interests were not collateral for ERG's debts; (b) the CTS-to-ERG Transfers made the Royalty Interests its collateral because the transfers occurred after the Bank had extended credit to ERG and thus became the Bank's after-acquired collateral; and (c) nevertheless, because Mr. Wood had told the Bank that its officers knew of, and consented to, the CTS-to-ERG Transfers, the Bank's lawyers were investigating Mr. Wood's explanation—although no evidence had been found to support it.

179.    On or about September 25, 2015, Royalty Clearinghouse's bankruptcy counsel had a telephone call with Mr. Wood's personal bankruptcy counsel in the ERG Bankruptcy Case, Partner C at Law Firm 3.  Partner C represented that Mr. Wood had asked the Bank to release its lien on the Royalty Interests because "it is at best after-acquired property and it's just not fair."

180.    On or about September 28, 2015, Royalty Clearinghouse's bankruptcy counsel had another telephone call with Partner B, the Bank's lawyer.  In this call, Partner B again disclosed that Mr. Wood repeatedly had claimed that he had disclosed the CTS-to-ERG Transfers to the Bank and obtained its consent to the transfers.

181.    This time, however, Partner B confirmed that the Bank had found no documents of any kind—not an email, voicemail, or any other document—that supported Mr. Wood's claims.

182.    Indeed, the Bank had asked Mr. Wood for "anything at all" that evidenced his claim, but Mr. Wood's lawyer in the ERG Bankruptcy Case—Partner C at Law Firm 3—had confirmed to Partner B that no documents existed.

183.    Partner B further disclosed that he interviewed the Bank loan officers who oversaw ERG's loans, and each stated they never agreed to the CTS-to-ERG Transfers.

184.    In late October 2015, as ERG's Bankruptcy Case was progressing, Mr. Lacey gave Mr. Zimmermann at Royalty Clearinghouse current contact information for Mr. Wood.

185.    On October 23, 2015, Mr. Wood participated in a call with Mr. Lacey, principals at Royalty Clearinghouse, and each side's lawyers.  In this call, Mr. Wood outlined his defense of the CTS-to-ERG Transfers, but also made four false statements that prove his fraud.

186.    First, Mr. Wood's California oil and gas lawyer admitted that the Royalty Interests were "probably after acquired" collateral for ERG's debt to the Bank.

187.    Second, six months after CTS told Royalty Clearinghouse that documents would prove that the Bank had consented to the CTS-to-ERG Transfers, Mr. Wood admitted that he had *no documents* supporting his claim.

188.    For the first time, Mr. Wood told Royalty Clearinghouse that the Bank *might* have documents—but only "internal emails" (*i.e.*, none between the Bank and Mr. Wood, Mr. Lacey, CTS, or anyone else upon whom Royalty Clearinghouse had relied).

189.    Mr. Wood claimed, however, that the Bank might not have documents because the Bank posts notes in its "bathrooms on white paper that say 'when in doubt, shred.'"  This, of course, is a convenient truth for Mr. Wood: shortly after admitting it was false when CTS repeatedly stated that it had documents, Mr. Wood began crafting a new, false narrative that the Bank had destroyed the documents that supported his story.

190.    Third, Mr. Wood claimed that Partner B (the Bank's lawyer) confirmed to Partner C (Mr. Wood's personal lawyer in the ERG Bankruptcy Case) that the Bank "knew" that the Royalty Interests were not part of the Bank's collateral.

191.    Both parts of Mr. Wood's statement are false.

192.    Partner B, the Bank's lawyer, had investigated Mr. Wood's claim that the Bank knew of, and consented to, the CTS-to-ERG Transfers, and found no evidence—either documents or witnesses—supporting Mr. Wood's story.

193.    And Partner C, Mr. Wood's own lawyer in the ERG Bankruptcy Case, had confirmed to Royalty Clearinghouse's lawyer that the Bank considered the Royalty Interests to be its collateral.

194.    <u>Fourth</u>, and finally, Mr. Wood stated on the October 23, 2015 telephone call that the CTS-to-ERG Transfers had been a "bookkeeping entry between affiliates," so he had instructed "his guys" (presumably ERG or CTS employees) to not put the Royalty Interests on any reserve reports given to the Bank.

195.    Again, both parts of Mr. Wood's statement are false.

196.    The CTS-to-ERG Transfers were not a bookkeeping entry: the transfers were filed with, and recorded by, Santa Barbara County.

197.    And Mr. Wood's claim that he instructed that the Royalty Interests not be put on any reserve reports given to the Bank directly contradicts what CTS told Royalty Clearinghouse six months prior.  On April 28, 2015, when Royalty Clearinghouse first called Mr. Lacey for an explanation of why it had been sued in the Bank's Foreclosure Lawsuit, Mr. Lacey said he would "walk down the hall" and get an answer from CTS (presumably from Mr. Wood).  Four hours later, Mr. Lacey called back and represented to Royalty Clearinghouse that the purpose of the CTS-to-ERG Transfer was to ***improve ERG's reserve report with the Bank***.  Both statements— Mr. Lacey's statement of April 28, 2015 and Mr. Wood's statement of October 23, 2015—cannot be true.

198.   After the October 23, 2015 call with Mr. Wood, it was clear to Royalty Clearinghouse that it had virtually no chance of success in litigation with the Bank—which had superior title to the Royalty Interests, hundreds of millions in debt to collect from ERG, and billions of dollars in cash reserves to fund a lengthy lawsuit against Royalty Clearinghouse.

199.   Royalty Clearinghouse negotiated the best exit it could—a settlement with the Bank worth $700,000, or less than 5% of the purchase price for the Royalty Interests—and then declared the transaction a multimillion dollar loss.

200.   Royalty Clearinghouse now brings this Complaint to recover from the beneficiaries of Mr. Wood's fraud the millions that it has lost.

## V.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION – VIOLATION OF THE FEDERAL SECURITIES LAWS (AGAINST DEFENDANTS CTS, CTS MANAGEMENT, AND MR. WOOD)

201.   The foregoing paragraphs are hereby incorporated by reference as if fully set forth therein.

202.   Pursuant to 18 U.S.C. § 78j(b) and 17 CFR § 240.10b-5, and in connection with the purchase or sale of any security made by use of any means or instrumentality of interstate commerce, it is unlawful for any person: (a) to employ any device, scheme, or artifice to defraud; or (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements, made in light of the circumstances under which they were made, not misleading.

203.   The Royalty Interests cover an overriding royalty interest and a non-participating royalty interest, both of which are fractional undivided interests in oil, gas, or other mineral rights, and therefore constitute a "security" under federal law.  *See generally* 15 U.S.C. § 77b(a)(1).

204.    The relationship between the Royalty Interests, ERG's debts to the Bank, and the Wood Divorce were material facts that CTS and Mr. Wood concealed through their device, scheme, and artifice to defraud the Divorce Court and Royalty Clearinghouse, as set forth above.

205.    The ownership of the Royalty Interests was a material fact about which CTS and Mr. Wood intentionally made false statements (including, without limitation, making the representations set forth above in Section IV(B) and (C)) and about which CTS and Mr. Wood omitted to state a material fact necessary in order to make the statements (including, without limitation, those set forth above in Section IV(B) and (C)), made in light of the circumstances under which they were made, not misleading.

206.    As discussed above in Sections IV(A), (B), (C), (D), and (E), CTS and Mr. Wood made these statements or omissions with an intent to deceive.  The motive was financial: without the deception, CTS and Mr. Wood could not convince Royalty Clearinghouse to pay $17.5 million for the Royalty Interests.

207.    A causal relationship exists between Royalty Clearinghouse's purchase of a security (the Royalty Interests) and both: (a) the device, scheme, and artifice to defraud employed by CTS and Mr. Wood; and (b) the material misstatements and omissions made by CTS and Mr. Wood.

208.    In reliance of the fraudulent actions taken by CTS and Mr. Wood and the material misstatements and omissions each made, Royalty Clearinghouse agreed to purchase the Royalty Interests, and it would not have entered into the transaction otherwise.

209.    Royalty Clearinghouse has suffered an economic loss because of its reliance on the misrepresentations, which if true, would have allowed Royalty Clearinghouse to avoid its losses.

210.    Royalty Clearinghouse paid $17.5 million to purchase, own free and clear, and receive a stream of income from the Royalty Interests.  Because CTS did not own the Royalty Interests free and clear, Royalty Clearinghouse could not obtain the economic benefit from the transaction.

211.    Accordingly, Royalty Clearinghouse has suffered damages which include but are not limited to out-of-pocket damages, benefit-of-the-bargain damages, rescission, restitution, consequential damages, attorneys' fees, court costs, and applicable pre- and post-judgment interest.

212.    As the general partner of CTS, a Texas limited partnership, CTS Management is responsible for the debts and liabilities of CTS, including Royalty Clearinghouse's claims contained in this Complaint.  *See generally* TEX. BUS. ORG. CODE § 153.152(b).

**SECOND CAUSE OF ACTION**
**BREACH OF CONTRACT**
**(AGAINST DEFENDANTS CTS AND CTS MANAGEMENT, LLC)**

213.    The foregoing paragraphs are hereby incorporated by reference as if fully set forth therein.

214.    Royalty Clearinghouse and CTS had valid contracts—the Purchase Agreement and the CTS-to-RCH Assignments.

215.    Royalty Clearinghouse performed all its obligations under the Purchase Agreement and the CTS-to-RCH Assignments including, without limitation, making the $17.5 million in payments as required by Purchase Agreement.

216.    CTS breached the Purchase Agreement and the CTS-to-RCH Assignments by warranting that it had good and valid title to the Royalty Interests when, in fact, it did not.

217.    CTS's breach has caused Royalty Clearinghouse damage including, without limitation, the cost of the $17.5 million in total payments required by both contracts, plus interest.

218.     Royalty Clearinghouse is entitled to recover its reasonable and necessary attorneys' fees in pursuing this claim for breach of written contracts against CTS.  *See generally* TEX. CIV. PRAC. & REM. CODE § 38.001.

219.     As the general partner of CTS, a Texas limited partnership, CTS Management is responsible for the debts and liabilities of CTS, including Royalty Clearinghouse's claims contained in this Complaint.  *See generally* TEX. BUS. ORG. CODE § 153.152(b).

### THIRD CAUSE OF ACTION – 
### FRAUD 
### (AGAINST DEFENDANTS CTS, CTS MANAGEMENT, AND MR. WOOD)

220.     The foregoing paragraphs are hereby incorporated by reference as if fully set forth therein.

221.     CTS and Mr. Wood agreed to convey, and did convey, an interest in real estate.

222.     In connection with the dealings between the parties, CTS and Mr. Wood made material misrepresentations of fact and omitted to disclose material facts.

223.     These material misrepresentations of fact and material omissions include, without limitation, those set forth above in Sections IV(B), (C), (D), and (E).

224.     The false representations and material omissions were made with the intent to induce Royalty Clearinghouse to enter into the Purchase Agreement and/or the CTS-to-RCH Assignments and to induce Royalty Clearinghouse to pay $17.5 million for the Royalty Interests that are the subject of those documents.

225.     The representations were demonstrably false at the time when made, because the CTS-to-ERG transfers were later admitted not to have been "errors," and thus the representations about free title and purporting to transfer them back to CTS were false.

226.    The representations were false for the added reason that Mr. Wood and CTS failed to alert Royalty Clearinghouse to the intentional CTS-to-ERG Transfers or to ERG's $350 Original Credit Agreement that encumbered the Royalty Interests as soon as the transfers were made.

227.    Royalty Clearinghouse justifiably relied upon the misrepresentations and relied upon the material omissions by CTS and Mr. Wood of which it was not made aware.

228.    Those misrepresentations and omissions caused Royalty Clearinghouse to lose virtually the entire value of the Royalty Interests to the Bank, who had superior title pursuant to ERG pledging of the Royalty Interests as after-acquired collateral and security for ERG's loan.

229.    Royalty Clearinghouse's reliance on the misrepresentations and omissions has caused it economic loss and damage—specifically, the $17.5 million investment in the Royalty Interests.

230.    As the general partner of CTS, a Texas limited partnership, CTS Management is responsible for the debts and liabilities of CTS, including Royalty Clearinghouse's claims contained in this Complaint.  *See generally* TEX. BUS. ORG. CODE § 153.152(b).

231.    Royalty Clearinghouse is also entitled to statutory and exemplary damages and attorneys' fees from CTS and Mr. Wood because of their fraud.

232.    Specifically, Royalty Clearinghouse is entitled to exemplary damages because CTS and Mr. Wood's actions as described herein constitute fraud, malice, and/or gross negligence.  *See generally* TEX. CIV. PRAC. & REM. CODE § 41.003.

233.    Royalty Clearinghouse affirmatively pleads that the limitations on exemplary damages under the Texas Civil Practice & Remedies Code § 41.008 do not apply to its fraud claims against CTS and Mr. Wood because the acts alleged here constitute securing the execution of a

document by deception (Tex. Civ. Prac. & Rem. Code § 41.008(c)(11)) and constitute theft of more than $300,000 (Tex. Civ. Prac. & Rem. Code § 41.008(c)(13)).

**FOURTH CAUSE OF ACTION –**
**ACTUAL INTENT FRAUDULENT TRANSFER**
**(AGAINST DEFENDANTS SCOTT WOOD AND TANA WOOD)**

234.   The foregoing paragraphs are hereby incorporated by reference as if fully set forth therein.

235.   Without conceding the legal question, Royalty Clearinghouse pleads its actual fraudulent conveyance claim against Mr. Wood and Ms. Wood in compliance with Fed. R. Civ. P. 9(b) and alleges as follows.

236.   **Who**.  Royalty Clearinghouse complains of an actual fraudulent conveyance—the transfer of at least $15 million of the $17.5 million it paid to CTS for the Royalty Interests—that was made by CTS (the transferor) to Mr. Wood (the initial transferee and/or the individual for whose benefit the transfer was made).  Royalty Clearinghouse refers to this as the "Initial Divorce Transfer."

237.   Mr. Wood then transferred $15 million of the money that he received from CTS in the Initial Divorce Transfer to Tana Wood. Royalty Clearinghouse refers to this as the "Subsequent Divorce Transfer."

238.   **Where**.   Upon information and belief, the Initial Divorce Transfer and the Subsequent Divorce Transfer were made in Harris County, Texas.

239.   **What**.  The Initial Divorce Transfer transferred $15 million of cash from CTS to Mr. Wood.  The Subsequent Divorce Transfer transferred the same $15 million from Mr. Wood to Ms. Wood.

240.  **When**. The Initial Divorce Transfer occurred on, before, or between January 21, 2014 (the date on which Royalty Clearinghouse paid the Option Fee), January 29, 2014 (the date on which Royalty Clearinghouse paid the balance of purchase price), and February 6, 2014 (the date of the Subsequent Divorce Transfer).  This lawsuit is filed within four years of the Initial Divorce Transfer and the Subsequent Divorce Transfer.

241.  **How**. The Initial Divorce Transfer was made by wire transfer and/or other negotiable instrument using the interstate wires or banking clearance system that resulted in the transfer of at least $15 million from CTS to Mr. Wood.  The Initial Divorce Transfer therefore constituted one or more transfers by CTS of an interest in its property. The Subsequent Divorce Transfer was made by wire transfer from Mr. Wood to Ms. Wood's Sanford C. Bernstein & Co., LLC account ending in xx1659.

242.  **Why**. CTS made the Initial Divorce Transfer with actual intent to hinder, delay, or defraud one or more entities to which CTS was indebted or became indebted on or after the date of such transfers (including, without limitation, Royalty Clearinghouse).

243.  Similarly, Mr. Wood made the Subsequent Divorce Transfer with actual intent to hinder, delay, or defraud one or more entities to which he was indebted on or after the date of such transfers (including, without limitation, Royalty Clearinghouse).

244.  The requisite intent to hinder, delay, or defraud creditors may be inferred from the badges of fraud listed in Texas's Uniform Fraudulent Transfer Act. The circumstances surrounding the Initial Divorce Transfer and the Subsequent Divorce Transfer reveal at least seven of the eleven badges of fraud.

245.  First, the Initial Divorce Transfer was to an insider or insiders. Defendant Mr. Wood owned 49.5% of CTS, owned 50% of CTS Management (CTS's general partner), and, at

all relevant times, owned, operated, and controlled CTS.  Thus, Mr. Wood was an insider of CTS at the time of the Initial Divorce Transfer. Likewise, the Subsequent Divorce Transfer was made from Mr. Wood (an insider of CTS) to Ms. Wood, who was both an insider of CTS (she owned 49.5% of CTS and 50% of CTS Management, just like Mr. Wood) and was Mr. Wood's wife at the time of the Subsequent Divorce Transfer.

246.   Second, CTS had been sued or threatened with suit before the Initial Divorce Transfer was made. Mr. Wood was aware that the Bank was threatening a foreclosure action against ERG and all of its secured assets – including all after-acquired collateral such as the Royalty Interests, which CTS owned prior to the Initial Divorce Transfer and which Mr. Wood knew or should have known exposed both CTS and him to claims by the Bank.

247.   Third, the Initial Divorce Transfer was of substantially all of CTS's assets.  At the time of the Initial Divorce Transfer, CTS lacked any material assets other than the $17.5 million received from Royalty Clearinghouse, and the Initial Divorce Transfer transferred $15 million of those assets to Mr. Wood.  Likewise, the Subsequent Divorce Transfer was of substantially all of Mr. Wood's liquid assets, if not all of his total assets. Pursuant to the parties' Modification to Agreement Incident to Divorce, Mr. Wood lacked the cash to pay Ms. Wood under the Divorce Settlement and initially represented that he would need to borrow the money to pay her, before ultimately obtaining the money to pay her through the fraud on Royalty Clearinghouse.

248.   Fourth, CTS removed assets by taking $15 million of the purchase price for the Royalty Interests and transferring it to Mr. Wood.  Likewise, Mr. Wood removed assets through the Subsequent Divorce Transfer by placing them with his wife, Ms. Wood.

249.   Fifth, the value of the consideration received by CTS was not reasonably equivalent to the value of the $15 million transferred from CTS to Mr. Wood. Mr. Wood gave no value to CTS in exchange for the $15 million.

250.   In particular, CTS paid the $15 million to Mr. Wood as an equity holder in the company and distributions on account of equity are, as a matter of law, not for value.

251.   Likewise, Ms. Wood gave no value and/or no reasonably equivalent value to CTS or Mr. Wood in exchange for the Subsequent Divorce Transfer. To the extent that the Subsequent Divorce Transfer was for Ms. Wood's equity in family-owned businesses, those distributions on account of equity are, as a matter of law, not for value.

252.   Moreover, Ms. Wood's signed declaration under oath in the Wood Divorce states that the family did not have sufficient assets to support a payment to her of $15 million in cash, meaning that whatever releases she gave Mr. Wood and/or CTS were not reasonably equivalent to the cash payment she received.

253.   Sixth, CTS was insolvent at the time of the Initial Divorce Transfer or became insolvent shortly thereafter.  Because CTS procured the $17.5 million that Royalty Clearinghouse paid for the Royalty Interests through fraud, it immediately owed repayment of that amount to Plaintiff. Thus, by transferring $15 million to Mr. Wood, CTS's liabilities exceeded its assets.

254.   Likewise, Mr. Wood became liable to Royalty Clearinghouse for his fraud, and at a time that he purportedly owed Ms. Wood money under the Wood Divorce, and lacked sufficient funds to pay without borrowing (i.e., incurring an additional liability).

255.   Seventh, the Initial Divorce Transfer occurred shortly after a substantial debt was incurred.  Specifically, CTS made the Initial Divorce Transfer after it incurred a debt to Royalty

Clearinghouse to repay the $17.5 million it received for the Royalty Interests, which were sold through fraud. The same is true for the Subsequent Divorce Transfer.

256.     Ms. Wood received the Subsequent Divorce Transfer not in good faith and not for value.

257.     Ms. Wood does not satisfy the good faith standard because she had knowledge of facts that would put her on actual or inquiry notice of the fraudulent nature of the Subsequent Divorce Transfer.

258.     Ms. Wood knew that Mr. Wood, and the Wood family businesses (including CTS), were insolvent at the time of the transfer.

259.     Ms. Wood knew that the Royalty Interests were encumbered—she admitted as much in her affidavit in the divorce proceedings which reflect her understanding that all assets were encumbered.

260.     Ms. Wood was an owner and insider of CTS and therefore knew, or had constructive knowledge of and thus should have known, that Mr. Wood used CTS's assets to pay the Subsequent Divorce Transfer to her.

261.     Yet Ms. Wood knew that Mr. Wood's payment of the Subsequent Divorce Transfer was a material change from the original representation he made to her regarding the source of the funds—*i.e.*, that the Subsequent Divorce Transfer was made with funds from the sale of assets (as opposed to from borrowed funds as he had originally represented)—thus putting her on actual, constructive, or inquiry notice.

262.     Mr. Wood disclosed the new source of the funds for the Subsequent Divorce Transfer to Ms. Wood—*i.e.*, that they were from a sale of assets that he had previously represented were encumbered. Ms. Wood was given the opportunity to investigate, and did investigate, the

source of the funds for the Subsequent Divorce Transfer, and yet still approved of Mr. Wood's Modification to the Agreement of the Incident to Divorce and agreed that, following her inquiry, she was satisfied with the source of the funds.

263.    Thus, Ms. Wood received the Subsequent Divorce Transfer at a time that she had knowledge of such facts that would excite the suspicions of the ordinary person and put her on inquiry notice of the fraudulent nature of the Subsequent Divorce Transfer.

264.    As noted above, any value Ms. Wood may have provided is not reasonably equivalent to the value ($15 million) provided by the Subsequent Divorce Transfer.

265.    Royalty Clearinghouse therefore seeks to avoid and/or recover the full cash value of the Initial Divorce Transfer and the Subsequent Divorce Transfer pursuant to Texas's Uniform Fraudulent Transfer Act and also seeks any and all other remedies to which it may be entitled under Texas and/or federal law.

### FIFTH CAUSE OF ACTION –
### CONSTRUCTIVE FRAUDULENT TRANSFER
### (AGAINST DEFENDANTS SCOTT WOOD AND TANA WOOD)

266.    The foregoing paragraphs are hereby incorporated by reference as if fully set forth therein.

267.    CTS, as transferor, and Mr. Wood, as the initial transferee and/or individual for whose benefit the transfer was made, made the Initial Divorce Transfer, as set forth above.

268.    CTS was insolvent at the time of the Initial Divorce Transfer or became insolvent shortly thereafter.

269.    Because CTS procured the $17.5 million that Royalty Clearinghouse paid for the Royalty Interests through fraud, it immediately owed repayment of that amount to Plaintiff.

270.    By transferring $15 million to Mr. Wood, CTS's liabilities exceeded its assets.

271.    The value of the consideration received by CTS was not reasonably equivalent to the value of the $15 million transferred from CTS to Mr. Wood.

272.    Mr. Wood gave no value to CTS in exchange for the $15 million.

273.    In particular, CTS paid the $15 million to Mr. Wood as an equity holder in the company and distributions on account of equity are, as a matter of law, not for value.

274.    Mr. Wood was insolvent at the time of the Initial Divorce Transfer or became insolvent shortly thereafter.

275.    Because Mr. Wood procured the $17.5 million that Royalty Clearinghouse paid for the Royalty Interests through fraud or fraudulent transfer, he immediately owed repayment of that amount to CTS.

276.    By transferring $15 million to Ms. Wood, Mr. Wood's liabilities exceeded his assets.

277.    The value of the consideration received by CTS and Mr. Wood was not reasonably equivalent to the value of the $15 million transferred.

278.    Ms. Wood gave no value and/or no reasonably equivalent value to CTS or Mr. Wood in exchange for the Subsequent Divorce Transfer. To the extent that the Subsequent Divorce Transfer was for Ms. Wood's equity in family-owned businesses, those distributions on account of equity are, as a matter of law, not for value.

279.    Moreover, Ms. Wood's signed declaration under oath in the Wood Divorce states that the family did not have sufficient assets to support a payment to her of $15 million in cash, meaning that whatever releases she gave Mr. Wood and/or CTS were not reasonably equivalent to the cash payment she received.

280.    Royalty Clearinghouse therefore seeks to avoid and/or recover the full cash value of the Initial Divorce Transfer and the Subsequent Divorce Transfer pursuant to Texas's Uniform Fraudulent Transfer Act and also seeks any and all other remedies to which it may be entitled under Texas and/or federal law.

**SIXTH CAUSE OF ACTION –**
**ACTUAL INTENT FRAUDULENT TRANSFER**
**(AGAINST DEFENDANT PLS)**

281.    The foregoing paragraphs are hereby incorporated by reference as if fully set forth therein.

282.    Without conceding the legal question, Royalty Clearinghouse pleads its actual fraudulent conveyance claim against PLS in compliance with FED. R. CIV. P. 9(b) and alleges as follows.

283.    **Who**. Royalty Clearinghouse complains of an actual fraudulent conveyance—the transfer of approximately $350,000 of the $17.5 million it paid to CTS for the Royalty Interests— that was made by CTS (the transferor) to PLS (the initial transferee and/or the individual for whose benefit the transfer was made).  Royalty Clearinghouse refers to this as the "PLS Transfer."

284.    **Where**.  Royalty Clearinghouse alleges that the PLS Transfer was made in Harris County, Texas.

285.    **What**.  The PLS Transfer transferred approximately $350,000 of cash from CTS to PLS.

286.    **When**.  The PLS Transfer occurred on, before, or between January 21, 2014 (the date on which Royalty Clearinghouse paid the Option Fee), January 29, 2014 (the date on which Royalty Clearinghouse paid the balance of purchase price), and February 6, 2014 (the date of the Subsequent Divorce Transfer).  This lawsuit is filed within four years of the PLS Transfer.

287.   **How**.   The PLS Transfer was made by wire transfer and/or other negotiable instrument that resulted in the transfer of approximately $350,000 from CTS to PLS.  The PLS Transfer therefore constituted one or more transfers by CTS of an interest in property.

288.   **Why**.  CTS made the PLS Transfer with actual intent to hinder, delay, or defraud one or more entities to which CTS and/or Mr. Wood was indebted or became indebted on or after the date of such transfers (including, without limitation, Royalty Clearinghouse).

289.   CTS's intent to hinder, delay, or defraud creditors may be inferred from the badges of fraud listed in Texas's Uniform Fraudulent Transfer Act. The circumstances surrounding the PLS Transfer reveal at least six badges of fraud.

290.   First, CTS owed the money back to Royalty Clearinghouse the moment it received $17.5 million because same was procured via fraud.  Thus, when CTS paid PLS, CTS was insolvent and its liabilities exceeded its assets.

291.   Second, PLS did not give reasonably equivalent value for the $350,000 it received from CTS.  PLS was CTS's agent for the purpose of the transaction and had a close ongoing relationship with Mr. Wood, principal and manager of CTS.  PLS's role was to effect a legitimate sale of oil and gas interests.  As detailed above, however, the sale engineered by PLS was a fraud, and the broker has no right to be paid a commission or service fees for a fraud.

292.   Third, CTS and Wood absconded with the money after the transfer, leaving insufficient assets for CTS's creditor.

293.   Fourth, PLS knew or should have known that Mr. Wood was in the midst of his divorce lawsuit with his wife and that the purpose of the transfer was to expedite the divorce settlement.

294.     <u>Fifth</u>, PLS knew or should have known that Mr. Wood and his entities were insolvent and subject to the looming action by the Bank to seize all encumbered assets.

295.     <u>Sixth</u>, PLS knew or should have known that between the divorce settlement and the PLS payment, CTS was paying out all or substantially all of its assets.

296.     Royalty Clearinghouse therefore seeks to avoid and/or recover the full cash value of the PLS Transfer pursuant to Texas's Uniform Fraudulent Transfer Act and also seeks any and all other remedies to which it may be entitled under Texas and/or federal law.

## VI.      PRAYER FOR RELIEF & JURY DEMAND

**WHEREFORE**, Royalty Clearinghouse prays for judgment as follows:

297.     For money damages, equal to the greater of $17.5 million or the benefit-of-the-bargain lost to Royalty Clearinghouse because of Defendants' conduct;

298.     For the avoidance, recovery, and other damages related to any and all fraudulent transfers described in this complaint;

299.     For exemplary damages and attorneys' fees from the culpable parties named above;

300.     For attorneys' fees from CTS and CTS Management as required by Section 38.001 of the Texas Civil Practice and Remedies Code;

301.     For all attorneys' fees, costs, pre-judgment interest and post-judgment interest recoverable under any of Plaintiff's claims; and

302.     For such other and further relief as the Court may deem just and proper.

303.     Plaintiff also demands a jury trial on all issues triable of right before a jury and to the fullest extent permitted by Fed. R. Civ. P. 38.

Dated: November 3, 2017                    Respectfully submitted,

                                           /s/ Andrew B. Ryan
                                           **RYAN LAW PARTNERS LLP**
                                           Andrew B. Ryan (TX Bar No. 24054464)
                                           3811 Turtle Creek Blvd.
                                           Suite 780
                                           Dallas, Texas 75219
                                           T: (214) 347-7377
                                           F: (888) 594-6240
                                           andy@ryanlawpartners.com

                                           **STECKLER GRESHAM COCHRAN**
                                           R. Dean Gresham (TX Bar No. 24027215)
                                           L. Kirstine Rogers (TX Bar No. 24033009)
                                           12720 Hillcrest Road
                                           Suite 1045
                                           Dallas, Texas 75230
                                           T: (972) 387-4040
                                           F: (972) 387-4041
                                           dean@stecklerlaw.com
                                           krogers@stecklerlaw.com

                                           **SBAITI & COMPANY PLLC**
                                           Mazin Sbaiti (TX Bar No. 24058096)
                                           1201 Elm Street
                                           Suite 4010
                                           Dallas, Texas 75201
                                           T: (214) 432-2899
                                           F: (214) 853-4367
                                           MAS@SbaitiLaw.com

                                           ***Counsel for Plaintiff***