IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ROYALTY CLEARINGHOUSE, LTD., | § § | JURY TRIAL DEMANDED |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. |
| | § | 1:16-cv-1342-LY |
| CTS PROPERTIES, LTD., CTS MANAGEMENT, LLC, AND SCOTT Y. WOOD, | § § § § | |
| Defendants. | § § | |

## PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS

Royalty Clearinghouse, Ltd. ("RCH" or "Plaintiff") respectfully submits this Motion for Judgment on the Pleadings (the "Motion") against Scott Wood ("Wood") CTS Properties, Ltd. ("CTS") and CTS Management, LLC ("CTS Management"; collectively, the "CTS Defendants") on the causes of action alleged in the CTS Defendants' Original Counterclaims (the "Counterclaims") (ECF No. 46).

### I.   INTRODUCTION

The CTS Defendants' Counterclaims assert two causes of action against RCH—breach of contract and tortious interference with prospective business relationship. Both claims fail.

First, the CTS Defendants allege that RCH breached its contracts with CTS—the Purchase Agreement and the CTS-to-RCH Assignments—first by not allowing CTS to defend its title to the Royalty Interests and then by assigning the Royalty Interests to ERG's Bank. But no section of either agreement requires RCH to allow CTS to defend its title. And the CTS-to-RCH

Assignments expressly allow RCH and its "successors and assigns" to have title to—and freely transfer—the Royalty Interests.

<u>Second</u>, the CTS Defendants allege that RCH tortiously interfered with CTS's prospective business relationships by making defamatory statements in its pleadings.  But the Fifth Circuit and the Supreme Court of Texas have held that the judicial proceedings privilege protects RCH's statements and bars the CTS Defendants' tortious interference claim.  Even if it didn't, the Counterclaims fail to allege a required element of the Counterclaim.  To state a claim, the CTS Defendants must allege that RCH's actions caused CTS to lose business relationships.  But the Counterclaim only alleges that CTS completed deals on terms that it considered less favorable.  As a matter of law, that is insufficient to support a claim for tortious interference with prospective business relationships.

For these reasons, RCH is entitled to judgment on the CTS Defendants' Counterclaims.

## II.   ARGUMENTS AND AUTHORITIES

### A.   STANDARD OF REVIEW

This Court has set forth the standard of review for RCH's Motion as follows:

> "After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).  "A motion brought pursuant to Rule 12(c) is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002).  The Fifth Circuit applies the same standard to a motion under Rule 12(c) as it does for a motion under Rule 12(b)(6). *Id.*, at 313 n.8; *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999).  When evaluating a motion to dismiss for failure to state a claim under Rule 12(b)(6) the complaint must be liberally construed in favor of the plaintiff and all facts pleaded therein must be taken as true. *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164, 113

S. Ct. 1160, 1161 (1993); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996).

*Bellamy v. Ocwen Loan Servicing, LLC*, A-14-CV-320 LY, 2014 WL 12493295, at *1 (W.D. Tex. Sept. 4, 2014) (Lane, J.). This Court may consider the attached Purchase Agreement and CTS-to-RCH Assignments when deciding RCH's Motion because the CTS Defendants incorporated these contracts into their Counterclaims. *Bosarge v. Ms. Bureau of Narcotics*, 796 F.3d 435, 440 (5th Cir. 2015).

> **B.    The Court Must Dismiss the CTS Defendants' Breach of Contract Claim With Prejudice Because the Purchase Agreement Does Not Require RCH to Allow CTS to Defend Title or to Approve Assignment of the Royalty Interests.**

The Counterclaims allege that RCH breached its Purchase Agreement with CTS in two ways: (1) RCH refused to allow CTS to defend title to the Royalty Interests (ECF No. 46 ¶ 56) (the "Title Defense Theory") and (2) RCH was not permitted to assign the Royalty Interests to ERG's Bank without CTS's consent (*id.* ¶ 55) (the "Anti-Assignment Theory"). Because the Purchase Agreement does not require RCH to allow CTS to defend title to the Royalty Interests or to approve assignment of the Royalty Interests, the CTS Defendants' Breach of Contract counterclaim must be dismissed with prejudice.

> 1.    The Purchase Agreement Does Not Contain Any Provision Regarding CTS's Title Defense Theory.

The CTS Defendants' Title Defense Theory is that RCH "breached the Purchase Agreement by not allowing CTS to defend title" to the Royalty Interests. *See* ECF No. 46 ¶ 56. For the Title Defense Theory to work, the Purchase Agreement must require RCH to allow CTS to defend its title from attack by a third party. But the Purchase Agreement contains no such requirement.

The Counterclaims define the Purchase Agreement to mean an agreement that "[t]he parties executed…relating to the Royalty Interests on January 18, 2017 [sic]." *Id*. ¶ 12. That Purchase

Agreement, which was executed in January 2014, is attached hereto as **Exhibit A**. It does not contain any mention of CTS defending its title to the Royalty Interests against a third-party attack. The Purchase Agreement's sole reference to a warranty of title is in Paragraph 5, titled "**ASSIGNMENTS & LETTERS-IN-LIEU**." Paragraph 5 states only that:

> Prior to January 23, 2014, **SELLER** [CTS] will provide **BUYER** [RCH] with a form of the Assignment of Interests and a "Letter-in-Lieu" (of Division Order), [sic] (the "Closing Documents"). The Assignment shall provide for a Limited Warranty, by, through and under **SELLER** but not otherwise.

*See* Ex. A at p. 2 (emphasis in original). Paragraph 5 does not mention CTS's right to defend its title to the Royalty Interests and does not impose any obligation upon RCH to allow CTS to defend its title. Thus, the CTS Defendants' Title Defense Theory must fail: because the Purchase Agreement does not contain any requirement that RCH allow CTS to defend its title form third-party attack, RCH cannot be sued for breaching this non-existent provision.[1]

    2.    <u>Because Neither the Purchase Agreement nor the CTS-to-RCH Assignments Restrict RCH's Right to Transfer the Royalty Interests Once Purchased from CTS, the CTS Defendants' Second Breach of Contract Theory Must Be Dismissed.</u>

The CTS Defendants' second breach of contract claim is their Anti-Assignment Theory, which alleges that "RCH breached the Purchase Agreement by assigning the Royalty Interests to CLMG [ERG's Bank] without CTS's consent." *See* ECF No. 46 ¶ 55. For their Anti-Assignment claim, the CTS Defendants cite to Paragraph 8 of the Purchase Agreement, titled

---

[1] Plaintiff suspects that the CTS Defendants may instead be referring to the warranty of title provided in the CTS-to-RCH Assignments, which states: "Assignor [CTS] does hereby warrant and agree to defend the title to the Assigned Interest [the Royalty Interests] against any and all persons whomsoever lawfully claim the same or any part thereof, by, through, or under Assignor, but not otherwise." *See* **Exhibits B & C**. This language, too, does not impose any obligation on RCH to allow CTS to defend its title to the Royalty Interests. Thus, if the CTS Defendants attempt to support their Title Defense Theory by admitting their citation to the Purchase Agreement was in error and citing instead to the CTS-to-RCH Assignments, the CTS Defendants still must identify what language—exactly—in the CTS-to-RCH Assignments imposed any obligation on RCH to allow CTS to defend its title from attack by ERG's Bank.

"**ASSIGNMENT**." *See* ECF No. 46 ¶¶ 12-14. The CTS Defendants claim that RCH breached Paragraph 8 of the Purchase Agreement by "cut[ting] a deal with CLMG [ERG's Bank]" to be paid "at least $700,000 in exchange for the Royalty Interests" and that "RCH did not seek or obtain CTS's consent to this transaction." ECF No. 46 ¶ 35. But Paragraph 8 of the Purchase Agreement does not restrict RCH's right to assign or convey the Royalty Interests once it has paid for them.

Paragraph 8 states, in its entirety, that: "**BUYER** [RCH] does not have the right to assign or transfer *any right created by this Letter* [the Purchase Agreement], including the right to purchase the Interests to anyone without the prior written consent of **SELLER** [CTS], which consent will not be unreasonably withheld." *See* Ex. A ¶ 8 (emphasis supplied). The primary rights created by the Purchase Agreement, however, were to: (1) receive CTS's commitment to exclusivity (Ex. A ¶ 6) in exchange for immediate payment of the Option Fee (*id*. ¶¶ 1, 12); and (2) close the transaction by January 29, 2014 (*id*. ¶ 4). Thus, Paragraph 8 only restricted RCH's actions during the time period of January 18th to January 29th. Essentially, Paragraph 8 states that RCH could not "flip" its deal with CTS to anyone without CTS's prior written consent. But Paragraph 8 says nothing about what RCH can do with the Royalty Interests once it completes its purchase. That is covered by the CTS-to-RCH Assignments, which plainly give RCH the right and ability to sell the Royalty Interests.

As noted above, Paragraph 5 of the Purchase Agreement provided that the parties would agree on a form Assignment to transfer the Royalty Interests from CTS to RCH. Ex. A ¶ 5. Those assignments—the CTS-to-RCH Assignments—each state that CTS conveys the Royalty Interests to RCH:

> TO HAVE AND TO HOLD the Assigned Interest [1] *unto Assignee and Assignee's successors and assigns*, forever, [2] *subject only* to the following terms and provisions.

*See* **Exhibits B & C** at p. 2 (emphasis & brackets supplied).  Thus, the CTS-to-RCH Assignments make clear that the Royalty Interests are conveyed to RCH and its "assigns," "subject only" to certain terms and conditions.  *Id.*  And none of the terms and conditions include restricting RCH's right to convey the Royalty Interests without CTS's consent.  *See* Ex. B at pp. 2-3 (the NPRI assignment, which contains three conditions, none of which include CTS's consent to a future assignment); Ex. C at pp. 2-3 (the ORRI assignment contains four conditions, none of which include CTS's consent to a future assignment).

Thus, because neither the Purchase Agreement or the CTS-to-RCH Assignments impose any obligation on RCH to obtain the CTS Defendants' consent to the assignment to ERG's Bank, the CTS Defendants' Anti-Assignment Theory must be dismissed with prejudice.

### 3. With No Contract Theory to Rely Upon, The CTS Defendants' Claim for Attorneys' Fees Must Be Dismissed.

The CTS Defendants' third cause of action—"Count III: Attorney's Fees"—is simply an element of damages for their breach of contract claim.  Paragraph 64 of the Original Counterclaims seeks attorneys' fees "[p]ursuant to Texas Civil Practice and Remedies Code § 38.001…"  ECF No. 46 ¶ 64.  The only subpart of Section 38.001 potentially applicable to the Original Counterclaims is for "an oral or written contract."  TEX. CIV. PRAC. & REM. CODE § 38.001(8).  As set forth above, however, both of the CTS Defendants' breach of contract theories fail.  So too, then, does their claim for attorneys' fees, which must be dismissed as a matter of law.

    **C.**    **Because the CTS Defendants' Tortious Interference With Prospective Business Relations Counterclaim Only Alleges that RCH Made Defamatory Statements in Court That Changed the Terms of (But Did Not Terminate) the CTS Defendants' Business Relationships, the Counterclaim Must Be Dismissed.**

        1.    <u>The Judicial Proceedings Privilege Bars the CTS Defendants' Prospective Interference Counterclaim.</u>

"Communications made during the course of judicial proceedings are privileged." *Bird v. W.C.W.*, 868 S.W.2d 767, 771 (Tex. 1994). "This privilege extends to any statements made by the judges, jurors, counsel, parties, or witnesses and attaches to all aspects of the proceeding, including statements made in open court, pre-trial hearings, depositions, affidavits, and any pleadings or other papers in the case." *James v. Brown*, 637 S.W.2d 914, 916-17 (Tex. 1982). The judicial proceedings privilege originally barred defamation claims. *Id.* But *Bird* explained that "the privilege [must] extend beyond defamation actions to avoid the 'circumvention of the policy behind the privilege by affording an almost equally unrestricted action under a different label.'" *Id.* (internal brackets omitted) (quoting *Doe v. Blake*, 809 F. Supp. 1020, 1028 (D. Conn. 1982)). Thus, if the action giving rise to the plaintiff's claim is a communication made during a judicial proceeding, then the claim is barred by the privilege:

> *Bird* makes it clear that, to avoid the circumvention of the policy behind the privilege, the privilege should be extended beyond defamation when the essence of a claim is damages that flow from communications made in the course of a judicial proceeding. On appeal, Levi attempts to show that his claims for libel and slander, intentional interference, civil conspiracy, intentional infliction of emotional distress, negligence, and constitutional violations are not merely defamation claims under different labels. However, the essence of each of these claims is that he suffered injury as a result of the *communication* of allegedly false statements during a judicial proceeding.

*Laub v. Pesikoff*, 979 S.W.2d 686, 691-92 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (emphasis in original) (internal citations omitted); *see also Blake*, 809 F. Supp. at 1029 (granting

motion to dismiss where the "[p]laintiff's claim does not exist *but for* [the defendant's] public testimony") (emphasis in original) (cited favorably by *Bird*, 868 S.W.2d at 772).

In *Martinez v. Hellmich Law Group, P.C.*, the Fifth Circuit held that the judicial proceedings privilege barred the plaintiff's tortious interference claim. 681 Fed. App'x 323, 326-28 (5th Cir. Mar. 8, 2017). The court explained that the judicial proceedings privilege bars any claim "where a plaintiff's damages 'are basically defamation damages,'" such as "injury to reputation, public contempt, ridicule, loss of relationships, and loss of self-esteem." *Id.* at 327, 327 n.12 (quoting *Bird*, 868 S.W.2d at 772). The judicial proceedings privilege applies "regardless of the label placed on the claim." *Id.* (internal quotations omitted). The *Martinez* court cited two Texas appellate decisions, *see id.* at 327 n.13, both of which held that the privilege specifically barred tortious interference claims. *See Crain v. Unauthorized Practice of Law Comm. of Supreme Ct. of Tex.*, 11 S.W.3d 328, 335 (Tex. App.—Houston [1st Dist.] 1999, writ denied) (holding the privilege barred a tortious interference suit based on statements made during an unlicensed practice of law investigation); *Laub*, 979 S.W.2d at 691 (holding the privilege bars tortious interference suit, even if false statements were intentionally made). If the plaintiff's "claims all arise out of communications [the defendant] was privileged to make [they] are therefore barred." *Martinez*, 681 Fed. App'x at 329.[2]

Here, the CTS Defendants' tortious interference counterclaim is barred by the judicial proceedings privilege for three reasons.

First, the CTS Defendants' claim stems exclusively from statements RCH made in pleadings and in open court. *See, e.g.,* ECF No. 46 ¶ 40 ("***Throughout these proceedings***, RCH

---

[2] Unpublished Fifth Circuit opinions are persuasive in determining Texas law, even where outlier Texas state cases hold otherwise. *See, e.g., Mainali Corp. v. Covington Specialty Ins. Co.*, No. 3:15-CV-1087-D, 2017 WL 840977, at *5 (N.D. Tex. Mar. 3, 2017).

has leaned heavily on this manufactured 'scheme,' recycling its ***defamatory*** allegations throughout almost every ***pleading*** filed.") (emphasis supplied); *id.* ¶ 45. As such, no liability can attach to these statements, even if they were made with fraudulent intent. *See Laub*, 979 S.W.2d at 691-92; *Martinez*, 681 Fed. App'x at 329.

Second, the CTS Defendants' counterclaim is, in substance, a defamation claim, which is expressly barred by the judicial proceedings privilege. Although the CTS Defendants label their claim as "tortious interference with prospective business," the counterclaim repeatedly makes clear the essence of its claim is that RCH defamed Wood and that Wood suffered defamation-like damages. *See, e.g.,* ECF No. 46 p. 2 ("RCH . . . weav[ed] a salacious and defamatory story . . . to drag Counterclaimants' names through the mud with fabricated stories."); *id.* ¶ 38 (asserting RCH's lawsuit "repeatedly maligns the character of Mr. Wood"); *id.* ¶ 40 (asserting RCH's claims are "defamatory allegations"); *id.* ¶ 44 ("RCH's pleadings . . . are both defamatory and extremely damaging."); *id.* ¶ 48 ("RCH . . . intentionally damage[d] their reputations and businesses in the process."); *id.* ¶ 50 (alleging the CTS Defendants suffered business injury "[a]s a direct result of RCH's defamatory allegations"); *id.* ¶ 51 ("In addition, because of RCH's fabrications and slanderous allegations, Counterclaimants" lost money). To permit the CTS Defendants to assert a defamation claim simply because they labeled it a "tortious interference" claim would directly contradict *Bird* and *Martinez*. *See Bird*, 868 S.W.2d at 771-72; *Martinez*, 681 Fed. App'x at 327.

Third, the purpose of the judicial proceedings privilege requires the Court to immunize RCH's statements. The judicial proceedings privilege protects the public by encouraging claimants to freely haul wrongdoers into court. *Laub*, 979 S.W.2d at 689 ("The proper administration of justice requires full and free disclosure from witnesses unhampered by fear of retaliatory lawsuits."); *cf. Bird*, 868 S.W.2d at 771-72. Securities fraud threatens the public:

"There is a strong public policy in favor of private enforcement of the nation's securities laws." *Basic, Inc. v. Levinson*, 458 U.S. 224, 230-31 (1988). Thus, to permit Wood to pursue a defamation action against RCH, on no basis other than the lawsuit RCH has filed suit against him, would sanction retaliation and discourage the filing of securities actions. Texas law requires dismissal of such a claim "regardless of the negligence or malice" with which RCH allegedly made its statements. *Patterson v. Marcantel*, No. 09-16-00173-CV, 2017 WL 4844514, at *17 (Tex. App.—Beaumont Oct. 26, 2017, no pet.).

      2.    The CTS Defendants Have Failed to Allege that RCH Prevented the CTS Defendants From Forming Any Business Relationship.

To state a claim for tortious interference with prospective business, the plaintiff must allege that the defendant **prevented** the plaintiff from forming a business relationship:

> 'A claim for prospective interference cannot stand where the plaintiff is able to consummate a contract with another party.' . . . This appears to mirror the requirement under Texas law that the business relationship be *prevented*. . . . '[I]t is irrelevant that the plaintiff could have realized a better deal 'but for' the actions of the defendant because the term 'potential' contractual relations does not mean 'full' contractual relations.'

*U.S. Enercorp., Ltd. v. SDC Montana Bakken Exploration, LLC*, 966 F. Supp. 2d 690, 702-03 (W.D. Tex. 2013) (emphasis in original) (quoting *BCD LLC v. BMW Mfg. Co., LLC*, 360 Fed. App'x 428, 436 (4th Cir. 2010)). Here, the CTS Defendants have failed to allege that RCH prevented them from forming a business relationship. Instead, the CTS Defendants alleged that RCH caused the CTS Defendants to complete deals on less favorable terms. *See* ECF No. 46 ¶ 60 (alleging the harm as "hav[ing] had to renegotiate these pending transactions on less favorable terms"). As a matter of law, this is insufficient to state a claim for tortious interference with prospective business relationship. *U.S. Enercorp., Ltd.*, 966 F. Supp. 2d at 704 ("[P]leading, in other words, that a contract did not end up being as beneficial as the plaintiff had hoped—does not

satisfy the requirement that a business relationship be *prevented*.") (emphasis in original); *BCD LLC*, 360 Fed. App'x at 436.

### III. Conclusion

For the foregoing reasons, RCH respectfully submits that it is entitled to judgment on the CTS Defendants' Original Counterclaims (ECF No. 46).

Dated: June 21, 2018

                                                  Respectfully submitted,

                                                  */s/ Andrew B. Ryan*
                                                  Andrew B. Ryan
                                                  State Bar Card No. 24054464
                                                  **RYAN LAW PARTNERS LLP**
                                                  3811 Turtle Creek Blvd., Suite 780
                                                  Dallas, Texas 75219
                                                  T: (214) 347-7360
                                                  F: (888) 594-6240
                                                  andy@ryanlawpartners.com

                                                  R. Dean Gresham
                                                  State Bar Card No. 24027215
                                                  L. Kirstine Rogers
                                                  State Bar Card No. 24033009
                                                  **STECKLER GRESHAM COCHRAN PLLC**
                                                  12720 Hillcrest Road, Suite 1045
                                                  Dallas, Texas 75230
                                                  T: (972) 387-4040
                                                  F: (972) 387-4041
                                                  dean@stecklerlaw.com
                                                  krogers@stecklerlaw.com

                                                  Mazin A. Sbaiti
                                                  State Bar Card No. 24058096
                                                  **SBAITI & COMPANY PLLC**
                                                  1201 Elm Street, Suite 4010
                                                  Dallas, Texas 75201
                                                  T: (214) 432-2899
                                                  F: (214) 853-4367
                                                  MAS@SbaitiLaw.com

                                                  *Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

    I hereby certify that on June 21, 2018, a true and correct copy of the foregoing document was served on counsel for all parties via the Court's ECF system.

                                            */s/ Andrew B. Ryan*
                                            Andrew B. Ryan