IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ROYALTY CLEARINGHOUSE, LTD., | § § | JURY TRIAL DEMANDED |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 1:16-cv-1342-LY |
| CTS PROPERTIES, LTD., CTS MANAGEMENT, LLC, AND SCOTT Y. WOOD, | § § § § § | |
| Defendants. | § | |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON ITS BREACH OF CONTRACT CLAIM**

Royalty Clearinghouse, Ltd. ("RCH") respectfully submits this Motion for Partial Summary Judgment on its Breach of Contract Claim (the "Motion") against CTS Properties, Ltd. ("CTS") and CTS Management, LLC ("CTS Management"; collectively, the "CTS Defendants").[1]

### I.   INTRODUCTION

This is a financial fraud case. RCH alleges that because the CTS Defendants represented—both orally and in writing—that CTS had good title to the Royalty Interests, RCH paid $17.5 million for unencumbered title to the assets. Unbeknownst to RCH, the Royalty Interests were encumbered—by $350 million in bank debt owed by a company related to the CTS Defendants,

---

[1] On August 11, 2017, RCH filed its Motion for Partial Summary Judgment on its Breach of Contract Claim (ECF No. 30). On November 3, 2017, RCH filed its First Amended Complaint (ECF No. 47). Based on the amended complaint, the Court dismissed RCH's pending motion for summary judgment without prejudice (ECF No. 54). On December 12, 2017, the CTS Defendants filed a Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 61). In the motion to dismiss, the CTS Defendants admit that RCH alleges "no additional factual allegations." (ECF No. 61 at 5). Because RCH has not alleged new facts on its breach of contract claim, RCH is renewing its prior motion for summary judgment and hereby consolidates the briefing from its prior motion and reply (ECF Nos. 30 and 32) into this Motion and is relying on the evidence submitted and attached to both RCH's prior motion (ECF No. 30) and the CTS Defendants' prior opposition (ECF No. 31).

ERG Resources, LLC ("ERG").  ERG's debt gave its bank title to the Royalty Interests that was superior to the supposedly unencumbered title that CTS claimed to have conveyed to RCH.

At the March 28th hearing before the Court, the CTS Defendants nevertheless claimed that there was no fraud because RCH got what it paid for.  In support, the CTS Defendants assert that RCH and CTS agreed to a limited warranty of title that does not protect RCH from the encumbrances created by ERG's Bank debt.  But ERG's Bank claimed superior title to the Royalty Interests *through CTS*: the bank lawfully claimed that CTS transferred good title to ERG (and, through the Deed of Trust's after-acquired title clause, to the Bank) before CTS transferred the Royalty Interests to RCH.  And CTS's assignment to RCH states that CTS "does hereby *warrant and agree to defend title* to the Assigned Interest [the Royalty Interests] against *any and all persons* whomever *lawfully claim the same* or any part thereof *by, through, or under Assignor [CTS]*, but not otherwise."  Courts interpreting this "by, through, or under" language have consistently held that if the party claiming superior title can base its claim on actions by the grantor, then the grantor has breached its warranty of title.  Thus, the *purely legal question* is whether the warranty of title in the CTS-to-RCH Transfers is so limited that it excludes a claim by ERG's Bank that CTS gave it good title before CTS purported to transfer good title to RCH.  The CTS Defendants have no law—from Texas (where the transaction took place), from California (where the Royalty Interests are located), or anywhere else—that countenances the narrow reading of the CTS-to-RCH Transfers urged by the CTS Defendants.

Moreover, CTS breached a written representation in the parties' Purchase Agreement that Divorce Court approval was not needed for the CTS-to-RCH Transfers.  But Divorce Court approval was, in fact, needed: seven months before the CTS-to-RCH Transfers, the Divorce Court

entered an injunction prohibiting Mr. Wood from transferring the Royalty Interests without court approval.

CTS's broken promises have caused RCH millions of dollars in damages, but the exact amount of that damage is reserved for another day. In this Motion, RCH asks the Court to rule that CTS breached its contracts with RCH, which is clear from the undisputed facts currently known to all parties.

## II.     UNDISPUTED MATERIAL FACTS

On or about December 20, 2012, Mr. Wood filed for divorce from Ms. Wood in the 264th District Court of Harris County, Texas (the "Divorce Court") in Case Number 2012-74497 (the "Wood Divorce"). *See* **Exhibit A** to ECF No. 30 (Ryan Decl.) at ¶ 3 & Ex. A-1 (App. at 5-8).

On or about January 24, 2013, ERG signed a loan agreement and deed of trust (collectively, the "Original Credit Agreement") with a consortium of lenders led by CLMG Corp. (collectively, the "Bank"). *See* Exhibit A to ECF No. 30 (Ryan Decl.) at ¶ 4 & Ex. A-2 (App. at 9-33). The Original Credit Agreement required ERG to pledge collateral as security for the debt, including through an after-acquired title clause. *See id.* (App. at 12). ERG pledged both its current property and any future property it might acquire as collateral under the Original Credit Agreement. Specifically, ERG agreed that:

> Mortgagor [ERG] hereby grants to Agent [the Bank] …a security interest in the entire interest of the Mortgagor (whether now owned or hereafter acquired by operation of law or otherwise) in and to…all rights, titles and interests now owned or hereafter acquired by Mortgagor in any and all…documents, money, instruments,…investment property,…contract rights,…and all rights and privileges with respect thereto[.]

*See id.* (App. at 12).

On or about the date of the Original Credit Agreement and the Deed of Trust, CTS and CTS Management were equally owed by Mr. Wood and his wife, Tana Wood.  *See* **Exhibit B** to ECF No. 30 (Plato Decl.) at ¶ 10 (App. at 181).  Mr. and Mrs. Wood each owned 49.5% of CTS. *Id*. (App. at 181).  CTS Management owned the other 1% of CTS, but Mr. and Mrs. Wood each owned 50% of CTS Management.  *Id*.

On or about March 28, 2013, Ms. Wood filed a Motion for Temporary Orders in the Wood Divorce.  *See* Exhibit A to ECF No. 30 (Ryan Decl.) at ¶ 5 & Ex. A-3 (App. at 34-39).  On or about May 30, 2013, the Divorce Court held a hearing on Ms. Wood's Motion for Temporary Orders.  *See* Exhibit A to ECF No. 30 (Ryan Decl.) at ¶ 6 & Ex. A-4 (App. at 40).  On or about June 6, 2013, the Divorce Court granted Ms. Wood's request and entered Temporary Orders that prohibited Mr. Wood from taking the following actions:

> The temporary injunction granted below shall be *effective immediately* and shall be *binding on Petitioner [Scott Wood] and*/or Respondent [Tana Wood]; *on their agents, servants, employees, and attorneys*; and on those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise…
>
> *IT IS ORDERED that Petitioner [Scott Wood] and Respondent [Tana Wood] are enjoined from*:
>
> 6. Destroying, removing, *concealing, encumbering, transferring*, or otherwise harming or reducing the value of the property of one or both of the parties.
>
> 7. *Falsifying any writing* or record relating to the property of either party.
>
> ….
>
> 11. Selling, *transferring, assigning*, mortgaging, *encumbering, or in any other manner alienating any of the property of Petitioner [Scott Wood] or Respondent [Tana Wood]*, whether personalty or realty, and whether separate or community, except as specifically authorized by this order.

*See id*. (App. at 41-42) (emphasis supplied). In a section titled "*Duration*", the Temporary Orders state that the injunction "shall continue in force until the signing of the Final Decree of Divorce or until further order of this Court." *See id*. (App. at 43).

Through three property transfers on August 20, 2013, and one more one week later, Mr. Wood caused CTS to transfer the Royalty Interests to ERG (the "CTS-to-ERG Transfers"). *See* Exhibit A to ECF No. 30 (Ryan Decl.) at ¶ 7 & Exs. A-5, A-6, A-7, A-8 (App. at 46-76).

On January 20, 2014, CTS and RCH signed a contract for RCH to purchase the Royalty Interests (the "Purchase Agreement"). *See* Exhibit A to ECF No. 30 (Ryan Decl.) at ¶ 8 & Ex. A-9 (App. at 77-87). Under the Purchase Agreement, RCH agreed to pay CTS an immediate option fee of $500,000 (the "Option Fee"), which would be nonrefundable unless CTS breached the following representation (the "Seller's Representation"):

> **SELLER** [CTS] warrants and represents unto **BUYER** [RCPTX] that there are no Temporary or Permanent Orders entered in the divorce proceedings between Tana Wood and Scott Wood which require (i) an Order from the Court having jurisdiction of the divorce proceedings approving the sale of the Interests to **BUYER** or (ii) approval of Tana Wood, to such sale. **BUYER** and **SELLER** expressly understand, acknowledge and agree that a breach of the foregoing representation and warranty shall constitute a failure of title…and **BUYER** shall be entitled to refund of the Option Fee.

*Id*. (App. at 79) (emphasis in original).

RCH also agreed to pay an additional $17 million, representing the balance of the Purchase Price, if the parties completed the sale on or before January 29, 2014. *Id*. (App. at 183). On January 21, 2014, RCH paid the $500,000 Option Fee to CTS via wire transfer. *See* **Exhibit C** to ECF No. 30 (Zimmermann Decl.) at ¶ 3 & Ex. C-1 (App. at 185).

On January 29, 2014, in full compliance with its obligations under the Purchase Agreement, RCH wired the $17 million balance of the purchase price to CTS and completed its purchase of the Royalty Interests. *See* Exhibit C to ECF No. 30 (Zimmermann Decl.) at ¶ 4 (App.

at 183). That afternoon, at 2:46PM, Doug Lacey wrote: "Houston, we have touchdown. It [RCH's $17 million wire] has arrived. Thanks and congratulations." *See* Exhibit C to ECF No. 30 (Zimmermann Decl.) at ¶ 5 & Ex. C-2 (App. at 186-187).

On January 29, 2014, Mr. Wood, on behalf of CTS, signed CTS's transfer of the Royalty Interests to Royalty Clearinghouse (the "<u>CTS-to-RCH Transfers</u>"), which had an effective date of February 1, 2014. *See* Exhibit A to ECF No. 30 (Ryan Decl.) at ¶ 9 & Exs. A-10, A-11 (App. at 88-103). In the CTS-to-RCH Transfers, CTS warranted that it had good title to the Royalty Interests: "Assignor [CTS] does hereby warrant and agree to defend the title to the Assigned Interest [the Royalty Interests] against any and all persons whomever lawfully claim the same or any part thereof by, through or under Assignor [CTS], but not otherwise." *See id*. (App. at 100).

On February 6, 2014, at 8:53AM, the Divorce Court entered the Woods' Agreed Final Decree of Divorce (the "<u>Divorce Judgment</u>"). *See* Exhibit A to ECF No. 30 (Ryan Decl.) at ¶ 10 & Ex. A-12 (App. at 104-125). The Divorce Judgment "approve[d]" Mr. Wood's and Ms. Wood's Divorce Settlement (*id*. (App. at 105)), under which Mrs. Wood transferred her one-half ownership of CTS and CTS Management to Mr. Wood in exchange for cash consideration. *See* Exhibit A to ECF No. 30 (Ryan Decl.) at ¶ 11 & Ex. A-13 (App. at 126-130). The Divorce Judgment also dissolved the Temporary Orders, stating that: "IT IS ORDERED AND DECREEED that Petitioner [Mr. Wood] and Respondent [Mrs. Wood] are discharged from all further liabilities and obligations imposed by…the temporary order of this Court rendered June 6, 2013." *See id*. (App. at 122).

### III.   ARGUMENT AND AUTHORITIES

On this Motion, the Court need only decide two elements of Plaintiff's breach of contract claim: (1) performance or tendered performance by RCH; and (2) breach of contract by the

defendant. *See* ECF No. 27 at 34 (citing *Marquis Acquisitions, Inc. v. Steadfast Ins.*, 409, S.W. 808, 814 (Tex. App.—Dallas 2013, no pet.)).[2]

### A. Because ERG's Debt Attached to the Royalty Interests, CTS Breached its Warranty of Title to RCH.

#### 1. The CTS-to-ERG Transfers Caused ERG's Bank Debt to Attach to the Royalty Interests.

In January 2013, ERG executed the Original Credit Agreement and Deed of Trust with the Bank. (App. at 9-33). The Deed of Trust contained an after-acquired title provision: "Mortgagor [ERG] hereby grants to Agent [the Bank] …a security interest in the entire interest of the Mortgagor (whether now owned or hereafter acquired by operation of law or otherwise) in and to…all rights, titles and interests now owned or hereafter acquired by Mortgagor..." (App. at 12). Seven months later, ERG acquired title to the Royalty Interests through the CTS-to-ERG Transfers. (App. at 46-76). Thus, the CTS-to-ERG Transfers caused ERG's Bank debt to attach to the Royalty Interests. (App. at 12).

Under California law,[3] the Deed of Trust is a grant deed that transferred the title to the Royalty Interests that ERG acquired through the CTS-to-ERG Transfers directly to ERG's Bank. The essential element of a grant deed that undeniably transfers after-acquired title is the word "grant." *Klamath Land & Cattle Co., v. Roemer*, 12 Cal. App. 3d 613, 618 (Cal. Ct. App. 1970) (holding that a grant deed "unquestionably transfers an after-acquired title"). Courts also have

---

[2] The other two elements—a valid contract and damages—are not at issue in this Motion. RCH is not seeking summary judgment on any of its several damages components. *See* ECF No. 27 at 13 (correctly noting that RCH "seeks money damages equal to the greater of $17.5 million or the benefit-of-the-bargain lost because of Defendants' conduct; recovery of all money that in equity and good conscience belongs to it; exemplary damages; attorney's fees; and pre-and post-judgment interest."). And the CTS Defendants have conceded that the Purchase Agreement and CTS-to-RCH Assignments are valid contracts. *See id.* at 42, n.8.

[3] The Deed of Trust contains a California choice of law provision. In California, the doctrine of after-acquired title is partially codified in Cal Civ. Code § 1106 and continues in the common law. *Noronha v. Stewart*, 199 Cal. App. 3d 485, 490 (Cal. Ct. App. 1988) (citing 2 Miller & Starr, Current Law of California Real Estate (1977) Deeds, § 14:56, p. 588)).

held that the "now or hereafter acquired" clause in a security agreement applies to all types of after-acquired collateral, "even though they were not expressly stated in the security agreement." *See, e.g.*, *In re Vecco Constr. Indus., Inc.*, 9 B.R. 866, 877 (Bankr. E.D. Va. 1981) (citing *In re Newkirk Mining Co.,* 1 U.C.C. Rep. Serv. 468 (E.D. Pa. 1962)). The attachment occurs even if the lender does not file a new lien specifically listing the after-acquired property. *See, e.g.*, *Crow-Southland Joint Venture No. 1 v. N. Fort Worth Bank*, 838 S.W.2d 720, 724-25 (Tex. App.—Dallas 1992, writ denied).

Here, ERG's Deed of Trust uses the term "grant" to transfer to the Bank title to property that ERG acquired after execution of the Original Credit Agreement and Deed of Trust. (App. at 12). And the Deed of Trust uses the phrase "now or hereafter acquired," which makes clear that the Bank's lien attached as soon as ERG acquired title to the Royalty Interests. (App. at 12; *accord* CAL. CIV. CODE § 2883(a) (after-acquired title lien "attaches from the time when the party agreeing to give it acquires an interest in the thing")). ERG executed the Original Credit Agreement and Deed of Trust in January 2013. (App. at 9). The CTS-to-ERG Transfers were in August and September 2013 and backdated to June 2013—but either date is after ERG executed the Original Credit Agreement and Deed of Trust. *See* Exs. A-14, A-15, A-16, & A-17 (App. at 131-163). The CTS-to-ERG Transfers therefore caused ERG's Bank debt—and the corresponding Deed of Trust encumbering ERG's assets—to attach automatically to the Royalty Interests the minute Mr. Wood executed the back-dated transfers in violation of the Temporary Orders.[4]

---

[4]     The CTS Defendants have asserted that the ERG-to-CTS Transfers rescinded the earlier CTS-to-ERG Transfers. (ECF No. 32 at 13-14.) But any purported rescission could not remove the Bank's lien from the Royalty Interests. That is because, as a matter of law, the parties to a contract—here, CTS and ERG—cannot invoke rescission to the detriment of a third party, such as ERG's Bank. *Gill v. Rich*, 128 Cal. App. 4th 1254, 1264–65, 28 Cal. Rptr. 3d 52, 59–60 (Cal. 2005) ("[W]hen the rights of others have intervened and circumstances have so far changed that rescission may not be decreed without injury to those parties and their rights, rescission will be denied… Thus, there can be no rescission where the rights of third parties would be prejudiced.") (internal citations & quotations omitted); *accord Long v. Newlin*, 144 Cal. App. 2d 509, 512, 301 P.2d 271, 273 (1956) ("The effect of a rescission is to void the contract *ab initio*. …**although of course**, having held himself out as an apparent member of the partnership prior

2.  Because the Bank Claimed Title to the Royalty Interests Through CTS, CTS Breached its Warranty of Title to RCH.

The CTS-to-RCH Assignments contain a warranty of title. A "[w]arranty of title" is "[a] warranty that the seller or assignor of property has title to that property, that the transfer is rightful, and that there are no liens or other encumbrances beyond those that the buyer or assignee is aware of at the time of contracting." BLACK'S LAW DICTIONARY 1823 (10th ed. 2014). The CTS-to-RCH Assignments both state:

> Assignor [CTS] does hereby warrant and agree to defend title to the Assigned Interest [the Royalty Interests] against any and all persons whomever lawfully claim the same or any part thereof by, through, or under Assignor, but not otherwise.

The CTS Defendants counter that the CTS-to-RCH Assignments' "by, through, or under" language constitutes a special warranty deed. (ECF No. 28 at 10.) RCH agrees.[5] The CTS Defendants argue that the special warranty could not be breached "unless CTS created the defect or encumbrance at issue." (*Id*.) RCH disagrees. An assignment's "by, through, and under" language extends the warranty of title to any encumbrances created by the grantor or through the grantor's "knowledge and acquiescence." Rhonda S. Kaye, *Defects in Title Encompassed by Warranty of a Special Warranty Deed*, 98 A.L.R. 5th 665 (2017).

Here, CTS warranted to RCH that it had good title to the Royalty Interests—that no one could lawfully claim title superior to RCH by, through, or under CTS. ERG's Bank claimed

---

to rescission thereof, ***appellant is not excused from his liability to the creditors*** of the co-partnership.") (emphasis supplied).

5   The CTS Defendants also have claimed that the CTS-to-RCH Assignments function as a "grant deed." But a grant deed impliedly covenants "that the grantor has not previously conveyed an interest in the estate to any other person." *Am. Title Co. v. Anderson*, 52 Cal. Rptr. 24, 26 (Cal. Ct. App. 1975); *Citizens for Covenant Compliance v. Anderson*, 906 P.2d 1314, 1329 (Cal. 1995) ("[T]he grantor of a grant deed covenants that the grantor has made ***no other*** encumbrance or conveyance of the property conveyed.") (emphasis supplied). Therefore, even if the CTS-to-RCH Assignments were a "grant deed," the CTS Defendants breached the implied covenant against prior conveyances that attach to a grant deed by CTS's prior conveyance to ERG. *Fidelity Nat'l Title Ins. Co. v. Miller*, 264 Cal. Rptr. 17, 20-21 (Cal. Ct. App. 1989).

superior title to the Royalty Interests by, through, and under CTS—that CTS had given full, unencumbered title to ERG before it purported to transfer the same to RCH. CTS is the only common link in the title dispute between RCH and ERG's Bank. Thus, CTS breached its "by, through, or under" warranty. *See, e.g.*, *Stracka v. Peterson*, 377 N.W.2d 580, 584 n. 6 (N.D. 1985) ("A special warranty deed warrants title only against claims held by, through, or under the grantor, *or* against encumbrances made or suffered by her…Therefore, under a special warranty deed a grantor is liable if the grantee's ownership is disturbed by **some claim arising through an act of the grantor**.") (internal citations omitted) (emphasis supplied); *accord State Bank & Tr. of Kenmare v. Brekke*, 1999 ND 212, ¶ 14, 602 N.W.2d 681, 685 (N.D. 1999) ("The only 'title' instrument under which the Partnership could make an adverse possession claim under this statute is the unrecorded purchase memorandum the Partnership received from Brekke…We, therefore, conclude, **as a matter of law**, the Partnership's adverse possession claim against the Bank's title constituted a **breach of Brekke's special warranty** against claims against title by, under, or through himself.") (emphasis supplied).

Indeed, the cases previously cited by the CTS Defendants support RCH's Motion. The CTS Defendants have cited *Paul v. Houston Oil Co. of Tex.*, 211 S.W.2d 345 (Tex. App.—Waco 1948, writ ref'd n.r.e.), which is primarily a procedural case. But *Paul* rejects the CTS Defendants' argument that a special warranty deed constitutes notice to RCH that CTS's title might be defective: "It is true that this deed contains a special warranty but under the great weight of authority, such special warranty does not carry *any* notice of defects of title to the grantee." 211 S.W.2d at 356 (emphasis supplied).[6] Similarly, the CTS Defendants also have cited *Owen v.*

---

[6] The CTS Defendants have argued that because RCH did not know about ERG's Bank debt, RCH was a *bona fide* purchaser that suffered no injury because it could have voided the Bank's after-acquired title lien. (ECF No. 32 at 14-15.) But the public recording of a lien gives the lienholder superior title over a subsequent purchaser—even a *bona fide* purchaser ("BFP"). *See* CAL. CIV. CODE § 1214; *accord In re Harvey*, 222 B.R. 888, 893 (9th Cir. 1998)

*Yocum*, 341 S.W.2d 709 (Tex. App.—Fort Worth 1960, no writ). But *Owen* supports RCH. In *Owen*, the chain of title was as follows: Owen to Baggs; Baggs to Yocum; Yocum to Owen; Owen to Yocum. *Id*. at 710. When Baggs owned the property, he failed to pay a plumber who had worked on the property, so Baggs' plumber (Bates) filed a mechanic's lien. *Id*. at 710. But in the last deed from Owen to Yocum, Owen warrantied title "against every person whomsoever lawfully claiming **under me only**." *Id*. (emphasis supplied). The court held that Owen was not liable because "**he** did not create the Bates lien [the plumber's lien], nor did **anyone claiming under him create said lien**." *Id*. (emphasis supplied). Here, a party claiming through CTS—ERG—created the lien that impaired RCH's title. And the same executive—Mr. Wood—signed all documents related to the encumbrance: ERG's Original Credit Agreement and Deed of Trust (App. at 26), the CTS-to-ERG Transfers (App. at 48, 59, 68, & 74), the ERG-to-CTS Transfers (App. at 133, 143, 154, & 159), and the CTS-to-RCH Transfers (App. at 90, 102). Therefore, there is no question of material fact whether CTS breached its warranty of title as soon as it made the CTS-to-RCH Transfers: CTS could not warrant title to the Royalty Interests because ERG's Bank had superior title under the after-acquired title doctrine.

---

("Under California law, every conveyance of real property must be recorded in order to be valid against a BFP of the same property, who in good faith and for valuable consideration records first."). That is because a BFP cannot prevail if it "has actual or constructive notice of the other party's interest in the property." *In re Whiting*, 311 B.R. 539, 543 (Bankr. N.D. Cal. 2004) (internal quotations & citations omitted). And the Ninth Circuit is clear that, under California law, "recorded instruments…might evidence a competing claim of title to the real property in question" and therefore impart "constructive notice" to any alleged BFP. *See, e.g.*, *In re Probasco*, 839 F.2d 1352, 1354–55 (9th Cir. 1988) (collecting cases). Here, the Bank recorded its Deed of Trust against ERG in January 2013. *See* Ryan Decl. at Ex A-2; *accord* Wood Decl. at Ex. A-1. This means that ERG's Bank had superior title to the Royalty Interests. *In re Probasco*, 839 F.2d at 1354–55. Therefore, RCH was barred as a matter of law from asserting BFP status under California law—even though it did not have actual knowledge of ERG's Bank debt or the agreement. *See, e.g.*, ECF No. 18 at 15-17 (RCH's constructive notice of a recorded instrument is irrelevant to its fraud claim).

**B.     Although RCH Fully Performed its Obligations Under the Purchase Agreement, CTS Breached its Seller's Representation that CTS Could Transfer the Royalty Interests Without Divorce Court Approval.**

RCH fully performed its obligations under the Purchase Agreement. RCH paid the $500,000 Option Fee on January 17, 2014. (App. at 185). And it paid the balance of the purchase price, $17,000,000, on January 29, 2014. (App. at 183 & 186-187). Because RCH paid what it promised while CTS breached its Seller's Representation, RCH is entitled to partial summary judgment on its claim that CTS breached the Purchase Agreement.[7]

The Seller's Representation "warrants and represents unto **BUYER** that there are no Temporary or Permanent Orders entered in the divorce proceedings between Tana Wood and Scott Wood which require (i) an Order from the Court having jurisdiction of the divorce proceedings approving the sale of the Interests…" (App. at 79). Because CTS made the Seller's Representation on January 20, 2014, it was false when made.

The Divorce Court had entered Temporary Orders seven months prior, on June 6, 2013. (App. at 104). Those Temporary Orders remained in effect until February 6, 2014, approximately 2 ½ weeks after the Seller's Representation. (App. at 122). The Temporary Orders prohibited Mr. Wood from "***encumbering, transferring***, or otherwise harming or reducing the value of the property of one or both of the parties" and from "[s]elling, ***transferring, assigning***, mortgaging, ***encumbering, or in any other manner alienating any of the property of Petitioner [Scott Wood]***

---

[7]     The CTS Defendants have asserted that there is a fact question regarding whether CTS's breach was material. (ECF No. 32 at 11-13.) That is legally incorrect. When a contract specifies that certain acts constitute a breach and states the remedy for that breach, a plaintiff is not required to prove materiality. *See, e.g.*, *United States v. Mire*, 838 F.3d 621, 627 (5th Cir. 2016). By specifying both the breach (a misrepresentation of the Temporary Orders' terms) and the remedy (a refund of the Option Fee), RCH and CTS contracted around the general rule requiring materiality. *Capcor at KirbyMain, L.L.C. v. Moody Nat'l Kirby Houston S, L.L.C.*, 509 S.W.3d 379, 391-92 (Tex. App—Houston [1st Dist.] 2014, no pet.).

*or Respondent [Tana Wood]*, whether personalty or realty, and whether separate or community." (App. at 41-42) (emphasis supplied).

The CTS-to-RCH assignments transferred and assigned a community property asset—the Royalty Interests belonged to CTS, a company jointly owned by Mr. and Mrs. Wood. *See* Wood Decl. (ECF No. 32-1 at Appx003) ¶ 5. The CTS-to-RCH Assignments were signed by Mr. Wood on January 29, 2014, with an effective date of February 1, 2014. (App. at 88-103). Indeed, the CTS Defendants concede that *all* transfers of the Royalty Interests relevant here—the CTS-to-ERG Transfers, the ERG-to-CTS Transfers, and the CTS-to-RCH Transfers—were made *after* the Divorce Court had enjoined Mr. Wood from transferring community property. *See* Wood Decl. (ECF No. 32-1 at Appx003) ¶¶ 7, 12, 13. Thus, CTS breached the Seller's Representation because the Temporary Orders entered in the Wood Divorce required court approval to sell the Royalty Interests to RCH. And CTS agreed that "breach of the foregoing representation and warranty shall constitute a failure of title…and **BUYER** shall be entitled to refund of the Option Fee." (App. at 79).[8]

The CTS Defendants do not dispute any of these material facts. Instead, the CTS Defendants contend that although the CTS-to-RCH Transfers violate the Temporary Orders' specific prohibitions, the CTS-to-RCH Transfers fall under the Temporary Orders' general business carve-out, which authorized Mr. Wood "[t]o engage in acts…as necessary to conduct Petitioner's [his] usual business and occupation." *See* ECF No. 32 at 9-10. But the record

---

[8] The CTS Defendants have argued that Ms. Wood approved the CTS-to-RCH Transfers. (ECF No. 32 at 10-11.) But CTS breached the Seller's Representation regardless of whether Ms. Wood approved the CTS-to-RCH Transfers. For one thing, Ms. Wood did not give her approval until *after* CTS sold the Royalty Interests to RCH. Mr. Wood obtained Ms. Wood's approval of the sale on February 5, 2014 (ECF No. 32-1 Appx157-161), but CTS sold the Royalty Interests the week prior on January 29, 2014 (Wood Decl. (ECF No. 32-1 Appx004) ¶ 13). For another, the Seller's Representation represents that *neither* the Divorce Court *nor* Ms. Wood needed to approve the CTS-to-RCH Transfers. (Pl. App. 42.) And Mr. Wood never obtained the Divorce Court's approval for the CTS-to-RCH Transfers. Thus, Ms. Wood's approval of the CTS-to-RCH Transfers raises no question of material fact.

demonstrates that the CTS-to-RCH Transfers were done for a *personal* reason (to fund Mr. Wood's divorce obligations to Ms. Wood) not a business one.

The default statutory business carve-out for temporary orders "award[s] one spouse exclusive control of a party's usual business or occupation." TEX. FAM. CODE § 6.502. But Mr. Wood was not awarded exclusive control of CTS. Instead, Mr. Wood was authorized "[t]o *engage in acts*…as necessary to conduct [his] *usual business* and occupation." *See* ECF No. 30, Pl. App. 42 (emphasis supplied). Thus, the Temporary Orders' general business carve-out applies only if the CTS-to-RCH Transfers were part of Mr. Wood's "customary" "commercial enterprise carried on for profit." BLACK'S LAW DICTIONARY 1777 (10th ed. 2014) (defining "usual"); *id.* at 239 (defining "business").

Here, the record shows that there was no business purpose behind the CTS-to-ERG Transfers, the ERG-to-CTS Transfers, or the CTS-to-RCH Transfers. The CTS Defendants *concede* that the ERG-to-CTS Transfers (a prerequisite to the CTS-to-RCH Transfers) were not for profit. The ERG-to-CTS Transfers were "not a purchase" and instead were "assignment[s]…*at no value*"; indeed, between ERG and CTS, "[n]o value or consideration was *ever paid or received* for" the Royalty Interests. (ECF No. 32-1 (Appx163)) (emphasis supplied). Thus, the CTS-to-ERG Transfers, and the subsequent ERG-to-CTS Transfers, constitute nothing more than the shuttling of multimillion dollar securities between related companies for no consideration. By definition, this is not a commercial enterprise for profit: neither CTS nor ERG made any money (or even was trying to make any money) from the transactions.

Moreover, the purpose of the CTS-to-RCH Transfers was personal: to fund Mr. Wood's divorce from Ms. Wood. On February 5, 2014, Mr. Wood "advised Tana R. Wood that *his financing* of $15,000,000 ("Funds") was *obtained from CTS Properties Ltd.* through the sale of

certain royalties previously owned and reassigned by ERG Resources, LLC." *See id*. (emphasis supplied). As Mr. Wood stated: "In order to finance the ***payment required by the Divorce Settlement***, ***I decided*** to market the Royalty Interests for sale in early January 2014." *See* Wood Decl. (ECF No. 32-1 Appx003) ¶ 9 (emphasis supplied). The summary judgment evidence therefore demonstrates that Mr. Wood had CTS sell the Royalty Interests and distribute $15 million to him for his personal use (*i.e.,* paying Ms. Wood). And when a spouse directs a family-owned business to distribute cash for their personal use, a business carve-out does not protect the spouse.

In *Ortiz v. Ortiz*, No. 13-15-00556-CV, 2016 WL 6124642 (Tex. App.—Corpus Christi Oct. 20, 2016, no pet.), a husband and wife owned "several businesses" as their community property. *Id.* at *1. The trial court entered temporary orders restricting the husband's use of the family businesses for personal use, subject to a business carve-out that allowed Mr. Ortiz "to only engage in acts reasonable and necessary to conduct usual business and occupation." *Id*. The court held that the husband's cash payment to himself "was diverting company funds for his personal use." *Id.* at *3.

Here, Mr. Wood issued himself a $15 million distribution from CTS. *See* Wood Decl. (ECF No. 32-1 Appx003) ¶ 9. He then used CTS's $15 million—obtained from RCH—to pay his personal divorce obligations. So, just as Mr. Ortiz's cash distribution to himself was held to fall outside the temporary order's "usual business" carve-out, *Ortiz*, 2016 WL 6124642, at *3, Mr. Wood's authorization of the CTS-to-RCH Transfers falls outside the general business carve-out because the sale was for Mr. Wood's personal benefit.

  **C. As CTS's General Partner, CTS Management is Liable for CTS's Breaches of Contract.**

CTS is a limited partnership. CTS Management is CTS's general partner. *See* Exhibit B (Plato Decl.) at ¶ 10 (App. at 181). As its general partner, CTS Management is liable for CTS's

debts, including CTS's breaches of its contracts with RCH.  *See* TEX. BUS. ORG. CODE § 153.152 ("Except as provided by this chapter or the other limited partnership provisions, a general partner of a limited partnership has the liabilities of a partner in a partnership without limited partners to a person other than the partnership and the other partners.").

### IV.     Conclusion

Because there are no issues of material fact, RCH seeks a summary judgment that: (1) RCH tendered the performance required of it by the Purchase Agreement and CTS-to-RCH Assignments; (2) CTS breached the Seller's Representation in the Purchase Agreement; (3) CTS breached the warranty of title in the CTS-to-RCH Assignments; and (4) CTS Management is liable for the debts of CTS, including any liabilities related to CTS's breaches of contract.

Dated: June 21, 2018                                        Respectfully submitted,

*/s/ Andrew B. Ryan*_____
Andrew B. Ryan
State Bar Card No. 24054464
**RYAN LAW PARTNERS LLP**
3811 Turtle Creek Blvd., Suite 780
Dallas, Texas 75219
T: (214) 347-7360
F: (888) 594-6240
andy@ryanlawpartners.com

R. Dean Gresham
State Bar Card No. 24027215
L. Kirstine Rogers
State Bar Card No. 24033009
**STECKLER GRESHAM COCHRAN PLLC**
12720 Hillcrest Road, Suite 1045
Dallas, Texas 75230
T: (972) 387-4040
F: (972) 387-4041
dean@stecklerlaw.com
krogers@stecklerlaw.com

        Mazin A. Sbaiti
        State Bar Card No. 24058096
**SBAITI & COMPANY PLLC**
1201 Elm Street, Suite 4010
Dallas, Texas 75201
T: (214) 432-2899
F: (214) 853-4367
MAS@SbaitiLaw.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

    I hereby certify that on June 21, 2018, a true and correct copy of the foregoing document was served on counsel for all parties via the Court's ECF system.

        */s/ Andrew B. Ryan*
        Andrew B. Ryan