# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | |
|---|---|
| ROYALTY CLEARINGHOUSE, LTD. § | |
| Plaintiff, § | |
| V. § | 1:16-CV-1342-LY |
| § | |
| CTS PROPERTIES, LTD., CTS § | |
| MANAGEMENT, LLC, SCOTT Y. § | |
| WOOD, TANA R. WOOD, AND PLS, § | |
| INC., § | |
| Defendants. § | |

**REPORT AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

TO THE HONORABLE LEE YEAKEL
UNITED STATES DISTRICT JUDGE:

Before the court are Defendants CTS Management, LLC, CTS Properties, Ltd., and Scott Y. Wood's Motion to Dismiss (Dkt. #61); Defendant Tana R. Wood's Motion to Dismiss (Dkt. #73) and Second Motion to Dismiss (Dkt. #90), Defendant PLS, Inc.'s Motion to Dismiss (Dkt. #83), and related pleadings.[1] Oral arguments were heard from the parties on Dkt. #61 and #73 on March 28, 2018; Dkt. #73, #83, and #90 were filed after the March 28 hearing and the undersigned concluded a hearing on those motions was unnecessary. After reviewing the pleadings, the relevant case law, as well as the entire case file, and considering the arguments made at the hearing, the undersigned issues the following Report and Recommendation to the District Court.

---

[1] The Motions were referred by United States District Judge Lee Yeakel to the undersigned for a Report and Recommendation as to the merits pursuant to 28 U.S.C. § 636(b), Rule 72 of the Federal Rules of Civil Procedure, and Rule 1(d) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas.

1

**I.     BACKGROUND**

This case arises out of alleged financial fraud. In short, Plaintiff Royalty Clearinghouse, Ltd. ("RCH") alleges that Defendant Scott Y. Wood ("Mr. Wood") orchestrated a complex scheme to defraud RCH into purchasing certain mineral assets (the "Royalty Interests"). RCH, a Texas limited partnership and a successor-in-interest to RCPTX, Ltd., purchases oil and gas interests. Mr. Wood owns several entities, including Defendant CTS Properties, Ltd. ("CTS"), a limited partnership, and ERG Resources LLC ("ERG"). Defendant CTS Management, LLC ("CTS Management") is the general partner of CTS. At times relevant to this lawsuit, Mr. Wood co-owned these companies with his now former wife, Defendant Tana R. Wood ("Ms. Wood"). Defendant PLS, Inc. ("PLS") served as the oil and gas broker to market the Royalty Interests.

The undersigned previously issued a Report and Recommendation on the CTS Defendants and Ms. Wood's Motions to Dismiss RCH's Original Complaint, Dkt. #12 and #13, recommending that the District Court grant the Motions as to RCH's money had and received claims and deny the CTS Defendants' Motion as to the remaining claims. Dkt. #27. The District Court adopted that Report and Recommendation and dismissed RCH's money had and received claims without prejudice, with leave to amend. Dkt. #29. As a result, no claims remained live against Ms. Wood and she was terminated as a party on CM/ECF. RCH filed its Amended Complaint on November 3, 2017, asserting claims against all the original defendants, including Ms. Wood, and adding PLS as a defendant. Dkt. #47. The Clerk of Court issued a Notice of Correction, noting that the Amended Complaint lacked a Certificate of Service and noting that "[a]ny future amended complaint that adds a new case party must be traditionally filed rather than electronically."

The factual allegations in the Amended Complaint are virtually identical to those in the Original Complaint and thus have already been considered in great detail in the undersigned's previous Report and Recommendation. *See generally* Dkt. #27. The key factual difference is that PLS is now named as the oil and gas broker engaged by Mr. Wood to market the Royalty Interests. *See generally* Dkt. #61-1 (CTS Defendants' redline comparison of Original and Amended Complaint). The Amended Complaint adds new claims for actual and constructive fraudulent transfer against Mr. Wood and Ms. Wood, as well as for actual fraudulent transfer against PLS, in place of RCH's earlier money had and received claims.

Relevant here as to the fraudulent transfer claims against Mr. Wood and Ms. Wood are two transfers, referred to by RCH as the "Initial Divorce Transfer" and the "Subsequent Divorce Transfer." *See* Dkt. #47, ¶¶ 234-280. According to the Amended Complaint, RCH and CTS entered into a Purchase Agreement on January 20, 2014, under which RCH agreed to purchase the Royalty Interests from CTS for $17.5 million. Dkt. #47, ¶¶ 101-104. Briefly, RCH alleges that it was defrauded by the Purchase Agreement due to the misrepresented, encumbered nature of the Royalty Interests and that it had a claim (for TUFTA purposes) against the CTS Defendants immediately upon consummation of the purchase, though it did not suspect the alleged fraud until October 2015. *Id.* ¶ 198.

Shortly after the Purchase Agreement was entered, RCH alleges that CTS transferred at least $15 million of the $17.5 million purchase price to Mr. Wood, around January 21-29, 2014 (the "Initial Divorce Transfer"). *Id.* ¶ 240. Then, according to RCH, on February 6, 2014, Mr. Wood transferred the same $15 million to Ms. Wood as a part of their divorce settlement (the "Subsequent Divorce Transfer"). *Id.* RCH alleges that these transfers were made with the actual intent to hinder, delay, or defraud RCH, and that the circumstances surrounding the transfers

"reveal at least seven of the eleven badges of fraud," including that the transfers were made to insiders (Mr. Wood and Ms. Wood, who were married as well as business partners until their divorce became final on February 6, 2018); that CTS had been sued or threatened with suit before the Initial Divorce Transfer (via a threatened foreclosure action against ERG), that the Initial Divorce Transfer constituted substantially all of CTS's assets; and that the value of the consideration received by CTS or Mr. Wood was not reasonably equivalent to the $15 million in respective transfers to Mr. Wood or Ms. Wood. *Id.* ¶¶ 244-255. Further, RCH alleges that these facts also support a claim for constructive fraudulent transfer, arguing that CTS was insolvent at the time of the Initial Divorce Transfer due to its indebtedness to RCH for the fraudulent Royalty Interests transaction, that Mr. Wood was insolvent upon the Subsequent Divorce Transfer of the $15 million to Ms. Wood, and that no value or reasonably equivalent value was exchanged for either transfer. *Id*. ¶¶ 266-280.

     As to PLS, RCH alleges that of the $17.5 million paid by RCH to CTS for the Royalty Interests, approximately $350,000 was transferred to PLS around the time of the Initial Divorce Transfer and Subsequent Divorce Transfer (the "PLS Transfer"). Citing "at least six badges of fraud," RCH argues that the PLS Transfer was made with actual intent to hinder, delay, or defraud RCH. *Id.* ¶¶ 281-296. Citing a close personal relationship between Mr. Wood and PLS, RCH argues that CTS was insolvent when the PLS Transfer was made, PLS did not give reasonably equivalent value for the money it received because the broker has no right to be paid a commission or service fees for the allegedly fraudulent sale of the Royalty Interests, CTS and Mr. Wood absconded with the money after the transfer, PLS knew or should have known about Mr. Wood's divorce proceeding and settlement, PLS knew or should have known Mr. Wood and his related entities were insolvent due to the "looming" foreclosure action, and, relatedly, that

PLS knew or should have known that between the divorce settlement and the PLS transfer, CTS was paying out all or substantially all of its assets. *Id.*

This Report and Recommendation addresses all pending Motions to Dismiss brought by the CTS Defendants, Ms. Wood, and PLS in two groups, below. First, the undersigned addresses Ms. Wood's arguments as to improper and untimely service. Next, the undersigned addresses the Defendants' substantive arguments as to the fraudulent transfer claims.

## II.   MS. WOOD'S MOTIONS REGARDING INADEQUATE AND UNTIMELY SERVICE

In her Motion to Dismiss the Amended Complaint (Dkt. #73), Ms. Wood argues that RCH's claims against Ms. Wood urged in its Amended Complaint should be dismissed because RCH failed to timely or properly serve her with process.[2] In her Second Motion to Dismiss the Amended Complaint (Dkt #90), she argues that she was not properly served within the applicable statute of limitations and that RCH has not shown and cannot show good cause for its failure to timely serve her.

Rule 4(m) provides that if a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period. *Id.* Further, "[e]ven if the plaintiff lacks good cause, the court has discretion to extend the time for service." *Thrasher v. City of Amarillo*, 709 F.3d 509, 511 (5th Cir. 2013)(citing *Millan v. USAA Gen. Indem. Co.*, 546 F.3d 321, 325 (5th Cir. 2008). A discretionary extension may be warranted where the applicable statute of limitations would bar the refiled action or where the defendant is evading service or conceals a defect in attempted

---

[2] Ms. Wood also argues for dismissal under Rule 12(b)(6) in that Motion.

service. *Millan*, 546 F.3d at 325 (quoting FED. R. CIV. P. 4(m) Advisory Committee Notes (1993)).

Here, Ms. Wood was timely served with RCH's Original Complaint. *See* Dkt. #4, Dkt. #75 at 4, Dkt. #12. When Ms. Wood's earliest Motion to Dismiss (Dkt. #12) was granted and RCH's claims against her were dismissed, Ms. Wood was terminated as a party on CM/ECF. As a result, Ms. Wood did not receive notification via CM/ECF when RCH filed its Amended Complaint on November 3, 2017. The Clerk of Court issued a Notice of Correction, noting that the Amended Complaint lacked a Certificate of Service and noting that "[a]ny future amended complaint that adds a new case party must be traditionally filed rather than electronically."

Upon its eventual recognition that Ms. Wood had not received notice via CM/ECF, RCH requested issuance of summons on January 12, 2018 and attempted to serve Ms. Wood at home at her Houston address on January 26, January 29, and January 31, 2018. *See* Dkt. #72 at 3. On February 3, 2018, RCH's process server served a woman who appeared to be about 40 years old and represented herself to be Ms. Wood at Ms. Wood's Houston address.[3] *Id.* The process server signed his Affidavit of Service on February 12, 2018, and the document was filed on February 23, 2018. *Id.* In the interim, on February 16, 2018, counsel for RCH emailed Ms. Wood's counsel asking Ms. Wood to waive service but without complying with the other requirements of Rule 4(d). Dkt. #76 at 1 n.1. Ms. Wood's counsel responded, noting the 90-day delay and asked counsel to reconsider on the merits Ms. Wood's presence in this case. *Id.* RCH's counsel responded by withdrawing the request to waive service believing RCH's process server had properly served Ms. Wood on February 3, 2018. *Id.* Ms. Wood filed her Motion to Dismiss (Dkt.

---

[3] RCH also notes that the woman, who is apparently Ms. Wood's housekeeper, did not tell the process server that she did not reside at Ms. Wood's address. Ms. Wood disputes the veracity of the process server's affidavit, on several grounds. *See* Dkt. #76 at 2 n.2.

6

#73) arguing in part that she had not been properly served on February 26, 2018, and in response, counsel for RCH mailed a copy of the Amended Complaint to Ms. Wood.

Even if neither the mailing of the Amended Complaint by RCH's counsel nor RCH's process server's delivery to Ms. Wood's housekeeper constitutes proper service, an effective extension of the time for service is appropriate here. The parties agree that Ms. Wood was properly served on March 29, 2018 via Ms. Wood's executed waiver of service after the undersigned directed RCH to effect proper service as soon as possible at the March 28 hearing. Further, at the March 28 hearing, counsel for Ms. Wood represented that Ms. Wood was on notice of the Amended Complaint and articulated only one possible prejudice due to the delay in service: Ms. Wood was not a part of the conversation in choosing a mediator for then-upcoming mediation. The parties agreed at the March 28 hearing that this potential harm could be assuaged by continued conversation among all parties about mediation and the proper mediator. While the undersigned is sympathetic to Ms. Wood's frustration concerning RCH's failure to carefully comply with the Federal or Texas Rules of Civil Procedure, simply put, Ms. Wood has now been properly served with the Amended Complaint. These facts do not rise to the level of a "clear record of delay or contumacious conduct" characterized by "stubborn resistance to authority" that the Fifth Circuit has held to warrant dismissal with prejudice due to delay in effecting service. *See Millan*, 546 F.3d at 325-26. Accordingly, the undersigned recommends denying Ms. Wood's Motions (Dkt. #73 and #90) as to her service arguments.

### III.   THE 12(B)(6) MOTIONS TO DISMISS

#### A.  Standard of Review

When evaluating a motion to dismiss for failure to state a claim under Rule 12(b)(6) the complaint must be liberally construed in favor of the plaintiff and all facts pleaded therein must

be taken as true. *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). Although Federal Rule of Civil Procedure 8 mandates only that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief," this standard demands more than unadorned accusations, "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Bell Atl. v. Twombly*, 550 U.S. 544, 555-57 (2007). Rather, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id*. at 570. The Supreme Court has made clear this plausibility standard is not simply a "probability requirement," but imposes a standard higher than "a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The standard is properly guided by "[t]wo working principles." *Id*. First, although "a court must 'accept as true all of the allegations contained in a complaint,' that tenet is inapplicable to legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678. Second, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Thus, in considering a motion to dismiss, the court must initially identify pleadings that are no more than legal conclusions not entitled to the assumption of truth, then assume the veracity of well-pleaded factual allegations and determine whether those allegations plausibly give rise to an entitlement to relief. If not, "the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to relief.'" *Id*. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

To the extent a complaint alleges claims sounding in fraud, Federal Rule of Civil Procedure 9(b) requires that plaintiffs go a step beyond the typical pleading standard: the underlying factual circumstances must be pleaded "with particularity." FED. R. CIV. P. 9(b). "Put simply, Rule 9(b) requires 'the who, what, when, where, and how' to be laid out." *Benchmark Elecs. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (citing *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 179 (5th Cir. 1997)). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." While "particularity" varies with the circumstances of each case, Rule 9(b) generally requires specificity of the time, place, contents, and the identity of the person making false representations. *Benchmark Elecs., Inc.*, 343 F.3d at 724; *WMX Techs., Inc.*, 112 F.3d at 179 (requiring the "who, what, when, where, and how" of the alleged fraud be stated).

RCH asserts two types of claims under the Texas Uniform Fraudulent Transfer Act ("TUFTA"), Tex. Bus. & Com. Code §§ 24.001-24.013: actual intent fraudulent transfer against Mr. Wood and Ms. Wood, as well as against PLS, and constructive fraudulent transfer against Mr. Wood and Ms. Wood. The purpose of TUFTA "is to prevent fraudulent transfers of property by a debtor who intends to defraud creditors by placing assets beyond their reach." *Nwokedi v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191, 203 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). "In general, a determination of liability under TUFTA is a two-step process: first, a finding that a debtor committed an actual, fraudulent transfer," or "a constructive, fraudulent transfer;" and "second, recovery of that fraudulent transfer, or its value, from the transferees." *Spring St. Partners-IV, L.P. v. Lam*, 730 F.3d 427, 436 (5th Cir. 2013).

9

Under TUFTA, any obligation a debtor incurs "with actual intent to hinder, delay, or defraud any creditor of the debtor" may be voided, and a creditor may obtain "an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property[.]" TEX. BUS. & COM. CODE §§ 24.005(a)(1), 24.008(a)(3)(A). A plaintiff must satisfy three elements to establish a TUFTA claim: (1) a debtor-creditor relationship exists between the parties; and (2) the debtor incurred an obligation (3) with the actual intent to hinder, delay, or defraud the creditor. *Id.* § 24.005(a)(1)(actual intent fraudulent transfer). TUFTA also supplies a "non-exclusive list of eleven factors, commonly known as 'badges of fraud,' that courts may consider in determining whether a debtor actually intended to defraud creditors" under this provision. *Spring St. Partners-IV, L.P.*, 730 F.3d at 437 (quoting *In re Soza*, 542 F.3d 1060, 1066 (5th Cir. 2008)). A single badge of fraud is not enough to find a fraudulent transfer occurred, but a few badges together can support an inference of actual fraudulent transfer. *See In re Soza*, 542 F.3d at 1066–67. As an alternative to the "actual intent" element, a TUFTA claim may also be premised on the *constructive* fraud of the debtor that, without receiving reasonably equivalent value in exchange for the transfer, engaged in a transaction for which its remaining assets were unreasonably small or that intended to incur debts beyond its ability to pay as they came due. *See* § 24.005(a)(2); *see also Fawaz v. Byers*, No. H-13-0897, 2014 WL 6473272 at *4 (S.D. Tex. Nov. 17, 2014). A transferee may also be liable unless she can show that she "accepted the transfers in good faith and for reasonably equivalent value." *Id.* (citing § 24.009(a)); *Hahn v. Love*, 321 S.W.3d 517, 526 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

### B. Analysis

As a threshold matter, the CTS Defendants, Ms. Wood, and PLS all argue that RCH's fraudulent transfer claims fail because RCH is not a "creditor" as contemplated by TUFTA. Dkt. #61 at 11-14; Dkt. #90 at 7; Dkt. #83 at 7. Defendants argue that because the Royalty Interests were not problematic to RCH until long after the Purchase Agreement (when the sale of ERG fell through and the Royalty Interests were foreclosed on), RCH did not yet have a claim at the time of the Initial Divorce Transfer, the Subsequent Divorce Transfer, or the PLS transfer. They further note that for other purposes in this suit, RCH has argued that its claims did not arise until 2015 and that it should now be judicially estopped from arguing otherwise for TUFTA purposes. RCH responds that because TUFTA broadly defines "claim" and differentiates between a "claim" for TUFTA purposes and the accrual of a cause of action, RCH is indeed a creditor with standing to sue for fraudulent transfer. *See, e.g.,* Dkt. #62 at 3.

TUFTA defines a creditor as a "person . . . who has a claim." TEX. BUS. & COM. CODE § 24.002(4). A "claim" is defined as a right to payment or property, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured. *Id.* § 24.002(3). Importantly, Texas courts and the Fifth Circuit have recognized that a plaintiff may be a creditor for TUFTA purposes before its cause of action accrues for statute of limitations purposes. *See Zahra Spiritual Trust v. United States*, 910 F.2d 240, 248 (5th Cir. 1990)("The Texas courts have given broad construction to the term creditor, so that [TUFTA] protects the holders of unliquidated unmatured contingent claims.")(internal quotations omitted). Moreover, TUFTA also allows for claims which arise "within a reasonable time after" the relevant transfers take place. TEX. BUS. & COM. CODE § 24.005(a).

The court has already recognized that RCH has plausibly stated a claim for fraud to which RCH may be entitled to recovery. Further, the undersigned concludes that for TUFTA purposes, that claim existed at the time the complained of transfers were made. On these alleged facts, RCH has pleaded that it is a creditor with a claim in a manner sufficient to survive the motions to dismiss.[4] Accordingly, the undersigned turns to Defendants' remaining substantive arguments.

1. *Actual Intent Fraudulent Transfer Claims against Mr. Wood and Ms. Wood*

In support of its actual intent fraudulent transfer claims against Mr. Wood and Ms. Wood based on the Initial Divorce Transfer and Subsequent Divorce Transfers RCH alleges seven badges of fraud: (1) the transfers were made to insiders; (2) CTS had been sued or threatened with suit before the transfers; (3) the transfers were of substantially all of CTS's and Scott Wood's assets respectively; (4) CTS removed assets through the transfer; (5) value of consideration was not reasonably equivalent; (6) CTS was insolvent at the time of the transfers; and (7) the transfers were made shortly after a substantial debt was incurred—i.e., repayment of the Purchase Price to Plaintiff for procuring it through fraud. Dkt. #47 at ¶¶ 244-55.

Generally, Defendants urge the court to accept that because Mr. Wood told RCH the Royalty Interests were being sold to fund his Divorce Settlement, it is inconsistent that RCH now brings claims asserting that the transfers were made with the intent to hinder, delay, or defraud RCH. Nevertheless, the CTS Defendants, at least, appear to concede that RCH has sufficiently pleaded that the Transfers were made to insiders and that the Transfers removed the assets. *See* Dkt. #61 at 18. On the other hand, Ms. Wood disputes that she was an insider at the time of the transfers because she ceased to be Mr. Wood's wife and business partner on the date of the

---

[4] Even under the alternative view urged by Defendants, that the claim did not exist for TUFTA purposes until the next calendar year, *see* Dkt. #47 at ¶ 198, the undersigned concludes that on these alleged facts, this is within the "reasonable time after" contemplated by the Act. *See* TEX. BUS. & COM. CODE § 24.005(a).

Subsequent Divorce Transfer. Dkt. #90 at 9. At this stage and based on the pleadings, the undersigned does not find this argument persuasive. Further, Ms. Wood's only argument as to the "removal of the assets" badge of fraud is that Mr. Wood was not a debtor at the time of the transfer (because she argues RCH was not a creditor at the time of the transfer). The undersigned has rejected this argument above. RCH has sufficiently pleaded these two badges of fraud. Further, the undersigned has concluded above that RCH has plausibly alleged that it was a TUFTA creditor at the time of the transfers based on the Purchase Agreement's alleged fraud. As a result, the undersigned also rejects Defendants' repeated arguments that RCH has not adequately pleaded that the transfers occurred shortly before or shortly after a substantial debt was incurred.[5] Accordingly, RCH has sufficiently pleaded at least three badges of fraud in support of a finding of actual intent to survive the Motions to Dismiss, and the undersigned recommends denying the CTS Defendants' and Ms. Wood's Motions as to the actual fraudulent transfer claims.

2. *Constructive Fraudulent Transfer Claims against Mr. Wood and Ms. Wood*

Defendants argue that RCH "fails to offer anything more than []conclusory assertions" in support of its constructive fraud theory; that RCH has failed to sufficiently plead that the alleged debtor (CTS) "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small," or that it "intended to incur, or believed or reasonably should have believed that [it] would incur, debts beyond [its] ability to pay as they became due." Dkt. #61 at 20 (citing *Spring St. Partners*, 730 F.2d at 437); Dkt. #90 at 11. They note the Fifth Circuit recently affirmed a district court's dismissal of TUFTA claims due to insufficient allegations, where the Fifth Circuit found that the trustee in the case should have

---

[5] *See, e.g.,* Ms. Wood's argument that "this badge of fraud fails for the same reasons that RCH cannot establish that it was a creditor or that its claim arose before or shortly after RCH's alleged [fraud] claim arose." Dkt. #90 at 10.

been capable of making detailed references to financial data showing current or likely insolvency because the trustee had access to the company's financial books and records. *In re ATP Oil & Gas Corp.*, 711 F. App'x 216 (5th Cir. 2017). There, the allegation on which the TUFTA claim relied was that the company received "less than reasonably equivalent value in exchange for the 'improper and exorbitant cash bonuses' received by certain employees." *Id.* at 223.

Here, the allegations of insolvency when taken as a whole go well beyond those outlined in the *ATP* case. Further, this case is distinguishable; as RCH is not in the special position the *ATP* trustee was in to have broad access to the defendants' financial records at the pleading stage. RCH has alleged that CTS lacked any material assets other than the Royalty Interests (worth $17.5 million) and that the Royalty Interests were completely encumbered by ERG's debt ($350 million at the end of 2013). It has further alleged that CTS transferred $15 million from the sale of the Royalty Interests to Mr. Wood, who transferred it to Ms. Wood. RCH clearly has pleaded that CTS's liabilities exceeded its assets such that it has plausibly stated a claim for constructive fraudulent transfer.

Additionally, the undersigned does not find Ms. Wood's argument that the Subsequent Divorce Transfer was for the discharge of an antecedent debt, i.e., pursuant to the former couple's Divorce Settlement, persuasive. Although the facts before the court show that the Divorce Settlement was negotiated before the Subsequent Divorce Transfer, and thus could be considered antecedent, at this stage the facts do not support a conclusion that the transfer was pursuant to a "debt" in the sense argued by Ms. Wood.[6] On the contrary, it appears at this stage that the payment was made (1) to end Ms. Wood's partnership interest in CTS and its related entities and/or (2) as an equitable division of the Woods' marital estate. The Amended

---

[6] The undersigned recognizes on the other hand, that RCH characterizes this as a "debt" in its arguments against PLS. *See, e.g.,* Dkt. #88 at 6. ("Moreover, Wood had an outstanding debt to his soon to be ex-wife, which he himself said motivated his desire to quickly sell the Royalty Interests."). This is addressed below.

14

Complaint also adequately alleges at this stage that Ms. Wood had reason to believe Mr. Wood was insolvent. *See, e.g.,* Dkt. #47 at ¶¶ 262-63; 279. Finally, as to any good faith transferee argument as to Ms. Wood, *see* Dkt. #73 at 9, the argument is premature. RCH is not required to plead facts negating Ms. Wood's affirmative defenses in order to survive a motion to dismiss. *See Rostain v. Trustmark Nat'l Bank*, Civil Action No. 3:09-CV-2384-N, 2016 WL 8216509 at *6, (N.D. Tex. July 26, 2016)(holding that plaintiffs need not plead around affirmative defenses to avoid dismissal under Rule 12(b)(6) even after the Texas Supreme Court's recent constructive fraudulent transfer claims decision in *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560 (Tex. 2016)). For the foregoing reasons, the undersigned recommends denying the CTS Defendants' and Ms. Wood's Motions as to this claim.

3. *Actual Intent Fraudulent Transfer Claim against PLS*

In addition to its argument that RCH is not a "creditor" for purposes of fraudulent transfer rejected by the undersigned above, PLS further argues that RCH has failed to plead sufficient badges of fraud as to the PLS transfer to demonstrate actual intent and that even if RCH has pleaded sufficient badges of fraud, PLS was a good faith transferee such that it is insulated from recovery under TUFTA.

As to the PLS Transfer, RCH alleges six badges of fraud, as described above. Again, while a single badge of fraud is insufficient to support an inference of actual intent, a few badges together are sufficient. The undersigned has already concluded that the allegations that CTS was insolvent at the time of the transfer due to its debt to RCH pursuant to the alleged fraud of the purchase agreement are sufficient.[7] Further, RCH has adequately pleaded that CTS transferred

---

[7] RCH also argues that Wood's Divorce Settlement constituted a $15 million "debt Wood could not pay" which is a "substantial debt" incurred before the transfer. Dkt. #88 at 6 n.3. However, as to its constructive transfer claim against Ms. Wood, RCH argues that this is not a debt in arguing that the Subsequent Divorce Transfer was not made for reasonably equivalent value. Dkt. #94 at 4 ("A divorce decree is a division of *assets*. Thus, a husband does not

15

all or substantially all of its assets through the transfer, as PLS received $350,000, Ms. Wood received $15 million, and taken together these transfers were nearly all of the total purchase price. Additionally, RCH has adequately pleaded that CTS's transfer to PLS happened shortly after CTS incurred a substantial debt (the obligation to RCH due to the alleged fraud). The undersigned is also persuaded that the allegations that CTS and PLS enjoyed a close relationship, that PLS knew about Mr. Wood's motivations and alleged misrepresentations throughout the negotiations of the Purchase Agreement, and PLS's familiarity with the other "moving parts" of the alleged scheme are all circumstantial evidence of actual intent as to the PLS transfer. *See In re Soza*, 542 F.3d at 1066 (describing that TUFTA's eleven enumerated badges of fraud constitute a *non-exclusive* list of factors).

As to its assertion that it is otherwise a good faith transferee, PLS's argument is premature. As described above, RCH is not required to plead facts negating PLS's affirmative defenses in order to survive a motion to dismiss. *See Rostain*, 2016 WL 8216509 at *6. Accordingly, RCH has sufficiently pleaded its claim against PLS at this stage and the undersigned recommends denying PLS's Motion to Dismiss.

### IV.   RECOMMENDATIONS

For the foregoing reasons, the undersigned **RECOMMENDS** that CTS Management, LLC, CTS Properties, Ltd., and Scott Y. Wood's Motion to Dismiss (Dkt. #61); Defendant Tana R. Wood's Motion to Dismiss (Dkt. #73) and Second Motion to Dismiss (Dkt. #90), and Defendant PLS, Inc.'s Motion to Dismiss (Dkt. #83) all be **DENIED**.

---

"owe" his wife a *debt*.")(emphasis in original). RCH offers the court no insight into its logic in offering these seemingly disparate arguments. The undersigned accordingly gives no weight to this argument.

## V. OBJECTIONS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battles v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415 (5th Cir. 1996)(en banc).

SIGNED July 31, 2018

_____
MARK LANE
UNITED STATES MAGISTRATE JUDGE